UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 17-1464 _____          _____ Caption [use short title] _____

Motion for: Release Pending Appeal _____

_____

_____

Set forth below precise, complete statement of relief sought:

Mr. Litvak requests release on bail pending appeal

of his criminal conviction. He also requests that the Court          United States of America v. Jesse C. Litvak

temporarily stay his surrender date pending its decision

on this motion if the motion cannot be decided by

September 12, 2017.

_____

MOVING PARTY: Jesse C. Litvak _____          OPPOSING PARTY: United States of America _____

[ ] Plaintiff          [✓] Defendant

[✓] Appellant/Petitioner          [ ] Appellee/Respondent

MOVING ATTORNEY: Kannon K. Shanmugam _____          OPPOSING ATTORNEY: Jonathan N. Francis _____

[name of attorney, with firm, address, phone number and e-mail]

725 Twelfth Street, N.W.          157 Church St., 25th floor

Washington, DC 20005          New Haven, CT 06510

(202) 434-5050; kshanmugam@wc.com          (203) 821-3700; jonathan.francis@usdoj.gov

Court- Judge/ Agency appealed from: U.S. District Court for the District of Connecticut - Hon. Janet C. Hall

Please check appropriate boxes:          FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:

Has movant notified opposing counsel (required by Local Rule 27.1):          Has this request for relief been made below? [✓]Yes [ ]No
[✓] Yes [ ] No (explain):_____          Has this relief been previously sought in this court? [ ]Yes [✓]No
_____          Requested return date and explanation of emergency: _____
          Mr. Litvak has been ordered by the Bureau of Prisons to surrender on September 12, 2017.

Opposing counsel's position on motion:          _____
[ ]Unopposed [✓]Opposed [ ]Don't Know          _____
Does opposing counsel intend to file a response:          _____
[✓]Yes [ ]No [ ]Don't Know

Is oral argument on motion requested? [✓]Yes [ ]No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? [ ]Yes [✓]No If yes, enter date:_____

Signature of Moving Attorney:

/s/ Kannon K. Shanmugam  Date: 06/30/2017 _____          Service by: [✓]CM/ECF [ ]Other [Attach proof of service]

Form T-1080 (rev.12-13)

# 17-1464

## In the United States Court of Appeals for the Second Circuit

---

UNITED STATES OF AMERICA,
APPELLEE

*v.*

JESSE C. LITVAK,
DEFENDANT-APPELLANT

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF CONNECTICUT (CRIM. NO. 13-19)*
*(THE HONORABLE JANET C. HALL, C.J.)*

---

**MOTION FOR RELEASE PENDING APPEAL**

---

KANNON K. SHANMUGAM
DANE H. BUTSWINKAS
ALLISON JONES RUSHING
MENG JIA YANG*
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.*
*Washington, DC 20005*
*(202) 434-5000*

* Admitted in California and practicing law in the District of Columbia pending application for admission to the D.C. Bar under the supervision of bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

# TABLE OF CONTENTS

Page

Introduction.................................................................................................1

Statement ...................................................................................................3

Argument....................................................................................................8

I.    It is undisputed that Mr. Litvak poses no risk of flight or danger
to the community ...............................................................................9

II.   Mr. Litvak's appeal raises substantial questions likely to result in
reversal or a new trial .......................................................................9

    A.    The appeal raises substantial questions ...............................9

        1.    Materiality ................................................................9

        2.    Evidentiary rulings................................................18

    B.    A favorable ruling would lead to reversal or a new trial .............21

Conclusion.................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Appert* v. *Morgan Stanley Dean Witter, Inc.*,
    673 F.3d 609 (7th Cir. 2012)..........................................................16

*Basic Inc.* v. *Levinson*, 485 U.S. 224 (6th Cir.1988) ........................................10

*Feinman* v. *Dean Witter Reynolds, Inc.*,
    84 F.3d 539 (2d Cir. 1996) ..........................................................4, 15

*Gupta* v. *United States*, No. 12-4448, Dkt. No. 47 (2d Cir. 2012).....................22

*List* v. *Fashion Park, Inc.*, 340 F.2d 457 (2d Cir. 1965)....................................14

*Radiation Dynamics, Inc.* v. *Goldmuntz*,
    464 F.2d 876 (2d Cir. 1972) ..........................................................14

(i)

Page

Cases—continued:

*San Leandro Emergency Medical Group Profit Sharing Plan*
   v. *Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996) ...........................................17

*SEC* v. *Texas Gulf Sulphur Co.*,
   401 F.2d 833 (2d Cir. 1968) ....................................................................14

*United States* v. *Abuhamra*, 389 F.3d 309 (2d Cir. 2004) ...................................8

*United States* v. *Certified Environmental Services, Inc.*,
   753 F.3d 72 (2d Cir. 2014) ......................................................................20

*United States* v. *English*, 629 F.3d 311 (2d Cir. 2011).........................................8

*United States* v. *Garcia*, 340 F.3d 1013 (9th Cir. 2003).......................................22

*United States* v. *Randell*, 761 F.2d 122 (2d Cir. 1985) .................................9, 21

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013) .............................................10

*United States* v. *Weimert*, 819 F.3d 351 (7th Cir. 2016)......................................16

*Universal Health Services, Inc.* v. *United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ......................................................................10, 12

## STATUTES

15 U.S.C. § 78j(b) ...................................................................................3

15 U.S.C. § 78ff.........................................................................................3

18 U.S.C. § 1001 ......................................................................................3

18 U.S.C. § 1031 ......................................................................................3

18 U.S.C. § 3143(b).................................................................................8

Page

**MISCELLANEOUS**

United States Courts, *Judicial Business of the United States Courts*, tbl. B-4A (2016)..................................................................21

Pursuant to Federal Rule of Appellate Procedure 9(b) and 18 U.S.C. § 3143(b), defendant-appellant Jesse Litvak moves for an order granting continued release pending appeal.[1]

## INTRODUCTION

In this case—the first of its kind—the government prosecuted Jesse Litvak, a bond trader, for securities fraud based on statements he made during negotiations with professional investment fund managers. This case has appeared before the Court once before. *See United States* v. *Litvak*, 808 F.3d 160 (2d Cir. 2015). As was true in the first trial and appeal, this case continues to turn primarily on a single element of liability: specifically, whether misrepresentations made during negotiations that did not affect the value of the security transacted were material for purposes of securities fraud.

At the initial trial, the district court prevented the defense from presenting expert testimony central to the materiality issue. The jury convicted Mr. Litvak on all fifteen counts, and the court sentenced him to 24 months of imprisonment. After the district court denied his motion, this Court granted Mr. Litvak continued release pending appeal. The Court later reversed the convictions on five of the counts and ordered a new trial on the remaining counts

---

[1] If this motion cannot be decided before September 12, 2017, the date set for Mr. Litvak's surrender, *see* A247, Mr. Litvak respectfully requests that the Court temporarily stay the surrender date pending its decision on the motion.

(1)

in light of the erroneous evidentiary rulings that had crippled Mr. Litvak's materiality defense.

At the retrial, the government advanced the same flawed theory of materiality as it did at the initial trial. The jury acquitted on nine of the remaining ten counts, convicting only on one count concerning a single trade. In that transaction, the investment fund manager told Mr. Litvak at the outset the price he was willing to pay for the bond. In the course of negotiations, Mr. Litvak concededly misstated the price his firm paid to purchase the security. Despite that misstatement, the manager bought the bond he wanted at the price he had previously said he was willing to pay. The primary evidence that distinguished this count from the nine acquitted counts was testimony from the fund manager that he (incorrectly) believed that Mr. Litvak was acting as his agent. Remarkably, although Mr. Litvak was convicted only on this one count, the district court again sentenced him to 24 months of imprisonment—and again denied his motion for release pending appeal.

This Court should again grant Mr. Litvak continued release pending appeal. Throughout this protracted proceeding, the government has failed to articulate a valid theory of materiality regarding Mr. Litvak's statements. At the retrial, the government failed to present sufficient evidence of materiality with respect to the single trade underlying the sole count of conviction. And the district court again made erroneous evidentiary rulings bearing on the lack

2

of materiality, to the detriment of the defense. Each of those issues raises a substantial question likely to result in reversal or a new trial. Because Mr. Litvak's eligibility for release is otherwise undisputed, and because Mr. Litvak would serve much if not all of his sentence before this appeal is decided, the Court should grant Mr. Litvak continued release pending its review of his conviction.

## STATEMENT

The government initially charged Mr. Litvak with eleven counts of securities fraud, *see* 15 U.S.C. §§ 78j(b), 78ff; one count of fraud against the Troubled Asset Relief Program (TARP), *see* 18 U.S.C. § 1031; and four counts of making false statements on a matter within the jurisdiction of the government, *see* 18 U.S.C. § 1001.[2] A1-21. Specifically, the government alleged that, while transacting residential mortgage-based securities (RMBS) as a bond trader at Jefferies and Co., Mr. Litvak lied to the investment professionals with whom he traded about the portion of the transaction price that would represent a profit to Jefferies. There was no allegation that he misrepresented the nature or quality of the securities transacted. Because Mr. Litvak conceded that he had misstated the composition of the purchase price, this case has always hinged on whether those statements were material.

---

[2] The government based the Section 1001 and Section 1031 counts on the fact that the counterparties for some of the charged trades managed funds in which the Department of the Treasury invested as part of TARP.

3

At the initial trial, Mr. Litvak was convicted of all fifteen counts that went to the jury. A58-60. In an 84-page decision, however, this Court reversed the convictions on the false-statements and TARP-fraud counts, vacated the convictions on the securities-fraud counts, and remanded for a new trial. 808 F.3d 160. Regarding the false-statements and TARP-fraud counts, the Court held that, while the misrepresentations "may have been *relevant* to the Treasury, and even contrary to its interest in maximizing the [funds'] returns," that was not enough to prove that the misstatements "were reasonably capable of influencing a *decision* of the *Treasury*," as was necessary to prove materiality. *Id.* at 172, 174.

Regarding the securities-fraud counts, this Court recognized that materiality was the "central issue in the case." 808 F.3d at 182. The Court distinguished its earlier decision in *Feinman* v. *Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996), in which it had held misstatements concerning hidden commissions immaterial as a matter of law. 808 F.3d at 176-177. But the Court acknowledged that a jury could reasonably determine that "misrepresentations by a dealer as to the price paid for certain RMBS would be immaterial to a counterparty that relies not on a 'market' price or the price at which prior trades took place, but instead on its own sophisticated valuation methods and computer model." *Id.* at 183.

4

This Court proceeded to vacate the convictions on the securities-fraud counts and to remand for a new trial on those counts. 808 F.3d at 175. The Court held that the district court had abused its discretion by excluding expert testimony that would have been "highly probative" of materiality. *Id.* at 182. That included testimony about the "process by which investment managers value RMBS"; the "likely impact on the final purchase price of a broker's statements made to a counterparty during the course of negotiating a RMBS transaction"; the effect of "minor price variances" on sophisticated investors; the "arm's-length nature of the relationship between a broker-dealer and counterparty"; and the "significance of the agent/principal distinction in the RMBS context." *Id.* at 182, 185, 186, 187 (internal quotation marks and citations omitted). Without that testimony, the Court concluded, Mr. Litvak had little opportunity to show that his misstatements were immaterial to a reasonable investor—even if the alleged victims deemed them important in hindsight. *Id.* at 184.

The Court also held that the district court had abused its discretion by excluding evidence of "widespread use of similar negotiation tactics [by other employees] at Jefferies[,] which would have shown that others at Jefferies engaged in the same conduct and that it was approved by supervisors and by Jefferies' compliance department." 808 F.3d at 188 (internal quotation marks

and citation omitted). As the Court recognized, that evidence was relevant to proving Mr. Litvak's good faith and lack of fraudulent intent. *Id.* at 190.

A second trial followed. Testifying as the government's witnesses, the counterparties acknowledged that Mr. Litvak's statements did not concern the value of the securities. *See, e.g.,* A111 (Canter) (confirming that "[n]othing about the investment performance of these three bonds changed at all given what [the fund manager] later learned about Jefferies' actual acquisition cost"); A212 (Wollman) (agreeing that "Mr. Litvak didn't misrepresent anything about the . . . fundamentals of the product").

After deliberating for two weeks, the jury acquitted Mr. Litvak of nine of the ten remaining counts. *See* A234-235. The jury convicted only on one count, Count 4. Just like the acquitted counts, Count 4 involved a RMBS trade between Mr. Litvak and an investment fund manager, Brian Norris, who was acting on behalf of Invesco. *See* A17. Mr. Norris testified that, before Invesco engages in a trade, a "credit research team" aims to "determine the actual value of a bond at any particular price" and provides a report to the fund manager showing bond price points and corresponding yields. *See* A144-145, A179-180.

Armed with that information, Mr. Norris approached Mr. Litvak to purchase a specific bond identified by Invesco, which was up for sale that day in an auction. *See* A145. Mr. Norris told Mr. Litvak at the outset that "[Invesco]

can bid 79-24" for that bond. *Id.*[3]  Mr. Norris assumed that Invesco would pay

Jefferies a mark-up of 6 ticks on top of the bid, for a total price of 79-30.  *See*

A163-164.  That was the "price that [Invesco was] willing to pay for this par-

ticular bond" based on its own "internal analytics," A145, A162-163—though

Mr. Norris told Mr. Litvak Invesco could pay even more, stating that he had

"got some room, too," A146.  Mr. Litvak responded that he won the auction

after "bid[ding] [Norris's] level," even though Jefferies had in fact acquired

the bond for 79-16.  A147, A149.  Mr. Norris agreed to pay Jefferies 79-30 and

received the specific bond he sought to purchase.  *See* A149.  At trial, Mr. Nor-

ris conceded that, if Mr. Litvak had bid 79-24 as requested, Mr. Norris would

still have paid the price he had expected to pay all along—79-30.  *See* A164.

The total price Invesco paid reflected its independent valuation, as was the

case in all the trades on which the jury acquitted.  The primary factor that set

Count 4 apart was Mr. Norris's erroneous belief that Mr. Litvak was acting as

Invesco's agent in the trade.  *See* A146.

   Although Mr. Litvak was convicted on only one count, the district court

sentenced him to the same period of imprisonment as in the initial trial.  *See*

A70, A241.  In addition to the alleged loss stemming from Count 4, the court

considered the nine transactions underlying the acquitted counts and 66 other,

---

   [3] Bond traders measure prices in increments known as "ticks."  Each tick
equals 1/32 of a dollar (based on a $100 face value).  For example, the "30" in a
price of 79-30 refers to 30 ticks, meaning that the price is $79.9375.

uncharged transactions. *See* A237-238. The district court's "view of the evidence" was that "Mr. Litvak committed the nine crimes [for which he was acquitted] and that the other conduct [for which he was never charged] . . . [was] also criminal." A240. The court denied Mr. Litvak's motion for continued release pending appeal, finding no error in any of its prior rulings. *See* A256-265. Mr. Litvak filed a timely notice of appeal on May 3, 2017. *See* A245-246.

## ARGUMENT

A court shall order the release of a convicted defendant if it finds (1) "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and (2) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact" that is "likely to result" in reversal or a new trial. 18 U.S.C. § 3143(b). Once the defendant makes the requisite showing, "the statute establishes a right to liberty that is not simply discretionary but mandatory." *United States* v. *Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

This Court reviews de novo a district court's determination as to the existence of a substantial question for appeal. *See United States* v. *English*, 629 F.3d 311, 319-320 (2d Cir. 2011). Because it is undisputed that Mr. Litvak poses no risk of flight or danger to the community; his appeal raises substantial questions likely to result in reversal or a new trial; and he would otherwise

8

serve a substantial portion (if not all) of his sentence before his appeal is decided, the Court should once again grant Mr. Litvak continued release pending its review.

## I. IT IS UNDISPUTED THAT MR. LITVAK POSES NO RISK OF FLIGHT OR DANGER TO THE COMMUNITY

The government does not dispute that Mr. Litvak satisfies the first requirement for release pending appeal. *See* A248-254. The district court readily agreed, noting that Mr. Litvak "has been free on bail for the last four years, and there has been no indication that [he] was likely or intended to flee, or that he posed any risk to others in his community." A258.

## II. MR. LITVAK'S APPEAL RAISES SUBSTANTIAL QUESTIONS LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL

### A. The Appeal Raises Substantial Questions

A substantial question is "one of more substance than would be necessary to a finding that it was not frivolous," a "close question" or one "that very well could be decided the other way." *United States* v. *Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (internal quotation marks and citation omitted). This appeal raises substantial questions concerning the element of materiality and evidentiary issues relating to that element.

### 1. *Materiality*

The district court erred in holding that the evidence was sufficient to prove that the misrepresentation at issue in this case was material. The only

9

misstatements alleged here related to the portion of the transaction price that represented Jefferies' profit in the RMBS trades. Those statements were relevant only to negotiations over price; they had no effect on the valuation of the bonds. Such misstatements are immaterial to the reasonable investor where, as here, the counterparty determined in advance the price he was willing to pay for the bond and ended up paying that price, regardless of the misstatement. And even if such misstatements could be material, the government presented insufficient evidence of materiality to support conviction on the particular count at issue, Count 4.

In order to establish materiality, the government must prove beyond a reasonable doubt "a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision." *United States* v. *Vilar*, 729 F.3d 62, 89 (2d Cir. 2013). A misstatement is "important" if it would have "significantly altered the total mix of information made available" at the time of the transaction. *Basic Inc.* v. *Levinson*, 485 U.S. 224, 232 (1988) (internal quotation marks and citation omitted). As the Supreme Court recently clarified, "[u]nder any understanding of the concept, materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Services, Inc.* v. *United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (internal quotation marks and citation omitted).

10

     *a.    The government presented insufficient evidence of materiality. —* Assuming, *arguendo*, that misstatements such as Mr. Litvak's could be material in some circumstances, the government presented insufficient evidence of materiality in the trade underlying Count 4, and the district court erred in holding otherwise.  In that trade, Mr. Norris asked Mr. Litvak to purchase a specific bond and told Mr. Litvak the price that Invesco was willing to pay.  *See* A145.  As Mr. Norris explained at trial, the fund's main goal was to acquire long-term investments it had independently determined to be good value using its internal analytics.  *See* A171-172.  To that end, Mr. Norris disclosed Invesco's reservation price of 79-24 (and noted that he had "some room" to pay even more).  A146-147.

     Mr. Norris further assumed that Invesco would pay Jefferies a mark-up of 6 ticks on top of the bid of 79-24, for a total price of 79-30, A163-164, which was "comfortably within [Invesco's] yield target" for that particular bond. A169.  Mr. Norris thus testified that, if Mr. Litvak had actually submitted the 79-24 bid as he said he did, Invesco would have paid 79-30 for the bond.  A164. In the end, Invesco bought the exact bond it wanted for the exact price it had previously determined to pay.  Mr. Litvak's misstatement that he had "bid [Mr. Norris's] level" had no bearing on Invesco's decision to transact at that price.  A147.  In other words, the Count 4 evidence fell well short of proving

securities fraud, because Mr. Norris effectively conceded that the misstate-ment was immaterial. *See Universal Health Services*, 136 S. Ct. at 2002.

In that respect, Count 4 was indistinguishable from the nine acquitted counts. Taken together, the transactions at issue here show why a reasonable RMBS investor would consider misstatements like Mr. Litvak's to be immaterial. All of the transactions involved two sophisticated parties, negotiating at arm's length over the total price, each trying to maximize its profit. *See* A95-97 (Canter); A130 (Corso). Before approaching Jefferies about a particular bond, the counterparty fund had independently assessed the bond's value using complex quantitative modeling, and determined a price range for buying the RMBS. *See* A90-93, A101-106 (Canter); A122-123, A126-127 (Corso). Acting on that information, the fund manager paid a total price that reflected the bond's predetermined value. A107-112 (Canter); A128, A131-134 (Corso); A213-214, A217-218 (Wollman). Jefferies' acquisition cost had no bearing on the valuation or whether the bond made a good long-term investment. That determination depended on the relationship between the bond's total price and its anticipated returns, which in turn were based on a host of factors, including the characteristics of the mortgage debt underlying the bond. *See* A92-93 (Canter); A144-145, A179, A182-186 (Norris).

As with the acquitted counts, the government tried to prove materiality on Count 4 by presenting the fund manager's conclusory testimony that, in

12

hindsight, the misstatements were subjectively "important" to him.  *See* A149-150.  That is plainly insufficient, however, in light of Mr. Norris's admission that Invesco bought the bond it wanted at the price the fund had deemed it to be worth.  What matters for materiality purposes is not a particular fund manager's after-the-fact perception of the misrepresentations, but how a reasonable investor in the same circumstances would have viewed them.  *See* 808 F.3d at 184.

In this case, Mr. Norris's perception was tainted by a fundamental misunderstanding.  He testified that he believed that Mr. Litvak was Invesco's agent in the transaction and was therefore obligated to act in the fund's best interest.  *See* A146.  According to Mr. Norris, that is why he believed information volunteered by a trader during negotiations—information that he and other fund managers typically treated with caution.  *See* A112-118 (Canter); A136-137 (Lemin); A192 (Norris); A214-216 (Wollman).

As a matter of law, however, it is undisputed that Mr. Litvak was acting as a principal whose duty was to secure the largest profit for Jefferies.  *See* A229.  Unlike Mr. Norris, other fund managers knew they were dealing with Mr. Litvak as a principal.  *See* A95-97 (Canter); A130 (Corso).  Mr. Norris's belief was therefore not that of a reasonable investor.  Ultimately, the government failed to show either that a reasonable investor in Mr. Norris's situation

would have made the same mistake or that a reasonable investor who understood the relationship would have found the misrepresentations material.

     b.     *The misstatements were immaterial as a matter of law.* — More fundamentally, Mr. Litvak's misstatements were immaterial as a matter of law and therefore could not form the basis for a securities-fraud conviction. In the previous appeal in this case, the Court held that a rational jury could potentially find the misstatements material based on the evidence presented at the first trial. *See* 808 F.3d at 175-176. Mr. Litvak respectfully submits that the Court's conclusion was incorrect and, in any event, the Court's reasoning does not squarely apply to the second trial, where the counterparty for the only count of conviction determined (and disclosed at the outset) the price he was willing to pay for the bond and ultimately paid precisely that price, regardless of the misstatement.

     In assessing materiality, this Court has repeatedly defined a material fact as one capable of affecting the value of the security being transacted. *See Radiation Dynamics, Inc.* v. *Goldmuntz*, 464 F.2d 876, 888 (2d Cir. 1972) (approving of a jury instruction defining materiality in terms of the "effect [on] the value of the security" (internal quotation marks omitted)); *accord SEC* v. *Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc); *List* v. *Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965). For example, in *Fein-*

*man*, this Court held that misstatements that were relevant only to negotiations and not to the security's value were immaterial as a matter of law. *See* 84 F.3d at 541. Plaintiffs in that case alleged that brokerage firms charged them transaction fees that "far exceed[ed] the cost to the firms . . . and instead represent[ed] hidden, fixed commissions." *Id.* at 540. By concealing the commissions, the firms "prevent[ed] customers from negotiating the fees." *Id.* Holding that those misstatements were immaterial as a matter of law, the Court clarified that cases holding to the contrary had involved misrepresentations that "did, or at least had the potential to, cause the plaintiff financial harm" by affecting the value of the security transacted. *Id.* at 541.

In the previous appeal, the Court drew certain distinctions between *Feinman* and Mr. Litvak's case, but those distinctions were without a difference. While the brokers in *Feinman* misrepresented the true costs of handling trades, Mr. Litvak "was untruthful about the portion of each transaction's total cost that would be used to purchase securities and the portion that would be retained by Jefferies." 808 F.3d at 176. Moreover, the additional profits per transaction were smaller in *Feinman*, and the Court believed that "competition among the firms" in pricing their services could address any problem from misrepresentations. *Id.* at 176-177 (internal quotation marks omitted). But both the brokers in *Feinman* and Mr. Litvak claimed that a

15

certain portion of the total price—the fees and the bond purchase price, respectively—represented their transaction cost. Because the actual cost was lower, they understated the profit margin earned by the brokers and by Jefferies. In both cases, however, the investor knew the total price for the security and agreed to pay that price. And just as the investors in *Feinman* could choose among multiple brokers, Mr. Norris did not have to buy the bond from Jefferies. If Invesco thought it could get a lower price from another broker, it was free to trade with that broker instead.

In substance, therefore, *Feinman*'s reasoning—namely, that misstating a component of the total transaction price relevant only to negotiations is immaterial to a reasonable investor—applies with full force here. *See Appert* v. *Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 613 (7th Cir. 2012) (relying on *Feinman* in holding that "any alleged misrepresentation . . . that the stated [fee] was tied to actual costs was not *material* to investors' decisions to buy or sell securities"). Other courts have agreed with that principle. For example, as the Seventh Circuit recently held, "[d]eception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material," because "negotiating parties . . . do not expect complete candor about negotiating positions." *United States* v. *Weimert*, 819 F.3d 351, 358 (7th Cir. 2016).

16

The government's theory of materiality here was that counterparties would have negotiated for a lower price if they had known Jefferies' actual profit margin. But that is not the legally correct inquiry. Materiality does not turn on information that investors would simply like to know. Otherwise, all kinds of sales talk and puffery uttered during negotiations could be material simply because one party might have bargained harder if it had known the truth. Sales talk and puffery, however, are classic examples of immaterial statements on which a reasonable investor would not rely. *See, e.g., San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996). Likewise, sophisticated RMBS investors, knowing that traders are out to get the best deal and have access to information the buyers do not, are naturally skeptical of statements made by counterparties in arm's-length negotiations. *See* p. 13, *supra*. The district court erred by accepting the government's low baseline for materiality, and its decision threatens to extend the securities-fraud laws into novel contexts.

At a minimum, a misstatement about the broker-dealer's profit margin cannot be material where, as here, the counterparty has determined, and disclosed, the price he is willing to pay for the bond before the negotiation begins and then ultimately pays precisely that price for the bond, despite the intervening misstatement. Whether as a matter of law or as specific to the evidence

supporting Count 4, the materiality issue presents a substantial question for appeal justifying Mr. Litvak's continued release.

## 2. *Evidentiary Rulings*

The district court made two erroneous evidentiary rulings that directly affected the jury's determination of materiality. Those rulings, too, present substantial questions for appeal.

a. *The district court erroneously admitted 'agency' testimony.* — The defense sought to exclude testimony that Mr. Litvak served as the counterparties' agent. The government conceded that the parties traded as principals. A76-77. The district court agreed that Mr. Litvak was not "*actually* an agent of the counterparties" during the trades and instructed the jury accordingly. A77; A229. The court nevertheless ruled that investment fund managers could testify that they *perceived* Mr. Litvak to be their agent. A77. Subsequently, two fund managers, Mr. Norris and Mr. Joel Wollman, testified that they believed Mr. Litvak was acting as their agent in trading with them. A146 (Norris); A208-209 (Wollman).

The district court's paper-thin distinction between reality and perception was almost surely lost on the jury. The admitted testimony—which both parties agree was incorrect in its description of the broker-investor relationship—likely created the very danger this Court previously recognized with respect to the principal/agent distinction: namely, that the jury would be misled

18

into thinking that these were not arm's-length transactions and that Mr. Litvak's statements would have "great import to a reasonable investor if coming from the investor's *agent*." 808 F.3d at 187 & n.32. Attempting to capitalize on that risk in its closing argument, the government referred to a supposed "relationship of trust" between Mr. Litvak and the fund managers. *See* A227.

Even if the jury were able to distinguish between the reality of the relationship and the counterparty's mere perception of its relationship with Mr. Litvak, the counterparty's perception is irrelevant. A fund manager's misunderstanding that Mr. Litvak was his agent does not tend to show that a *reasonable* investor would have been similarly confused. The "agency" testimony risked drawing the jury's attention away from the objective inquiry and towards Mr. Norris's subjective expectation that Mr. Litvak would act in his best interest. Jurors may well have walked into deliberations thinking that Mr. Litvak's statements, coming from a perceived agent, affected Mr. Norris's decisionmaking, instead of considering whether the same statements would have influenced a reasonable investor. That may explain—indeed, it is the most plausible explanation—why the jury convicted on Count 4 and acquitted on nine other substantially similar counts. The district court's admission of "agency" testimony was a clear abuse of discretion and presents a substantial question for appeal.

19

*b.     The district court erroneously excluded evidence of industry practice.* — The defense sought to introduce evidence of widespread conduct identical to Mr. Litvak's at broker-dealers other than Jefferies. The district court refused to admit that evidence unless it revealed that investors like the ones in this case were aware that those traders were making misrepresentations. *See* A83-86. The court excluded any evidence that did not directly reflect the investors' knowledge as irrelevant and as "confusing, misleading, and prejudicial under Rule 403." A85. In the court's view, "this case is about Jesse Litvak" and "[t]here is little probative value to evidence that tends to show that the whole RMBS industry engaged in the kind of conduct for which Litvak has been indicted." A85.

Respectfully, the district court's reasoning is incorrect. Evidence need only have an "incremental effect" to be relevant. *United States* v. *Certified Environmental Services, Inc.*, 753 F.3d 72, 90 (2d Cir. 2014) (internal quotation marks omitted). Showing that the type of misrepresentation at issue here was pervasive in the RMBS industry—in which the counterparties were sophisticated players—makes it more likely that a reasonable investor would have known about the practice and discounted such representations by traders. This evidence served the same purpose as a defense expert's opinion that "a sell-side bond trader's statements, such as Litvak's, would be widely considered within the industry as 'biased'" and "unworthy of consideration in

trading decisions." 808 F.3d at 179, 182 (emphasis and internal quotation marks omitted). In its earlier opinion, this Court concluded that such expert testimony about the misstatements' "likely impact on the final purchase price" was relevant to the jury's view of materiality and had been erroneously excluded from the first trial. *Id.* at 182. The district court's exclusion of the evidence of industry practice, in disregard of this Court's earlier guidance, raises a substantial question for appeal.

### B. A Favorable Ruling Would Lead To Reversal Or A New Trial

To warrant release pending appeal, a substantial question must be one that, if it "is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed." *Randell*, 761 F.2d at 125 (internal quotation marks and citation omitted). A holding that Mr. Litvak's misrepresentations were immaterial as a matter of law, or alternatively, that the evidence was insufficient to prove materiality on Count 4 would compel reversal of Mr. Litvak's conviction. And because both flawed evidentiary rulings relate directly to materiality, a determination that the district court abused its discretion in making either ruling would warrant a new trial on Count 4.

*    *    *    *    *

Unless this Court orders his continued release, Mr. Litvak will have served much, if not all, of his sentence before his appeal can be resolved. *See*

21

Administrative Office of the United States Courts, *Judicial Business of the United States Courts*, tbl. B-4A (2016) (noting that the median time from notice of appeal to final disposition for criminal cases in this Court is 13½ months).  Given the length of the sentence, incarcerating Mr. Litvak "immediately upon conviction could substantially diminish the benefit he would ordinarily receive from an appeal."  *United States* v. *Garcia*, 340 F.3d 1013, 1019 (9th Cir. 2003); *see also United States* v. *Litvak*, No. 14-2902, Dkt. No. 41 (2d Cir. Oct. 3, 2014) (granting the motion for release pending appeal when the district court previously imposed a 24-month sentence in this case); *Gupta* v. *United States*, No. 12-4448, Dkt. No. 47 (2d Cir. Dec. 6, 2012) (granting a motion for release pending appeal where the district court imposed a 24-month sentence).  As in the previous appeal, this Court should have an opportunity to consider the substantial questions raised by this case before Mr. Litvak is sent to prison for conduct that may not have constituted a crime.

## CONCLUSION

The motion for release pending appeal should be granted.

Respectfully submitted,

/s/Kannon K. Shanmugam

KANNON K. SHANMUGAM
DANE H. BUTSWINKAS
ALLISON JONES RUSHING
MENG JIA YANG*
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.*
*Washington, DC 20005*
*(202) 434-5000*

JUNE 30, 2017

---

* Admitted in California and practicing law in the District of Columbia pending application for admission to the D.C. Bar under the supervision of bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellant and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 27(d), that the attached Motion of Defendant-Appellant is proportionately spaced, has a typeface of 14 points or more, and contains 5,135 words.

/s/Kannon K. Shanmugam
KANNON K. SHANMUGAM

JUNE 30, 2017

# Addendum

# TABLE OF CONTENTS

Page

1. Indictment, January 25, 2013................................................................A1

2. Expert Disclosure, December 24, 2013 .........................................A22

3. Pretrial Hearing Transcript, February 6, 2014 (excerpts) ...............................A42

4. Trial Transcript, February 26, 2014 (excerpts) ...............................A51

5. Trial Transcript, March 7, 2014 (excerpts)......................................A55

6. Sentencing Hearing Transcript, July 23, 2014 (excerpts) ...............................A63

7. Judgment, July 25, 2014 .........................................................A70

8. Order Granting Bail Motion, October 3, 2014 ...............................A74

9. Ruling Regarding Motions in Limine, June 28, 2016 (excerpts) ...................A75

10. Trial Transcript (Canter), January 5-6, 2017 (excerpts)...................................A89

11. Trial Transcript (Corso), January 9, 2017 (excerpts) ...................................A119

12. Trial Transcript (Lemin), January 10, 2017 (excerpts) .................................A135

13. Trial Transcript (Norris), January 10, 2017 (excerpts)..................................A138

14. Trial Transcript (Wollman), January 10, 2017 (excerpts)............................A207

15. Trial Transcript, January 13, 2017 (excerpts)..................................A225

16. Jury Charge, January 13, 2017 (excerpts) .....................................A228

17. Trial Transcript, January 27, 2017 (excerpts)................................A233

18. Sentencing Hearing Transcript, April 26, 2017 (excerpts)............................A236

19. Judgment, May 2, 2017 .........................................................A241

(i)

20. Notice of Appeal, May 3, 2017 ....................................................A245

21. Self-Surrender Letter, May 19, 2017 ............................................A247

22. Government's Opposition to Mr. Litvak's

    Motion for Release Pending Appeal, May 19, 2017 .....................A248

23. Order Denying Motion for Release Pending Appeal, June 6, 2017 .............A256

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
FILED

GRAND JURY N-12-3  2013 JAN 25  PM 4 46

U.S. DISTRICT COURT
NEW HAVEN, CT.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:13CR___ (___) |
| | : | |
| v. | : | VIOLATIONS: |
| | : | 15 U.S.C. §§ 78j(b), 78ff [Securities Fraud] |
| JESSE C. LITVAK | : | 18 U.S.C. § 1031 [TARP Fraud] |
| | : | 18 U.S.C. § 1001 [False Statements to the |
| | : | Government] |

INDICTMENT

The Grand Jury charges that at all times relevant to this Indictment:

The Defendant

1.    Defendant JESSE C. LITVAK, a licensed securities broker, resided in the State of New York and was a senior trader and managing director at Jefferies & Co., Inc. (referred to herein as "Jefferies"). LITVAK was hired by Jefferies on or about April 14, 2008 and was terminated on or about December 21, 2011.

2.    Jefferies is a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a Financial Industry Regulatory Authority ("FINRA") member firm. Jefferies is a global securities and investment banking firm, with headquarters in New York. Jefferies also has a trading floor in Stamford, Connecticut where LITVAK and other members of its Mortgage and Asset-Backed Securities Trading group worked.

3.    LITVAK specialized in trading certain types of residential mortgage-backed securities ("RMBS"), which are securities within the meaning of the federal securities laws.

The Victim-Customers

4.    LITVAK's victims are known by the Grand Jury to have been certain of Jefferies' customers.

**A1**

5.    LITVAK's victim-customers included funds established by the United States Department of Treasury's Legacy Securities Public-Private Investment Program ("PPIP"). PPIP was, and is, a part of the United States Government's Troubled Asset Relief Program ("TARP"), the Government bailout plan created in 2009 in response to the financial crisis.

6.    In March 2009, Treasury announced the creation of PPIP, the purpose of which was to purchase certain troubled real estate-related securities, including types of RMBS, from financial institutions to allow those financial institutions to free up capital and extend new credit.

7.    Beginning in late 2009, the Government used more than $20 billion of bailout money from TARP to fund Public-Private Investment Funds ("PPIFs"), which would purchase the troubled securities. The Government matched every dollar of private investment in a PPIF with one dollar of equity and two dollars of debt. Thus, 75% of each PPIF's money consists of taxpayer funds disbursed by the Government as part of its bailout plan through TARP.

8.    Each PPIF was established and managed by a Legacy Securities PPIP fund manager (a "PPIF Manager") selected by the Department of Treasury. Each PPIF Manager owed fiduciary duties to the investors that contributed money to its PPIF, which was primarily the Government.

9.    Each PPIF received between approximately $1.4 billion to $3.7 billion of bailout money.

10.    Under the rules of PPIP, a PPIF could buy or sell only certain types of RMBS, including the types of RMBS that LITVAK specialized in.

11.    The following six PPIFs are known by the Grand Jury to have been LITVAK's victim-customers (each a "TARP-Funded Victim"):

- 2 -

**A2**

a.      AG GECC PPIF Master Fund, L.P. (PPIF Manager: Angelo, Gordon & Co., LP);

b.      AllianceBernstein Legacy Securities Master Fund, L.P. (PPIF Manager: AllianceBernstein, LP);

c.      BlackRock PPIF, L.P. (PPIF Manager: BlackRock, Inc.);

d.      Invesco Legacy Securities Master Fund, L.P. (PPIF Manager: Invesco Ltd.);

e.      RLJ Western Asset Public/Private Master Fund, L.P. (PPIF Manager: RLJ Western Asset Management, LLC); and

f.      Wellington Management Legacy Securities PPIF Master Fund, LP (PPIF Manager: Wellington Management Company, LLP).

12.      In addition, the following non-PPIP entities or their affiliates, or funds or entities managed by or affiliated with them, are known by the Grand Jury to also have been LITVAK's victim-customers (each a "Privately-Funded Victim"):

a.      DE Shaw & Co.;

b.      DW Investment Management LP;

c.      EBF & Associates;

d.      Magnetar Capital;

e.      MFA Financial, Inc.;

f.      Monarch Alternative Capital;

g.      Oak Hill Capital;

h.      Pine River Capital Management;

i.      Putnam Investments;

  j.  QVT Financial;

  k.  Red Top Capital Investments;

  l.  Soros Fund Management LLC;

  m.  Third Point LLC; and

  n.  York Capital Management, LLC.

Other Relevant Persons

  13.  Supervisor #1 is known by the Grand Jury to have been one of LITVAK's supervisors at Jefferies.

RMBS Trading

  14.  RMBS are bonds comprised of large pools of residential mortgages and home equity loans. The RMBS owners receive payments on a monthly basis based on repayments from the homeowners that took out the mortgages or loans, until the homeowners repay their debt, refinance or default. Unlike stocks, RMBS bonds are not publicly traded on an exchange, such as the New York Stock Exchange or NASDAQ, and pricing information is not publicly-available. Instead, buyers and sellers of bonds use broker-dealers, like Jefferies, to execute individually negotiated transactions.

  15.  The unit at Jefferies that handles RMBS trading is known as the Mortgage and Asset-Backed Securities group, which employs traders and salespeople. In general, a trader, like LITVAK, specializes in particular kinds of RMBS or "sectors," while a salesperson is responsible for certain customers or "accounts."

  16.  RMBS bonds typically are sold in three ways:

  a.  from a broker-dealer's inventory, in which the broker-dealer like Jefferies is selling a bond that it has owned for a period of time;

- 4 -

A4

b.  as an order, in which the seller commissions the broker-dealer to seek a buyer, or the buyer commissions the broker-dealer to seek a seller, for a particular bond; or

c.  as part of a "bid list" or "BWIC" ("bids wanted in competition"), in which the seller circulates a list of specific bonds it is interested in selling so that the broker-dealer may seek a potential buyer willing to negotiate terms for the trade.

17.  Orders and bid list trades are considered "riskless" trades for broker-dealers like Jefferies because in those transactions broker-dealers merely act as match-makers, serving as a conduit for a bond to pass from a seller to a buyer.

18.  In orders and bid list trades, the buyer and the seller do not know each other's identity, but communicate exclusively through the broker-dealer's traders and salespeople.

19.  Buyers attempt to purchase bonds at the lowest price available in the market, and sellers try to sell bonds at the highest price available. This is called "best execution." Where a buyer does not obtain best execution, its investment will be less profitable than it would have been otherwise.

20.  A broker-dealer's profit, if any, on a set of trades is the difference or "spread" between the price it pays the seller and the price it charges the buyer. In the bond industry, prices are measured in 1/32s of a dollar, commonly referred to as "ticks." For instance, if a broker-dealer buys a bond for $65.25 (meaning $65.25 per $100 of current face value), the price would be expressed as "65 dollars and 8 ticks," "65 and 8" or "65-8." If the broker-dealer then sells that bond for $65.50 (meaning $65.50 per $100 of current face value), the price would be expressed as "65 dollars and 16 ticks," "65 and 16," or "65-16." The broker-dealer's profit on this set of trades would be $0.25 per $100 of current face value, or 8 ticks.

21. A customer can compensate a broker-dealer for a trade in one of two ways, either on an "all-in" or an "on-top" basis.

    a. In an "all-in" trade, the buyer agrees to a price without reference to the price the broker-dealer paid to the seller; the spread between the amount paid by the buyer and the amount paid to the seller is the broker-dealer's compensation.

    b. In an "on-top" trade, the buyer and the broker-dealer agree on a specific amount that is added to the price the broker-dealer paid to the seller; in other words, the broker-dealer's compensation is a commission added to the cost of the bond.

22. Inventory trades are usually "all-in" transactions, while bid lists are "on top" trades, and orders can be either depending on what the broker-dealer, buyer and seller negotiate.

### Jefferies' Codes of Conduct

23. Jefferies maintained (i) a Code of Ethics, (ii) Compliance and Supervisory Policies and Procedures for Mortgage & Asset-Backed Securities Sales and Trading Personnel, and (iii) Compliance and Supervisory Policies and Procedures for Fixed Income Sales and Trading Personnel.

24. In the section entitled "Fair Dealing," Jefferies' Code of Ethics stated that "[t]aking unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practice is a violation of the Code."

25. Both the Compliance and Supervisory Policies and Procedures for Mortgage & Asset-Backed Securities Sales and Trading Personnel and the Compliance and Supervisory Policies and Procedures for Fixed Income Sales and Trading Personnel include the following statement: "Traders should bear in mind that the anti-fraud provisions of the Exchange Act and

- 6 -

**A6**

the best execution provisions of FINRA-NASD rules continue to apply to all securities transactions, regardless of the customer's status, and that trading that is suggestive of abuse will not be permitted."

26.     Before and during the acts alleged in this Indictment, LITVAK completed acknowledgement forms certifying that he had "read, understood, complied and agree[d] to comply with" these policies.

COUNTS ONE through ELEVEN
Securities Fraud
15 U.S.C. §§ 78j(b), 78ff

The Scheme and Artifice

27.     The allegations set forth in paragraphs 1 through 26 of this Indictment are realleged and incorporated as though fully set forth herein.

28.     Beginning in approximately 2009 and continuing until approximately December 2011, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, LITVAK knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the mails, in connection with the purchase and sale of RMBS, would and did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (i) employing devices, schemes and artifices to defraud, (ii) making untrue statements of material facts and omitting to state material facts necessary to make the statements made not misleading in the light of the circumstances under which they were made and (iii) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit on purchasers and sellers of such RMBS.

29.    As a result of this scheme, LITVAK caused victim-customers to sustain losses of more than $2,000,000.

### Purpose of the Scheme and Artifice

30.    A purpose of LITVAK's scheme was to enrich Jefferies and himself by using materially false and fraudulent misrepresentations and omissions to take secret and unearned compensation from TARP-Funded Victims and Privately-Funded Victims on RMBS trades.

31.    LITVAK's supervisors at Jefferies, including Supervisor #1, established and communicated specific annual profit goals for the Mortgage and Asset-Backed Securities group. As LITVAK knew, his individual trading revenue was tracked by his supervisors and steadily declined each year—from a profit of more than $40,000,000 in 2009 to a loss of more than $10,000,000 in 2011.

32.    LITVAK's scheme increased the profitability of his trades.  For example, on or about June 22, 2011, LITVAK corresponded with a trader at another broker-dealer firm about a RMBS bond being offered via a bid list.  The approximate "on-top" compensation a broker-dealer can expect on a bid list transaction is between four ticks and eight ticks (between 4/32s and 8/32s per $100 of the bond's current face value).  In discussing the price that LITVAK hoped to induce a specific TARP-Funded Victim to pay for this bid list bond, LITVAK wrote "f this 4 - 8/32 sht [sic]," to which the other trader responded, "that doesnt feed anyone."

### Manner and Means of the Scheme and Artifice

The manner and means by which LITVAK sought to accomplish the scheme included, among others, the following:

33.    In certain order and bid list transactions:

       a.     where the buying victim-customer had agreed upon a specified commission "on top" of the price that Jefferies had negotiated with the seller of a RMBS bond, LITVAK would and did misrepresent to the buyer the price Jefferies had agreed to pay the seller, providing Jefferies with an extra and unearned profit at the buying victim-customer's expense; and

       b.     where the selling victim-customer had agreed upon a specified commission to be deducted from the price at which Jefferies had negotiated to sell a RMBS bond, LITVAK would and did misrepresent to the seller the price the buyer had agreed to pay to Jefferies, providing Jefferies with an extra and unearned profit at the selling victim-customer's expense.

34.     In certain sales of bonds from Jefferies' inventory, LITVAK would and did misrepresent to the buying victim-customer that the transaction was an order or bid list trade requiring "on top" compensation, providing Jefferies with an extra and unearned profit at the buying victim-customer's expense.

35.     LITVAK perpetrated this scheme by the use of means and instruments of interstate commerce and the mails in various ways:

       a.     LITVAK used electronic communications with victim-customers, including telephone, email, instant messages and electronic group "chats," to communicate false statements and misrepresentations with the intent and purpose of soliciting and negotiating fraudulent RMBS bonds trades;

       b.     LITVAK sent and caused to be sent to victim-customers trade confirmations or tickets documenting fraudulent transactions; and

     c.      LITVAK caused victim-customers to wire funds to Jefferies, and Jefferies to wire funds to victim-customers, to pay for fraudulent transactions.

Misrepresented Prices

36.     It was part of the scheme that LITVAK would defraud victim-customers buying RMBS bonds in bid list and order trades, where the victim-customers agreed to pay Jefferies specific amounts of compensation "on top" of the prices paid to the sellers, by misrepresenting the acquisition costs to be higher than the prices actually paid by Jefferies to the sellers, fraudulently increasing Jefferies' compensation on the transactions.

37.     For instance, on or about March 31, 2010, LITVAK executed his scheme in connection with the purchase by the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. of two RMBS bonds, HVMLT 2006-10 2A1A (the "HarborView Bond") and LXS 2007-15N 2A1 (the "Lehman Bond"), as follows:

     a.      On March 31, 2010 at approximately 10:32 a.m., the seller placed an order with Jefferies to sell these two bonds. The seller's offering price at that time was 58 on the HarborView Bond and 57 on the Lehman Bond.

     b.      At approximately 10:49 a.m., LITVAK approached the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. about buying these bonds, writing "wanted to give you first crack on em." The PPIF Manager asked for details, and LITVAK responded by misrepresenting the seller's offering prices as 59 on the HarborView Bond (instead of the actual offering price of 58) and 58-16 on the Lehman Bond (instead of the actual offering price of 57).

     c.      Between approximately 11:21 a.m. and 11:42 a.m., LITVAK and the PPIF Manager spoke by telephone.

- 10 -

**A10**

    d.      At approximately 11:42 a.m., LITVAK electronically communicated with Supervisor #1 as follows:

> alliance just bid me 58 on the 06-10s [the HarborView Bond]....i
> know he will pay us 4/32s if i tell him we have to pay 58-16.... he
> also bid us 57-16 on the lxs [the Lehman Bond]....i am thinking of
> telling him that one has to be 58-8 cuz its one of the bigger ones....

[Ellipses in original.]

    e.      At approximately 11:48 a.m., Supervisor #1 replied to LITVAK "boom! tell me when to go in."  In this context, "tell me when to go in" means when Supervisor #1 should intercede to buy the bonds from the seller.

    f.      At approximately 12:45 p.m., Supervisor #1 electronically communicated with the seller to confirm Jefferies was buying the HarborView Bond for 57-16 and the Lehman Bond for 56-16.  Supervisor #1 then described these prices to LITVAK as "layups."

    g.      At approximately 12:45 p.m., LITVAK misrepresented the state of negotiations with the seller to the PPIF Manager:

> ok big man....here is what i got from him...i beat him up pretty
> good.....but this is what he came back with:
> he will sell to me 20mm orig of hvmlt 0610 @ 58-00
> but he is being harder to knock back on the lxs bonds...said that he
> thinks that one is much cheaper yada yada yada....he told me he
> would sell them to me at 58-8 (30mm orig)......i would be fine
> working skinnier on these 2....but think you are getting good
> levels on these....let me know what you want to do big man....

[Ellipses in original.]

    h.      At approximately 1:14 p.m., the PPIF Manager responded by inquiring whether these would be "all-in" or "on-top" trades, asking "is he [the seller] paying u or am i?"

    i.      At approximately 1:21 p.m., LITVAK responded with additional misrepresentations:

- 11 -

**A11**

> all the levels i put in this [chat]room are levels he wants to sell to
> me...i tried to beat him up so i could get these levels to
> you.......but those are the levels he wants to sell to me...i will
> work for whatever you want on these...

[Ellipses in original.]

j.      The PPIF Manager replied back "gonna finish lunch first then re-run it all," and at approximately 1:24 p.m., LITVAK repeated and summarized his earlier misrepresentations:

> sounds good.....so to recap the levels he is offering to me:
> hvmlt 06-10 2a1a (20mm orig) @ 58-00
> lxs 40mm orig at 58-8

[Ellipsis in original.]

k.      At approximately 1:45 p.m., LITVAK told the PPIF Manager "bot em," indicating that LITVAK had purchased the HarborView Bond and the Lehman Bond. The PPIF Manager replied by proposing Jefferies not receive any compensation on (or "wash") the smaller HarborView Bond trade and add five ticks as compensation on the Lehman Bond trade. Approximately one minute later, LITVAK responded "thats fine."

38.      The AllianceBernstein Legacy Securities Master Fund, L.P. paid approximately $7,000,000 for the HarborView Bond and approximately $20,000,000 for the Lehman Bond.

39.      The seller did not offer to sell the HarborView Bond for 59, as LITVAK misrepresented to the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. In truth and in fact, as LITVAK knew, the seller's offer was actually 58.

40.      The seller did not offer to sell the Lehman Bond for 58-16, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, the seller's offer was actually 57.

- 12 -

**A12**

41.     LITVAK did not communicate to the seller the PPIF Manager's bids made between approximately 11:21 a.m. and 11:42 a.m., as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, all his statements about the seller's reaction to those bids were false.

42.     When LITVAK electronically communicated with the PPIF Manager after approximately 12:50 p.m., the seller was no longer seeking 58 for the HarborView Bond or 58-8 for the Lehman Bond, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, the seller had already agreed to accept lower prices.

43.     Jefferies did not pay the seller 58 for the HarborView Bond, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies paid 57-16.

44.     Jefferies did not pay the seller 58-8 for the Lehman Bond, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies paid 56-16.

45.     Jefferies did not work without compensation on the HarborView Bond trade, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, on this riskless trade, LITVAK took 16 ticks as compensation for Jefferies, or approximately $60,000.

46.     Jefferies did not work for five ticks of compensation on the Lehman Bond trade, or approximately $50,000, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, on this riskless trade, LITVAK took 61 ticks as compensation for Jefferies, or approximately $650,000.

<u>Misrepresented Inventory Trades as Orders or Bid List Trades</u>

47.     It was further part of the scheme that LITVAK would defraud victim-customers buying RMBS bonds held in Jefferies' inventory by misrepresenting those as orders and bid list trades with compensation for Jefferies "on-top," taking increased and unearned profits because, on inventory transactions, broker-dealers are not entitled to extra compensation in addition to the price paid. By doing this, LITVAK falsely portrayed himself to victim-customers as their ally in negotiations against non-existent sellers, rather than admitting that he was, in fact, negotiating directly against his victim-customers.

48.     To effect his scheme, LITVAK would invent a fictitious seller for a bond that Jefferies already had in its inventory and was seeking to sell to a victim-customer. LITVAK would then falsely describe the fictitious seller's offering price and reaction to LITVAK's negotiating tactics.

49.     For instance, on or about December 23, 2009, LITVAK executed his scheme in connection with the purchase by the PPIF Manager for the Wellington Management Legacy Securities PPIF Master Fund, LP of the RMBS bond WFMBS 2006-AR12 1A1 (the "Wells Fargo Bond"), as follows:

        a.      On or about December 14, 2009, LITVAK paid 70 (meaning $70 per $100 of current face value) for the Wells Fargo Bond, with an original face value of $6,230,000, for Jefferies' inventory.

        b.      On or about December 18, 2009, LITVAK first offered to sell Jefferies' Wells Fargo Bond to the Wellington Management Legacy Securities PPIF Master Fund, LP. LITVAK misrepresented that he had an order from a third party seller, writing "i have a guy that has 6+mm orig of wfmbs 06-ar12 1a1…my guy would sell to me at 77…. [ellipses in original.]"

- 14 -

**A14**

The PPIF Manager bid 74, and LITVAK responded by describing his communications with the fictitious seller:

> i will reflect that in big man and see what he says….
> at this point…he really wants me to work it longer (i just got the bonds this am to work)….so he actually gave me the ol "just keep working em at 77" rap…..didnt even give me any room off 77…..fck [sic]
> he appreciates it…but has some internal conversations about where he told them he can sell it and at 75 he would not be looking good internally is what he said….
> i thought i could work him over…but he is kind of being a weenie

[Ellipses in original.]

c.     On or about December 23, 2009 at 7:46 a.m., LITVAK approached the PPIF Manager for the Wellington Management Legacy Securities PPIF Master Fund, LP again, asking for information about another trade and suggesting "maybe i can use that as leverage to go beat the guy up that owns the 06-ar12 1a1 bonds….as of last nite it sounded like he was starting to warm up to the idea of coming off his level [ellipsis in original]."

d.     At approximately 7:48 a.m., the PPIF Manager expressed interest, asking "what's the current size and offer on the 06-ar12 1a1 again?" Approximately one minute later, LITVAK responded "it's 3+mm current and he was offering them at 77….. [ellipsis in original.]"

e.     At approximately 8:14 a.m., LITVAK updated the PPIF Manager by making further misrepresentations about the fictitious seller, writing "he is still red-dotted….usually rolls in around now…..so should know soon brotha….. [ellipses in original.]" ("Red-dotted" in this context means that the fictitious seller was unavailable to participate in electronic communications.)

f.     At approximately 8:46 a.m., LITVAK misrepresented to the PPIF Manager that he had concluded negotiations with the seller at a price that would result in a four-tick profit to Jefferies, writing "winner winner chicken dinner……he is gonna sell em to me at

75-28 as i told him to not get cute and just sell the bonds so you can own them at 76....he said cool..... [ellipses in original.]"

50.     The Wellington Management Legacy Securities PPIF Master Fund, LP paid approximately $2,300,000 for the Wells Fargo Bond.

51.     LITVAK did not engage in any negotiations or communications with the seller of Wells Fargo Bond on December 23, 2009, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, there was no third party seller, since Jefferies already owned the Wells Fargo Bond.

52.     Jefferies did not purchase the Wells Fargo Bond from a third party seller on December 23, 2009, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies purchased that bond nine days earlier, on or about December 14, 2009.

53.     Jefferies did not pay the seller 75-28 for the Wells Fargo Bond, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies paid 70 or approximately $2,100,000.

54.     Jefferies' profit on this set of transactions was not four ticks, or approximately $3,800, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies's profit was 192 ticks, or approximately $185,000.

The Securities

55.     Beginning in approximately 2009 and continuing until approximately December 2011, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, Defendant JESSE C. LITVAK knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the mails, in connection with the purchase and sale of securities, to wit, the RMBS set forth below, would and did use and

employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (i) employing the aforementioned devices, schemes and artifices to defraud, (ii) making untrue statements of material facts and omitting to state material facts necessary to make the statements made not misleading in the light of the circumstances under which they were made and (iii) engaging in acts, practices and courses of business that would and did operate as a fraud and deceit on purchasers and sellers of such securities as set forth below, each constituting a separate count of this Indictment:

| Count | Trade Date | Security |
|---|---|---|
| 1 | 3/31/10 | HVMLT 2006-10 2A1A (HarborView Bond) |
| 2 | 3/31/10 | LXS 2007-15N 2A1 (Lehman Bond) |
| 3 | 6/22/11 | HVMLT 2007-7 2A1A |
| 4 | 7/1/10 | SARM 2005-21 7A1 |
| 5 | 12/23/09 | WFMBS 2006-AR12 1A1 (Wells Fargo Bond) |
| 6 | 5/28/09 | INDX 2007-AR7 2A1 |
| 7 | 12/9/09 | NYMT 2005-2 A |
| 8 | 1/7/10 | DLSA 2006-AR1 2A1A |
| 9 | 3/29/10 | CWALT 2006-OA3 1A1 |
| 10 | 4/1/10 | LXS 2007-15N 2A1 |
| 11 | 11/22/10 | FHAMS 2005-AA10 2A1 |

All in violation of Title 15, United States Code, Sections 78j(b) and 77ff, and Title 18, United States Code, Section 2.

COUNT TWELVE
TARP Fraud
18 U.S.C. § 1031

56.     The allegations set forth in paragraphs 1 through 26 and 28 through 54 of this

Indictment are realleged and incorporated as though fully set forth herein.

57.     Beginning in approximately December 2009 and continuing until approximately

December 2011, in the District of Connecticut and elsewhere, Defendant JESSE C. LITVAK

devised a scheme and artifice to defraud the United States and to obtain money and property by

means of false and fraudulent pretenses, representations and promises in connection with grants,

contracts, subcontracts, subsidies, loans, guarantees, insurance and other forms of Federal

assistance—including TARP, an economic stimulus, recovery or rescue plan provided by the

Government, and the Government's purchase of troubled assets as defined in the Emergency

Economic Stabilization Act of 2008—the value of such Federal assistance, or any constituent

part thereof, being in excess of $1,000,000.

58.     On or about the following dates, in the District of Connecticut and elsewhere,

defendant LITVAK knowingly executed and attempted to execute the aforementioned scheme

and artifice with the intent to defraud the United States and to obtain money and property by

means of false and fraudulent pretenses, representations and promises in connection with such

Federal assistance in the following RMBS bond transactions with a TARP-Funded Victim:

a.      the March 31, 2010 sale of the HarborView Bond to AllianceBernstein

Legacy Securities Master Fund, L.P.;

b.      the March 31, 2010 sale of the Lehman Bond to AllianceBernstein Legacy

Securities Master Fund, L.P.;

c.      the June 22, 2011 sale of the HVMLT 2007-7 2A1A bond to

AllianceBernstein Legacy Securities Master Fund, L.P.;

- 18 -

**A18**

      d.      the July 1, 2010 sale of the SARM 2005-21 7A1 bond to Invesco Legacy Securities Master Fund, L.P.; and

      e.      the December 23, 2009 sale of the Wells Fargo Bond to Wellington Management Legacy Securities PPIF Master Fund, LP.

All in violation of Title 18, United States Code, Sections 1031 and 2.

COUNTS THIRTEEN through SIXTEEN
False Statements to the Government
18 U.S.C. § 1001

59.     The allegations set forth in paragraphs 1 through 26 and 28 through 54 of this Indictment are realleged and incorporated as though fully set forth herein.

60.     On or about the following dates, in the District of Connecticut and elsewhere, LITVAK, in a matter within the jurisdiction of the United States Department of Treasury, a department and agency of the United States, did knowingly and willfully make and cause to be made a materially false, fictitious, and fraudulent statement and representation to a PPIF Manager for a TARP-Funded Victim, each statement set forth below constituting a separate count of this Indictment:

| Count | Date of Statement | Recipient | False Statement | Correct Fact |
|---|---|---|---|---|
| 13 | 3/31/10 | Trader at PPIF Manager for AllianceBernstein Legacy Securities Master Fund, L.P. | "[S]o to recap the levels he is offering to me: hvmlt 06-10 2a1a (20mm orig) [the HarborView Bond] @ 58-00." | Jefferies had already negotiated with the seller to purchase the HarborView Bond at 57-16. |
| 14 | 3/31/10 | Trader at PPIF Manager for AllianceBernstein Legacy Securities Master Fund, L.P. | "[S]o to recap the levels he is offering to me: … lxs 40mm orig [the Lehman Bond] at 58-8." | Jefferies had already negotiated with the seller to purchase the Lehman Bond at 56-16. |
| 15 | 12/23/09 | Trader at PPIF Manager for Wellington Management Legacy Securities PPIF Master Fund, LP | "[H]e is gonna sell em to me at 75-28 as i told him to not get cute and just sell the bonds so you can own them [the Wells Fargo Bond] at 76….he said cool." | Jefferies had actually purchased the Wells Fargo Bond in question on December 14, 2009 at 70. |
| 16 | 6/24/10 | Trader at PPIF Manager for Invesco Legacy Securities Master Fund, L.P. | In electronic chat between LITVAK and seller forwarded to trader at PPIF Manager for Invesco Legacy Securities Master Fund, L.P., LITVAK altered chat in original message to show Jefferies' purchase price of "79-26." | In original electronic chat between LITVAK and seller, chat reflected Jefferies' actual purchase price of 79-24. |

All in violation of Title 18, United States Code, Sections 1001 and 2.

- 20 -

A TRUE BILL

/s/

FOREPERSON

UNITED STATES OF AMERICA

/s/ David B. Fein

DAVID B. FEIN
UNITED STATES ATTORNEY

/s/ Jonathan N. Francis

JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY

/s/ Eric J. Glover

ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY

- 21 -

**A21**

**DLA Piper** LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
www.dlapiper.com

Patrick J. Smith
patrick.smith@dlapiper.com
**T** 212.335.4685
**F** 917.778.8685

December 24, 2013

*VIA EMAIL*

Jonathan N. Francis
Assistant United States Attorney
United States Attorney's Office
District of Connecticut
Connecticut Financial Center
157 Church Street, Floor 23
New Haven, CT 06510

  **Re:**   *United States v. Jesse C. Litvak*

Dear Mr. Francis:

  Pursuant to Fed. R. Crim. P. 16(b)(1)(C)(i) and the Court's December 17, 2013 order, defendant Jesse C. Litvak provides updated summaries of the testimony of the two previously identified expert witnesses who may be called if the defense presents a case. For the reasons set forth below, these summaries and all exhibits hereto are subject to revision.

  As previously noted, due to the fee dispute with Jefferies & Co. ("Jefferies"), Mr. Litvak was denied his right to the advancement of expenses to defend himself in this case. As a result, he lacked the resources to retain expert witnesses and to fund the projects necessary to prepare their testimony, including a thorough review of the discovery material provided to date by the government. While the fee dispute appears to be resolved, certain projects are still ongoing as of the date of this updated disclosure. Further, our ability to complete all work in progress has been impeded by the government's long overdue disclosure, on December 17, 2013, of information material to the preparation of the defense of this case concerning the valuation, trade execution, and performance of the Residential Mortgage Backed Securities ("RMBS") bonds at issue. The defense was first able to access only some of this material on December 20, 2013 – nearly 7 weeks after the Court directed the government to produce it. Large segments of this production remain incomprehensible. From the documents that are accessible and understandable, the monthly and quarterly reports from the Public-Private Investment Program ("PPIP") managers, it is abundantly clear that these reports contain data material to the preparation of the defense and which is highly relevant to the opinions of the expert witnesses. Extensive review and analysis of this data will be necessary. As a result of the government's ongoing Rule 16 and *Brady* violations, we are moving for a continuance today.

**A22**

Jonathan N. Francis
December 24, 2013
Page Two

Mr. Litvak therefore may revise or supplement the summaries of testimony set forth below. Further, Mr. Litvak may designate additional expert witnesses if it is determined that such witnesses are necessary as trial preparation proceeds.

1) **Ram Willner**

a) Qualifications: Mr. Willner has extensive experience in portfolio management in the fixed income asset class, including extensive experience in the analysis and purchase of Residential Mortgage Backed Securities. With a focus on dealing with securities from an investor's perspective, Mr. Willner has significant investment industry experience. He most recently managed global fixed income portfolios for Analytic Investors, LLC and Global Fixed Income Partners, LLC, a hedge fund, where his oversight included both quantitative and qualitative review of global bonds, credit bonds, international fixed income, equity derivatives, and mortgage security purchases. Prior to that, he headed Bank of America Capital Management's International Fixed-Income department, where he was responsible for the management of nearly $1 billion in global sovereign and credit bonds. Mr. Willner worked for Morgan Stanley Investment Management in London as a portfolio manager and director of global fixed-income analytics, and for PIMCO as a senior member of the International Fixed-Income team.

Prior to practicing in the field, Mr. Willner served as a professor at the Tuck School of Business at Dartmouth and the Stern School of Business at New York University. He served as a visiting professor at the University of California at Irvine and has lectured at USC and UCLA.

Mr. Willner earned a Ph.D. (DBA) in business administration (finance/quantitative methods) from Harvard University, an MBA from Carnegie Mellon University, and a bachelor's degree in mathematics from Brandeis University. Mr. Willner has published in such journals as the *Journal of Fixed Income* and the *Journal of Portfolio Management* and has lectured in many venues.

A copy of Mr. Willner's CV was attached to our initial notice.

b) Summary of Opinions and Bases Therefore: It is anticipated that Mr. Willner would, if called as a witness, testify as to his opinions on the following issues:

- RMBS analysis and trading from the professional manager's perspective: Based upon his education, training, and experience, Mr. Willner will describe the

**A23**

Jonathan N. Francis
December 24, 2013
Page Three

process of selecting and valuing RMBS for inclusion in an investment portfolio, including analytical tools and methods available to an investment manager, and the development of an investment thesis for a particular RMBS.

- Mr. Willner will refer to several examples from the available records of the alleged victim funds that show the analytical process actually followed in evaluating RMBS. *See* Gov't Exs. 409, 647, 648, 741, 742; documents bearing bates numbers INVESCO 000001-INVESCO 000018, MFA-00031-MFA-00072, AB 000005, AB 000006-000013, AB000100-AB000157. Mr. Willner will opine that the analytical procedures set forth in these materials are consistent with the procedures one would expect to find at a sophisticated investment management firm.

- Mr. Willner will offer his opinion on the nature of an investment manager's fiduciary duty to his or her client (*i.e.*, the investment fund and the investors therein), and describe how that fiduciary duty mandates that certain professional standards be adhered to, including rigorous analysis and valuation procedures.

- Mr. Willner will further opine that where a manager follows rigorous valuation procedures, as was the case here, consideration of, or reliance on, statements by sell-side salesmen or traders concerning the value of a RMBS or the price at which the broker-dealer acquired it or could acquire it, are not relevant to that fund's determination with respect to how much to pay for a bond. In Mr. Willner's opinion, such statements from sell-side sales representatives or traders are generally biased, often misleading, and unworthy of consideration in trading decisions. Accordingly, such statements from sell-side sales representatives or traders are not material to a professional investment manager's decision-making.

- Analysis of relevant RMBS transactions and opinion regarding fair market value: Based upon his education, training, and experience, as well as an analysis of available market data relevant to RMBS transactions referenced in the Indictment (the "Subject Trades" or "Subject Bonds"), including historical transaction data, comparable bond transactions, and certain statistical tests, Mr. Willner will offer his opinion that prices paid for RMBS were in the context of the market and within the range of fair value and that the Subject Trades did not take place at inflated prices.

**A24**

Jonathan N. Francis
December 24, 2013
Page Four

o  <u>General Observations on the Nature of the Market for RMBS in the Relevant Time Frame</u> – Mr. Willner will describe generally the RMBS market as being quite volatile, with wide bid-ask spreads, poor liquidity, and difficult price discovery. Given these market conditions, market participants would have expected to transact across a range of prices for the same RMBS on a given day.

o  <u>Analysis of PPIP transaction data confirms market volatility, illiquidity and wide bid-ask spreads.</u>

    ▪ An analysis of PPIP transaction data in the Indictment period (program inception through December 31, 2011) is attached hereto as Exhibit A. This analysis first shows all PPIP trades in the Indictment period, and then isolates RMBS trades.

    ▪ The analysis shows multiple trades of the same bond on the same date and multiple trades of the same bond on the same date by the same manager. The analysis then segments the results to show the variability in price for a bond on a given day, as well as the magnitude of the variability.

    ▪ This analysis illustrates the volatility in the market due to poor liquidity and other market factors.

    ▪ In Mr. Willner's opinion, given these market conditions, minor variances in price would not have mattered to sophisticated investors and traders, particularly where, as here, the bonds were heavily discounted but still mostly performing and the investment thesis anticipated significant potential gains on the trade.

o  <u>Analysis of Fairness of Pricing on Subject Trades through Comparable Bond Analysis</u>

    ▪ <u>Selection of Comparable Bonds</u>

        ▪ The selection of comparable bonds for the Subject Bonds followed a consistent and systematic methodology which used origination characteristics-based criteria as well as performance

**A25**

Jonathan N. Francis
December 24, 2013
Page Five

characteristics-based criteria to match the bond characteristics.
The "Comparable Bond Universe" consisted of securities trades
from all the transactions involved in nine Public-Private
Investment Funds (PPIFs). A wider data set showing transactions
by non-PPIF funds was not available.

- Bonds from the "Comparable Bond Universe" were subjected to
  the following criteria to select the Comparable Bonds and to filter
  out bonds that are not appropriate comparables:

  - The bonds must have been traded in the period of two
    calendar weeks before and after the trade date of the
    Subject Bond. The trade should not be an odd-lot trade
    unless the Subject Bond trade is an odd-lot.

  - The bonds must match origination characteristics of the
    Subject Bond such as collateral type, original ratings
    (Moody's and S&P at origination), tranche seniority level,
    deal structure and collateral vintage (bonds from one
    vintage before and after were also included).

  - The bonds must match performance characteristics of the
    Subject Bond such as credit support, cumulative loss,
    delinquency buckets and weighted average life of loan.

- The securities which matched all these criteria were selected as
  comparable bonds for the purpose of analysis.

- Of the twelve Subject Trades referenced in the Indictment, two had
  no comparables and were therefore excluded from the analysis.

- Attached as Exhibit B is a list of the Subject Bonds and their
  comparables.

**A26**

Jonathan N. Francis
December 24, 2013
Page Six

- Analysis to Determine Whether the Prices Charged on the Subject Trades Were Consistent with the Prices on Comparable Trades.

  - For each of the Subject Bonds, yield data for its comparable bonds was input into Intex, a commercially available and standard valuation tool for RMBS.  Applying typical assumptions on RMBS performance, including that CPR, CDR, and severity from the prior six month period should be assumed to be the same going forward, an average price was generated as a basis for comparison to the price on the Subject Trade.

  - Attached as Exhibit C is a chart showing that the distribution of prices on the Subject Trades compared to the implied prices from comparable bond analysis.  The comparison shows that prices on Subject Trades were lower than the comparable price in 6 of 10 instances.

  - Statistical tests were applied to this result to ensure that the weighted average of the 4 instances in which the Subject Trades had prices higher than the implied prices generated by the comparable bonds was not of such a magnitude as to render these comparisons misleading.  The results of these tests were that, statistically, one could not reject the hypothesis that the prices on the Subject Trades were the same as the implied prices.

  - Testing to Determine Whether the Prices Charged on the Subject Trades Were Statistically Distinguishable from the Comparable Trades.

    - An additional statistical test was conducted, the Kolmogorov-Smirnov test, to determine whether the prices on the Subject Trades were, as a group, distinguishable from the comparable trades.

    - The result of these tests is that we cannot reject the hypothesis that the Subject Trades came from the same

**A27**

Jonathan N. Francis
December 24, 2013
Page Seven

    underlying distributions as the comparable trades at a
conventional level of statistical significance.

- o  Based upon the foregoing, it is Mr. Willner's opinion that the prices Jefferies
charged for the Subject Bonds were fair market value prices and were not
inflated. Further, since the investment funds that purchased the Subject Bonds
paid cash for a fairly valued asset, no investment loss took place as of the
transaction dates.

- <u>Analysis of Rate of Return and Net Profits on Subject Trades</u>

- o  The calculation of the Net Profit/Loss and Rate of Return involved three steps:

- ▪  1) Identifying Buy Price (Entry Price) and Sell Price (Exit Price): The
buy price information along with original notional amount bought on
the charged bond trades was collected from trade tickets of the trades.
To identify the corresponding sell transaction, the original notional
amount was matched to the sell transaction of the same bond by the
same fund. If a PPIF fund already had a position in the Subject Bond
from prior transactions, or had collected additional positions after the
charged transaction with Jefferies and exited the position through
multiple transactions at different level or different times or both, then
last-in-first-out (LIFO) was used to match the entry transaction to the
exit transaction. For the Subject Trades which were not traded with
PPIF funds, information on exit level and price was not available and
hence analysis on those funds was not conducted.

- ▪  2) Collecting data on interest and principal received: Data of interest
and principal received by the fund for holding on to the Subject Bond
was collected using the standard industry software such as Intex and
Bloomberg. The "Factor" of the principal left in the bond was
collected from Intex using the settlement date of the transaction.

- ▪  3) Calculations: Profits/Losses were calculated using the difference in
market value of the exit trade and market value of the entry trade,
interest and principal collected were added to the above difference.
Market value of a trade is calculated by multiplying the bonds price
(expressed as percentage) with original face amount of the bond and

**A28**

Jonathan N. Francis
December 24, 2013
Page Eight

the "Factor"(percentage of original principal unpaid). The rate of
return is also given by calculating the Internal Rate of Return (IRR) for
a transaction by taking into account all the out-flows (market value
paid to buy the bond) and in-flows (market value received on selling a
bond, interest received and principal received) along with the timing of
such cash-flows.

Attached as Exhibit D is a summary of the rate of return and net profit
calculations for the Subject Trades where exit price data is available.[1]

o   For transactions for which exit prices were available, the alleged victim funds
    experienced, with one exception, positive returns.

o   The exception is the FHASI 07-AR1 1A1 acquired by Invesco on June 24,
    2010 and sold on March 13, 2012, the net loss on which was $1,043.
    However, given the small magnitude of the alleged misstatement – 2 ticks –
    this bond would have experienced a loss at the manager selected exit time and
    price in any event.  The loss on this bond is attributable to a combination of
    security selection, timing of sale and market conditions for this RMBS.

o   The government's contention is that but for Mr. Litvak's tactics, a lower
    transaction price should have been available.  While it is unclear whether
    Jefferies would have been willing to transact at lower prices, the difference
    between the actual trade price and the assumed lower price can be assessed in
    terms of impact on net return.  For purposes of this analysis, the lower
    assumed transaction price is the actual trade price less any potential increase
    in trade price that fairly resulted from Mr. Litvak's tactics (the "Alleged
    Overcharge").

o   The Alleged Overcharges did not have a significant impact on the
    attractiveness of projected returns or actual net profits on the Subject Bonds.
    Put differently, fund managers would have transacted at either price and
    would not have passed up the significant potential upside that their analytics
    indicated were available at the actual transaction prices.  The Alleged
    Overcharges were not significant and did not have a meaningful impact on the
    funds' returns.  Market volatility for RMBS at the time as well as the inability

---

[1] The defense is endeavoring to acquire additional exit price information, some of which may be in materials
produced on December 17, 2013.

Jonathan N. Francis
December 24, 2013
Page Nine

      to ascertain, whether contemporaneously or historically, a single market price
for RMBS (as opposed to a range of fair market values) is further support for
these conclusions.

o   The Subject Bond transactions as a group performed approximately as well as
the average RMBS investment in the PPIP universe.

o   The Alliance Bernstein Subject Bond transactions performed significantly
better than the average Alliance Bernstein RMBS investment.

## 2) **Marc Menchel**

a)  Qualifications:

*September 2012 to Present, Principal, Menchel Consulting LLC*

      Founder of a firm designed to engage in non-legal expert consulting services such
as: expert witness; strategic consultancy during the pendency of a regulatory
problem, examination, or disciplinary proceeding; oversight for remedial
undertakings in response to a regulatory matter; or guidance as to the sufficiency
of compliance programs in response to regulatory requirements.

*May 2002 to May 2012, General Counsel, Executive Vice President, FINRA*

      General Counsel of the largest U.S. securities self-regulatory organization, based
in Washington, D.C. and New York. Management responsibility for the Office of
General Counsel (OGC), which is comprised of 45 staff members including 25
attorneys and a $10 million annual budget. OGC is divided among the Appellate
Group, Regulatory Groups, and the Ahead of the Curve Group (ATC Group).
The Appellate Group serves as counsel to the National Adjudicatory Council (the
appellate body for disciplinary proceedings) and writes all FINRA appellate
decisions and appears as FINRA's counsel on all appellate briefs submitted to the
SEC; the Regulatory Group is charged with determining FINRA regulatory policy
both in conjunction with and independently from the operating divisions of
FINRA, preparing, filing, and shepherding all rule filings with the SEC, issuing
Regulatory Notices, interpretive guidance, and other publications dealing with
FINRA policy, providing a liaison function to all standing committees of FINRA,
and providing counsel and policy guidance to all operating departments of FINRA

Jonathan N. Francis
December 24, 2013
Page Ten

and senior management. The General Counsel regularly presents on regulatory matters and rule proposals to the FINRA Board of Governors and represents and speaks on behalf of FINRA at national and international securities forums, panels, and conferences throughout the year.

Achievements include creation of the mission statement and operating protocols of the ATC Group in May 2002 for the purpose of identifying nascent regulatory issues with potential pernicious and wide-ranging impact (the ATC Group has identified over 50 regulatory topic areas and the program has been emulated by the SEC and NYSE); development of sweeping rule amendments across a broad topical spectrum including the areas of supervisory control, CEO certification of compliance processes, debt mark-up, quality of market rules for the unlisted OTC market, transparency and dissemination protocols for debt instruments, new securities issuance, variable annuity sales, business continuity planning, limit and market order protection rules; securities analyst conflicts rules; leadership participation in various FINRA task forces on mutual funds breakpoints and account transfer issues; policy statements on best execution in bonds, obligations attached to the sale of non-conventional instruments, retail participation in hedge funds, and investment issues pertaining to the sale of structured and new products.

*July 1995 to March 2002, Director and Corporate Secretary, Executive Vice President and General Counsel, Member of the Board of Directors, Tucker Anthony Incorporated*

General Counsel of a Boston based broker-dealer, investment bank and investment adviser. Overall management responsibility for the firm's legal and compliance departments staffed by five attorneys, nine compliance/registration professionals, and four support staff. Position entailed broad direct legal responsibilities beyond the management of professionals and the departments. Responsibilities included the determination of legal and compliance policy concerning all aspects of the firm's business; providing counsel in the following areas: investment/merchant banking, broker-dealer and investment advisory matters, capital markets, operations, regulatory capital issues, and personnel matters; the supervision and management of outside counsel for all matters; handling regulatory matters before the SEC and the self-regulatory organizations; and directing the conduct of firm litigation.

Achievements during this period included legal management and due diligence in the buyout of the parent company (Freedom Securities Corporation) from John

**A31**

Jonathan N. Francis
December 24, 2013
Page Eleven

Hancock Mutual Life Insurance Company; negotiation and implementation of conversion from self-clearing firm to introducing broker; legal and regulatory counsel and management of the private placement of a firm sponsored private-equity fund (a fund of select and top performing venture capital and private-equity funds); responsibility for a range of legal matters regarding the initial public offering of the parent company, Freedom Securities (listed on the NYSE); and complete restructuring and enhancement of firm compliance and trading policies.

*January 1991 to June 1995, Senior Vice President and International Counsel, Prudential Securities Incorporated*

Chief international legal officer, based in London (and subsequently New York), and responsible for supervision of legal and compliance departments located in London, Paris, Hong Kong, and Melbourne. Duties included responsibility for the oversight of significant international litigation; acting as corporate secretary and counsel to the futures, foreign exchange, money broker and equity broker subsidiaries; providing counsel to branch offices throughout Europe, South America, Asia, and Australia; oversight of regulatory matters in all locations; providing counsel on capital market issues, regulatory capital matters, and matters pertaining to the provision of financial services generally.

Chief achievement during this period was the establishment of a private bank (based in Luxembourg) with EC-wide passport privileges during the period (1991 to 1992 and following) that the Banking Directive was first implemented and the Financial Services and Capital Adequacy Directives were pending (which added significant difficulties to the implementation of this project because of an uncertain and shifting legal and political environment). Project included directing and managing counsel in various countries and in-depth negotiation with various central banks including the IML in Luxembourg, The Bank of England, and the U.S. Federal Reserve Board.

*April 1990 to December 1991, Vice President and Compliance Officer, Prudential-Bache Securities (UK) Incorporated*

Chief legal and compliance officer, based in London, for the UK subsidiary of Prudential Securities Incorporated and its affiliated futures, foreign exchange, money broker, and equity broker companies. Responsibility for all UK and applicable U.S. regulatory matters; UK capital market issues; European litigation;

**A32**

Jonathan N. Francis
December 24, 2013
Page Twelve

UK property matters; provision of counsel relative to branch and operational inquiries; and UK corporate matters. Served as a member of the UK investment banking commitment committee. Wrote the UK compliance manual based on AFBD and TSA (later updated for SFA) regulations (these were the UK self-regulatory organizations prior to the advent of the FSA). Developed surveillance program for Eurobond and foreign exchange trading.

*September 1989 to March 1990, Vice President and Associate General Counsel, Prudential Securities Incorporated*

Served as counsel to the Correspondent Clearing Division, Bank Certificate of Deposit Division, Precious Metals Division and general corporate area of the firm. Duties involved negotiating and drafting legal agreements and providing counsel based on the regulatory and legal requirements applicable to each of these areas.

*November 1986 to August 1989, Vice President and Associate General Counsel, Thomson McKinnon Securities Incorporated*

Duties included the negotiation of the firm's leasehold agreements throughout the United States and Europe; drafting of contracts; review and drafting of documentation attendant to the firm's capital market transactions and registered commodity pool offerings; management of significant litigation; preparation of pleadings and appearing on behalf of the firm in arbitrations; and representation of the firm and various employees before the SEC and self-regulatory organizations. Worked extensively on asset sale of firm's clearing operation to ADP and eventual asset sale of remainder of business to Prudential Securities.

*January 1983 to October 1986, Vice President and Deputy Director of Compliance, Thomson McKinnon Securities Incorporated*

Directly managed and supervised a staff of 40 compliance professionals including five attorneys. Was primarily responsible for resolving and representing the firm before all principal U.S. regulatory bodies. Managed complex litigation with outside counsel. Wrote firm compliance manual. Provided counsel to the banking, institutional, trading, and retail areas of the firm.

**A33**

Jonathan N. Francis
December 24, 2013
Page Thirteen

*August 1980 to December 1982, Compliance Officer, Thomson McKinnon Securities Incorporated*

Responsibilities included handling customer complaints and correspondence; responding to regulatory inquiries; processing special securities transactions (Rule 144); managing outside counsel and litigation; preparation of pleadings in arbitration, research, and response to general broker-dealer trading and retail issues.

*Professional Affiliation*

Past member of the Executive Committee of the Securities Industry Association, Compliance and Legal Division (SIACL). Received the SIACL President's award as Regulator of the Year in 2006.

*Professional Qualification*

Member of The New York State Bar

*Education*

Syracuse University College of Law – Juris Doctor Degree awarded 1980
Davidson College – Bachelor of Arts Degree awarded 1977

b) <u>Summary of Opinions and Bases Therefore</u>: It is anticipated that Mr. Menchel, if called as a witness, would testify as to his opinion on the following issues:

- <u>Securities Industry Terminology and Practices</u>: Based upon Mr. Menchel's extensive experience in the securities industry and as a securities regulator, Mr. Menchel will offer his expert opinion on the meaning of certain terms relevant to RMBS trading, and related industry practices that are used in the Indictment, including:

  - o A broker-dealer is a securities firm that is in the business of buying and selling securities. "Broker" refers to a broker-dealer effecting securities transactions, in an agency capacity for others. When acting as agent, broker-dealers charge a commission to their customers. "Dealer" refers to a broker-dealer acting as "principal," which means buying securities for

Jonathan N. Francis
December 24, 2013
Page Fourteen

and selling securities from its own account. When acting as principal, a broker-dealer is compensated through mark-ups or mark-downs – or profit – embedded in the price of the security. No commission is charged when a broker-dealer acts as principal.

o The Indictment's references to "commissions" are misplaced. Jefferies charged no commissions on any of the trades referenced in the Indictment. The term "commission" applies when a broker-dealer is acting in the capacity of agent and are virtually unheard of in the fixed-income market (which includes RMBS). Rather, examination of the relevant trade tickets and confirmations indicates that Jefferies, acting as principal and trading for its own account, earned profit by selling RMBS bonds to counter-parties at prices higher than its acquisition costs. Jefferies was not receiving any other remuneration or charging any other fee for the execution of principal transactions.

o The terms "all-in" and "on-top" in Paragraph 21 of the Indictment are not terms that are derived from, or recognized by securities industry regulation. Rather, they are jargon used by market participants as part of a price negotiation. Strictly speaking, all trades with a broker-dealer acting as principal are "all in" because when an agreement is reached, the deal is always memorialized as one price to the customer for a quantity of a bond. There are no other separate fees or charges for the transaction.

o Trade confirmations reflect this "all in" understanding. As governed by SEC Rule 10b-10, which was promulgated under the anti-fraud provisions of the federal securities laws, in the context of fixed income transactions, a broker-dealer, when acting in the capacity of principal on a fixed income transaction, is under no duty to disclose its cost or the amount of mark-up that it charges on the sale of a bond. Consistent with applicable disclosure requirements, when acting as principal, dealers in debt securities do not disclose their costs or mark-ups. For illustration, Mr. Menchel will review several trade confirmations that Jefferies provided to customers following the transactions referenced in the Indictment. Among other aspects of these confirmations, Mr. Menchel will observe that the dealer's cost is not disclosed and no commission was charged.

Jonathan N. Francis
December 24, 2013
Page Fifteen

o   Mr. Menchel will also review the rationale for this regime, and opine that
    several attempts to change the rules to require dealers to disclose mark-ups
    failed because bond market participants – on both the "sell" side and the
    "buy" side did not want full disclosure.  Mr. Menchel will opine that
    institutional bond market participants such as investment funds, hedge
    funds and pension funds do not regard disclosure of a dealer's costs or
    profits as important; rather institutional bond buyers focus on total price
    and yield, which necessarily take into account any embedded profit in the
    price quoted by a dealer, and are equipped to evaluate the fairness of a
    price and negotiate accordingly.

o   Paragraph 21(b)'s description of what purports to be an "on-top" trade
    does not comport with industry disclosure requirements and fixed income
    trading practices.  Since a broker-dealer typically does not disclose its
    costs (*i.e.*, the "price the broker-dealer paid it to the seller") and does not
    quote prices in relation to its costs, the customer typically, and from a
    regulatory perspective appropriately, has no way of knowing how much
    additional compensation might be "on top" of a broker-dealer's cost.
    Rather, a more typical negotiation would involve a customer agreeing to
    pay some price greater than its bid.  It is incorrect to assume that a
    customer's bid is the equivalent of a broker-dealer's cost.

o   Mr. Menchel will opine that the allegation in paragraph 32 of the
    Indictment concerning the size of mark-ups on bid list transactions is not
    grounded in any regulatory guidance.  There is no rule that places a
    specific limit on the mark-ups that may be charged on a bid list trade.

o   The Indictment's summary in paragraph 19 of the best execution principle,
    to the extent it refers to a broker-dealer's duty of best execution to a
    customer, is incomplete and misleading in that it is defined solely in
    relation to price.  "Best execution" is a term that encompasses three
    concepts: speed of execution, certainty of execution, and price.
    Institutional market participants routinely choose to execute with
    brokerage firms that offer the best execution in terms of the size of the
    negotiated order without regard to getting the lowest price at which a
    particular bond may trade at a given time.

**A36**

Jonathan N. Francis
December 24, 2013
Page Sixteen

o   As alluded to in paragraph 25 of the Indictment, broker-dealers owe a duty
    of "best execution" to their customers.  In the stock market, where the
    markets are transparent, this duty is more straightforward and easier to
    apply.  A brokerage firm has to route held market orders to the market
    where it has the highest likelihood of achieving the best price.  Thus,
    instead of simply filling an order at the firm's quoted price, it must check
    around to other markets and route the order accordingly.  In some
    segments of the bond market, including the RMBS market in 2009 through
    2011, there was no consolidated or listed market and no ready access to all
    market participants.  There were no alternative exchanges or electronic
    trading platforms.  The fact that the bond markets are negotiated, not order
    driven, lack robust pre-trade price discovery mechanisms, and lack
    electronic access to firm quotes, assessing best execution in real time, let
    alone after the fact, is a much different process for a bond dealer than for
    an equity dealer. A bond dealer does not have the same pre-trade point of
    quote discovery that an equity dealer has in seeking to obtain best
    execution and in reviewing executions after the fact to determine if, in
    fact, best execution was achieved.

o   In any event, the duty of best execution is inapplicable to the situation in
    which a broker-dealer is transacting with a Qualified Institutional Buyer
    ("QIB") in non-investment grade bonds. The duty of best execution is
    subsumed by the QIB exemption for non-investment grade bonds as set
    forth in FINRA IM 2440-2 as that exception in effect puts broker-dealers
    and their QIB customers in the role of arms-length counter-parties as to
    the pricing of non-investment grade bonds.  Jefferies and Mr. Litvak had
    no duty to offer better prices to its counter-party, or otherwise assist that
    counter-party in executing at a better price.  Rather, Jefferies and Mr.
    Litvak were free to negotiate any price with a QIB, irrespective of profit
    earned on the trade.  The whole point of the QIB exemption is that the
    sophistication of the QIB in negotiating the transaction is the sole check
    on the price of the transaction.

o   From the buy-side perspective, there is a different duty of best execution:
    that of the investment manager to his clients to get the most favorable
    price for his client under the circumstances.  This is typically done by
    comparing price quotes from many dealers and negotiating that price with
    one or more dealers.   Again, price is not the sole consideration.  Speed,

**A37**

certainty, and other factors with respect to a transaction of institutional size may also be relevant, as well as relationships that an investment manager may have with brokerage firms that may benefit its client.

o A buy-side account is not required to transact with a particular broker. Nothing that Mr. Litvak did prevented any buyer from checking prices at other broker-dealers. Given the fiduciary duties these sophisticated buy side professional investment firms owed their clients, which are assumed to have been fully adhered to, there is nothing that Mr. Litvak did that caused his counter-parties to transact with Jefferies at prices higher than the prices available from other firms unless it was in the interest of these buy-side firms to do so. If lower prices were available, the buy-side accounts likely would have traded away from Jefferies. The fact that the buy side account chose to transact with Jefferies indicates that Jefferies in all likelihood had the best price (or only price) for a transaction of the size in the market at the time.

o From the buy-side account's perspective, one could only say that the price component of a trade execution was poor in terms of a comparison to what was available from other broker-dealers. If the price negotiated was the only price available in the market there would be no basis to conclude that the execution was poor and that the price should have been better.

- Importance of Broker-Dealer Compliance Function: Based upon Mr. Menchel's extensive experience in the securities industry and as a securities regulator, Mr. Menchel will offer his expert opinion on role of the compliance function in a broker-dealer generally. With regard to training, Mr. Menchel will opine:

o Internal compliance training is important in brokerage firms. Through training, the compliance function at a broker-dealer distills the securities' industry's many rules to provide clarity to brokers, traders and sales representatives on how to conduct themselves. Internally within a firm, the interpretation of the compliance staff on what is permissible is very important and is appropriately understood by the employees of that firm as authoritative.

Jonathan N. Francis
December 24, 2013
Page Eighteen

- Trade Specific Opinions:

  o Wellington-Wells Fargo Trade -- Count Five

    ▪ On this trade, Jefferies was acting as principal and trading for its own account.

    ▪ At the time of the transaction, the Wells Fargo bond was a non-investment grade debt security.

    ▪ At the time of transaction, Wellington was a QIB as that term is used in FINRA IM 2440-2.

    ▪ As a general matter, neither Jefferies nor Mr. Litvak had any duty to disclose the price at which Jefferies acquired the Wells Fargo bond on.

    ▪ As a general matter, neither Jefferies nor Mr. Litvak had any duty to offer the Wells Fargo Bond to Wellington at a price that was calculated in relation to its acquisition cost.

    ▪ Jefferies did not charge any commission on this transaction.

    ▪ Whether or not Mr. Litvak's sales tactics had any impact on the price negotiations and final execution price is not an issue on which Mr. Menchel has an opinion. That said, because Jefferies was acting as a principal on a non-investment grade bond sale to a QIB, Jefferies's acquisition cost of the bond is not relevant. Having reviewed the communications set forth in proposed government exhibits 520, 523, 533, 534, Jefferies did not offer the bond at a price that related to its historical acquisition cost. The statements about the fictitious seller do not relate to Jefferies historical acquisition cost, something that Wellington would not have been entitled to know and would not reasonably have expected to know. Whatever impact Mr. Litvak's tactics had on the purchaser, and the price it agreed to pay, they are independent of the historical acquisition cost.

**A39**

Jonathan N. Francis
December 24, 2013
Page Nineteen

- Harborview and Lehman Trade – Counts One and Two

  - On this trade, Jefferies was acting as principal and trading for its own account.

  - At the time of the transaction, each of the Harborview and Lehman bonds was a non-investment grade debt security.

  - At the time of transaction, Alliance Bernstein was a QIB as that term is used in FINRA IM 2440-2.

  - As a general matter, neither Jefferies nor Mr. Litvak had any duty to disclose the price at which Jefferies acquired these bonds.

  - As a general matter, neither Jefferies nor Mr. Litvak had any duty to offer the Lehman and Harborview bonds to Alliance Bernstein at a price that was calculated in relation to its acquisition cost.

  - Jefferies did not charge any commission on either of these trades.

  - Whether or not Mr. Litvak's sales tactics had any impact on the price negotiations and final execution price is not an issue on which Mr. Menchel has an opinion.

  - Review of the relevant communications and trade tickets on these two trades indicates that Jefferies acquired each of the Harborview and Lehman bonds from Wayzata Investment Partners at no later than approximately 12:45 p.m. As of the time this trade was complete, Jefferies did not have a buyer on the other side of the trade. Alliance Bernstein, while it had bid on these bonds, had not yet agreed to buy them. In other words, Alliance Bernstein was free to walk away from these negotiations; Jefferies was free to sell the bonds to another customer.. Jefferies owned each of the Harborview and Lehman bonds prior to the later sale to Alliance Bernstein and was subject to market risk during the approximately one hour and forty-five minutes that it owned them.

  - Paragraph 45 of the Indictment incorrectly categorizes the Harborview bond trade as a riskless trade.

**A40**

Jonathan N. Francis
December 24, 2013
Page Twenty

- Paragraph 46 of the Indictment incorrectly categorizes the Lehman bond trade as a riskless trade.

Please do not hesitate to contact me at 212-335-4685 with any questions.

Sincerely,

Patrick J. Smith

EAST\67213552.5

**A41**

```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF CONNECTICUT

 3    _____
      United States of America   )February 6, 2014
 4              Government   )11:59 a.m.
      v.                          )
 5    Jesse C. Litvak             )3:13cr19(JCH)
                Defendant.   )
 6    _____)

 7
                               141 Church Street
 8                             New Haven, Connecticut

 9                    PRETRIAL HEARING

10
      B E F O R E:
11                    THE HONORABLE JANET C. HALL, U.S.D.J.

12    A P P E A R A N C E S:

13
      For The Government  :    Jonathan N. Francis
14                             Eric Glover
                               U.S. Attorney's Office-NH
15                             157 Church St., 23rd floor
                               New Haven, CT 06510
16

17    For the Defendant  :     Ross H. Garber
                               Michael Chase
18                             Shipman & Goodwin
                               One Constitution Plaza
19                             Hartford, CT 06103-1919

20                             Patrick Smith
                               Sarah B. Zimmer
21                             John Michael Hillebrecht
                               DLA Piper US LLP-NY
22                             1251 Avenue of the Americas,
                               27th Floor
23                             New York, NY 10020-1104

24

25             -- continued --
```

**A42**

74

1    meet the standard of materiality.  I don't happen to share

2    the defendant's view of how limited the government is in the

3    proof of this case.

4         With respect to the Motion to Preclude, the

5    defendant has repeatedly and appropriately reminded the court

6    he has a right under the Constitution of particularly the due

7    process clause thereto to mount a defense to the case put on

8    by the government, and it's certainly not ever going to be

9    and it is not now my intention from preventing him from being

10   able to do that.

11        However, as strongly as his counsel reminds me of

12   that fact, I will likewise remind him of the Supreme Court's

13   statement in Taylor versus Illinois sometime ago, clearly the

14   accused does not have an unfettered right to offer testimony

15   that's incompetent, privileged or inadmissible under the

16   standard of rules of evidence.  The United States versus

17   England decision from the Second Circuit in 1999 obviously

18   adopts that view because it is Supreme Court law and applies

19   it in the context of relevancy.

20        With respect to the motion to preclude the two

21   experts, the Court will grant it in part and deny it in part.

22   I will start first with the government's argument that the

23   disclosure in early November on the date required was

24   deficient.  I would agree with the government it was woefully

25   deficient.  However, the defense subsequently sought, I

**A43**

1    believe it was Attorney Garber's motion, an extension of time

2    if I recall correctly, to some date in January.  I granted

3    that motion in part and gave until December 24 which is the

4    date upon which the disclosures that the government is citing

5    to and arguing about were filed.

6         So to the extent we're going to measure the ability

7    of these experts to testify based upon the adequacy of the

8    disclosures, I'm looking to the December 24 disclosure.  In

9    my view, I gave the defense until then to make a disclosure

10   so I'm not going to preclude it, even though it was late in

11   the sense of the trial scheme that I set forth months ago,

12   maybe now almost a year ago, I still had given the defense

13   time until the 24th.  So in my view, it is not late.

14        With respect to Mr. Willner, it is the Court's view

15   of much of what is proposed to be testified to by him is

16   irrelevant to the case before the court.  For example, to the

17   extent he wants to the talk about the often misleading nature

18   of trader statements in the immateriality.  Let's back up.

19   He talks about -- first of all, I will say that I find the

20   disclosure under 702 to be lacking.  Again it is sort of a --

21   how shall I put it -- a recitation sort of what he's going to

22   describe, what he's going to refer to, occasionally there's a

23   word that he will opine, but when there's such a phrase he

24   will opine, there's not the required disclosure of the basis

25   for that opinion.  When I questioned counsel, he would often

**A44**

76

1    say you have to look at what's said later in this disclosure

2    is where he's laying out his basis.  That's I think is a

3    risky business because it requires me and the other side but

4    most particularly me in deciding has there been proper

5    disclosure to sort of hunt and peck among many, many pages,

6    10, 15, whatever with respect to Mr. Willner not knowing what

7    later pages relate to which of the opinions.  In my view, a

8    disclosure the witness will opine that the bearing broke and

9    caused the injury, and the basis for that opinion is testing

10   as follows: observations as follows: review of documents as

11   follows: and a listing of them.  That's not how the

12   disclosure is.  I'm not going to stop at that as a reason to

13   prevent the testimony.  I have to say it makes it difficult

14   for the Court to make a judgment about questions like 401 and

15   403 if I'm not certain what exactly which opinions he's

16   giving, whether he's qualified to give those opinions,

17   whether they're opinions stated to a reasonable degree of

18   certainty in his profession and finally is there a basis of

19   those opinions that would have some basis in his expertise.

20          To the extent I find in the disclosure the

21   suggestion that he would opine about or testify to fiduciary

22   duty owed to the client, that mandates certain professional

23   standards about whether, for example, you must disclose

24   something or you don't have to disclose something.  I don't

25   find that relevant as I suggested in my questioning of

**A45**

77

1    counsel.  It isn't here a question of there was a sale and

2    you know, Mr. Litvak made too much money.  The question is

3    Mr. Litvak caused the sale to happen by saying something

4    which was false, and the issue is is it material.

5         As to testimony that suggested as to what's fair

6    market value or were the prices paid fair, was there a profit

7    made after the fact, in my opinion, those are not relevant to

8    this case.  I mean after the transaction occurred whether

9    there was a profit made or not is a function of things that

10   happened long after the statements that are at issue that are

11   claimed to be false were made.

12        In my view, the case focuses on what Mr. Litvak said

13   and whether what he said was false, whether what he said was

14   false was done with the intent to deceive or part of a scheme

15   to deceive, and whether it was material as that term is

16   understood as a legal term.  That is that it affects the mix

17   of things that enter into the person receiving the

18   information decision.

19        I don't think under 401 that the testimony proffered

20   by this expert about fair market values or about profits in

21   the future and trades being within a realm of what's

22   reasonable is relevant.

23        MR. SMITH:  May I ask a question?  Your Honor seems

24   to have put two concepts together in there.  I understand the

25   profit piece.  On the intent to defraud piece to fair market

**A46**

78

1    value, that goes straight to Mr. Litvak's intent.  There's

2    objective proof that that transaction was a million dollars

3    for a bond and you got back a bond fairly valued at a million

4    dollars, means that there was no harm.

5              THE COURT:  If you let me finish, maybe at the end

6    if you have any questions, you can ask me then.

7              Also to the extent that he proffered testimony about

8    the analysis of real estate -- mortgage backed securities

9    transactions, quote, in the context of the market and within

10   its fair value, I also conclude it is not relevant under 401

11   and will tend to confuse under 403.

12             A fair value is what a willing buyer will pay a

13   willing seller, so in my view, it is almost metaphysically

14   difficult to think about these being opined about as being

15   fair if, in fact, that the jury concludes that the willing

16   buyer wouldn't have been willing had they been told the

17   truth.  If he is told the truth, he's a willing buyer.  The

18   price is fair even if he paid five times in actuality here.

19             Finally I think Mr. Willner is offered for the

20   question on the opinion that this is a volatile market.

21   Again I think it is irrelevant.  The fact that it is

22   volatile.  It is volatile.  We're talking about a transaction

23   at a particular time based on a certain mix of information

24   provided to the buyer.  There's one aspect of the testimony

25   that the Court reserves on.

**A47**

79

1          With respect to Mr. Menchel, as to the testimony, it

2     appears he's offering opinions about their being no duty to

3     disclose.  I find that irrelevant under 401.  With respect to

4     the terms that he's offered to testify to about, what they

5     mean, based upon his expertise and further with respect to

6     what I would call background evidence about the nature of

7     these markets that they function in a different way, they

8     aren't of the New York Stock Exchange.  How do people

9     communicate, how do they buy and sell things, the Court

10    reserves on that.  I think that I should wait until I hear

11    how much comes in on that but I also think the defendant has

12    a right, if there's still some dispute or the record isn't

13    clear, he doesn't think the jury understands, he's allowed to

14    offer that evidence, even though the government thinks it

15    will be very clear, I suspect the defendant won't think it is

16    very clear, it sounds like the two sides don't necessarily

17    agree about what terms mean.  I want to caution that when the

18    issue comes up again, which I would ask or invite the

19    defendant to indicate as the government's case gets close to

20    a close, that you see a need to offer testimony on these

21    subjects that I have broadly framed, that you be prepared to

22    tell me what it is you think they can offer and why it would

23    be helpful.  I.e., not confuse them more than it adds sort of

24    probative information to them.

25          And secondly, I would also state that if it is

80

```
 1   allowed, which I'm inclined to think I would allow it, that
 2   it not be viewed as a way to open the door to the matters
 3   which I have already ruled are irrelevant and which if
 4   introduced in my opinion, the prejudicial value, the
 5   confusion will greatly, greatly outweigh, I don't think it
 6   has probative value but things like the post-transaction
 7   performance of the bond.  I mean if the day after one of
 8   these transactions took place, the president announced he was
 9   by executive order guaranteeing 100 percent of face value of
10   every mortgage backed securitized bond, clearly these people
11   would have made a heck of a killing.  It has nothing to do
12   with this case, so I don't know why what happens in the
13   market after this transaction, which may show that these
14   people made money, that isn't what this case is about.  So I
15   don't think post-transactional performance is admissible, and
16   I don't think this proffer at least as I understand it, as it
17   is disclosed in the 702 disclosure, as I commented on, is not
18   done in a manner that makes it easy for someone of my limited
19   abilities to understand, I do not find the things they are
20   speaking about in here about what's the fair market value or
21   its within the fair range or things like that that took place
22   at the fair market value, I don't find those to be relevant.
23   Therefore, further under 403, they are irrelevant their
24   ability to confuse the jury about what the issue really is in
25   this case greatly outweighs any probative value which I don't
```

1    think it has any.

2        To the extent particularly that Mr. Menchel talks

3    about going to opine, on page 15, that institutional bond

4    market participants such as investment funds do not regard

5    the disclosure of dealer's cost or profits as important, the

6    Court finds he has no basis for that opinion.  One, he hasn't

7    told me and two, I look at his experience, I don't see how he

8    would.

9        There's another subject matter that Mr. Menchel was

10   offered for about training and compliance which I gather the

11   government intends to offer evidence on, and I would invite

12   the defendant to, in effect, tell me if he feels that he

13   needs to offer evidence on that subject and what exactly he

14   would want to offer as the government's case goes in.  It may

15   be that we don't need it.  I'm sure the defendant would

16   rather put their own witness up and have testimony about it.

17   Maybe that testimony would be different than what the

18   government witnesses say.  I can't make that judgment about

19   it until I heard what the government is doing on the subject

20   so that was another area that I meant to indicate in effect I

21   reserve on so vocabulary, the general nature of the market

22   and training are I think the three areas I identified that I

23   will reserve on and may allow testimony on depending on where

24   we were at the time it becomes relevant, so that's the

25   Court's ruling on the motion.  Yes sir.

1460

1       UNITED STATES DISTRICT COURT

2          DISTRICT OF CONNECTICUT

3    _____
     United States of America    )February 26, 2014
4              Government   )8:51 a.m.
     v.                          )
5    Jesse C. Litvak             )3:13cr19(JCH)
                 Defendant.  )
6    _____)

7
                         141 Church Street
8                        New Haven, Connecticut

9          DAY SEVEN OF TRIAL

10
     B E F O R E:
11             THE HONORABLE JANET C. HALL, U.S.D.J.
               AND JURY OF 15
12

13   A P P E A R A N C E S:

14   For The Government  :   Jonathan N. Francis
                             Eric Glover
15                           U.S. Attorney's Office-NH
                             157 Church St., 23rd floor
16                           New Haven, CT 06510

17
     For the Defendant   :
18                           Michael Chase
                             Shipman & Goodwin
19                           One Constitution Plaza
                             Hartford, CT 06103-1919
20
                             Patrick Smith
21                           Sarah B. Zimmer
                             John Michael Hillebrecht
22                           DLA Piper US LLP-NY
                             1251 Avenue of the Americas,
23                           27th Floor
                             New York, NY 10020-1104
24

25

A51

1734

1    which to form that opinion even though it wasn't disclosed as

2    an opinion.

3         As to, you know, words that are jargon that have

4    understandings in the industry based on his experience like

5    "all in" or "on top," he can tell us what his opinion is as

6    to what those terms mean.  And the basis for his opinion, I

7    guess, is his experience as revealed, and that's okay,

8    subject to cross-examination.

9         MR. SMITH:  If I may, your Honor, at the bottom of

10   page 13 in the sub (b) summary of opinions and bases

11   therefore, I think we have language that tee this up in the

12   bullet securities industry and practices that plainly

13   indicates that everything that follows is his expert opinion

14   on the meaning of certain terms.

15        THE COURT:  Meaning of certain terms, I do not

16   include in that phrase, the meaning of certain terms or an

17   opinion about the meaning of certain terms, I do not find the

18   following words to equate to his opinion of the meaning of

19   certain terms, quote, Jefferies charged no commissions on any

20   of the trades referenced in the Indictment.  That is -- in

21   effect, it is a statement of fact.  But as I say, if I read

22   in the words it is his opinion that they charged no

23   commission, I don't think that's the meaning of certain

24   terms.  As to related industry practices, I don't think I

25   have ever said he could opine on that.

**A52**

1735

1    MR. SMITH:  In the prior bullet we do have, which I

2    don't think your Honor had a problem, which is the bottom of

3    13, carrying over to 14.

4    THE COURT:  Yes, sir.

5    MR. SMITH:  That in the scenario when one is acting

6    as principal.  So he could describe what it means for a

7    dealer to trade for its own, acting as principal.

8    THE COURT:  When?  Right.  When acting.

9    MR. SMITH:  When.  And not tie it back to Jefferies.

10   THE COURT:  Right.

11   MR. SMITH:  We'll in closing be able to tie that to

12   Mr. Paradiso's testimony.  So we've got --

13   THE COURT:  I don't know if the Government objects,

14   but I would have trouble with keeping that out.  I mean, I

15   don't know that it's been disputed.

16   MR. SMITH:  I think what he could say is that in a

17   scenario when a broker/dealer is acting as principal, the

18   term commission is inapplicable.  That's what the last

19   sentence of the first bullet says.  And he wouldn't tie it

20   back to Jefferies.

21   THE COURT:  I don't know that it's applicable.  I

22   suppose somebody could agree to it, but I think what he's

23   saying a principal trades in his own account and he doesn't

24   charge a commission.

25   MR. FRANCIS:  I agree.  Those are the definitions of

**A53**

1736

1     the terms.

2               THE COURT:  You don't disagree with them.  You could

3     stipulate to them, I would assume.

4               MR. FRANCIS:  I suppose we probably could.  The

5     issue here is that's not what they want him for.

6               THE COURT:  I understand.  That doesn't mean that's

7     what they are getting him for.

8               MR. FRANCIS:  As long as we are talking about the

9     same thing then.  I don't think this is a definition at all.

10    They are saying, he's going to define terms.  He's going to

11    take the stand and he's going to opine broadly about the way

12    the world works.  That's not a definition of a word "broker"

13    or "agent" or "dealer" or "principal," that's just telling

14    the jury how it should be because he's a paid expert.

15              THE COURT:  As I said, it's been a long day and I'm

16    tired, but I thought I was very clear.  I have said today and

17    I have said in the past, he would be allowed to testify

18    about, quote, the meaning of certain terms relevant to RMBS

19    trading, end quote, period.  There's a period at the end of

20    that, Attorney Smith, and I hope that if you have any

21    question about what I'm allowing, I would ask you to ask me

22    because you have, on occasion, in my view, maybe mis -- not

23    understood what I thought was appropriate.  So I just want to

24    be sure you know exactly what I am allowing this man to

25    testify to.

1

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3   _____
     United States of America   )March 7, 2014
 4              Government   )9:30 a.m.

 5   v.                          )
     Jesse C. Litvak             )3:13cr19(JCH)
 6              Defendant.   )
     _____)
 7

 8                           141 Church Street
                             New Haven, Connecticut
 9
                      DAY TWELVE OF TRIAL
10                       (Verdict)

11   B E F O R E :
                     THE HONORABLE JANET C. HALL, U.S.D.J.
12                   AND JURY OF 12

13

     A P P E A R A N C E S :
14

     For The Government  :   Jonathan N. Francis
15                           Eric Glover
                             U.S. Attorney's Office-NH
16                           157 Church St., 23rd floor
                             New Haven, CT 06510
17

18   For the Defendant   :
                             Michael Chase
19                           Shipman & Goodwin
                             One Constitution Plaza
20                           Hartford, CT 06103-1919

21                           Patrick Smith
                             Sarah B. Zimmer
22                           John Michael Hillebrecht
                             DLA Piper US LLP-NY
23                           1251 Avenue of the Americas,
                             27th Floor
24                           New York, NY 10020-1104

25
```

**A55**

2

1          (Whereupon, the jury deliberated from 9:30 a.m. to

2    2:15 p.m.)

3          THE COURT:  We have received a note that reads as

4    follows: Your Honor, we have completed deliberation.  Thank

5    you.  Juror 10, dated today.  I'm going to ask the clerk to

6    mark it as the next court exhibit.  The clerk confirmed with

7    the jury that language meant they had a verdict.  So I'm

8    about to bring the jury out and the alternates.

9          Before I do so, though, I know this is a very

10    emotional time.  It always is.  Regardless of what the

11    verdict is, I can imagine it will be emotional for obviously

12    Mr. Litvak yourself but all the people that have been here

13    with you every day in support of you.  My remarks are

14    addressed to everyone in the courtroom.  Most of the rest of

15    the people are reporters probably but I don't know if you

16    would have an outburst.  My remarks apply to everybody.  If

17    you do not feel you can sit here while the verdict is being

18    read without maintaining decorum, I would direct you to leave

19    the courtroom.  The jury's job is hard enough.  They know the

20    impact it has, one way or another, on the individuals

21    involved.  They don't need to sit through reaction I guess I

22    will call it, the only word I can use, to what they have

23    done, I can only assume in good faith and hard work and

24    thoughtful deliberation.  If you don't think you will be able

25    to control yourself, then I would invite you to leave.  It is

3

```
1     a public courtroom.  Everybody is welcome to stay but if
2     there's any kind of outburst, I will deem it in contempt of
3     court.  I hope that's clear to everybody.  Unless there's
4     anything else, I will direct the Deputy Clerk to get the jury
5     and bring them into the courtroom.
6               (In the presence of the alternate jurors.)
7               THE COURT:  It's probably likely someone on the
8     court staff has told you but we received  a note from the
9     jury that they reached a verdict, so we'll bring them back in
10    as well.  We'll thank you for your willingness to come back
11    again today.
12              The record should reflect that counsel is here on
13    both the government side and the defense side and Mr. Litvak
14    is present.
15              (In the presence of the jury.)
16              THE COURT:  You can take any seat.  You can take any
17    seat, it doesn't matter, whatever is convenient for you all.
18              Everyone be seated please.  Ladies and gentlemen of
19    the jury, have you agreed upon a verdict?
20              THE FOREPERSON: Yes, your Honor.  We have.
21              THE COURT:  Would you state your juror number.  I
22    imagine you are the foreperson.
23              THE FOREPERSON:  Yes, Juror 10.
24              THE COURT:  Thank you.  Would you hand the verdict
25    form to the officer please and he'll get it to me.
```

**A57**

1          (Handing.)

2          THE COURT:  Thank you very much.

3          Ladies and gentlemen, at this time the procedure of

4   the court calls for me to give your verdict to the Courtroom

5   Deputy, Diahann, and to have her read it into the record.

6   That way we have not only the paper copy, we also have a

7   transcription copy which means if anyone were to tamper with

8   the paper copy and suggest your verdict was different, we

9   would know we have it as a record.

10          She's going to read it through.  When she's

11   finished, I'm going to ask you is that your verdict.  You

12   would respond yes or you would respond no.  Just answer my

13   question.  When she finishes reading, I would ask you that

14   question.  Diahann, if you would please read the verdict into

15   the record.

16          THE CLERK:  In the case of the United States of

17   America versus Jesse C. Litvak, Criminal Action Number

18   313CR19.

19          As to the charge in Count One of Securities Fraud,

20   we, the jury, unanimously find the defendant, Jesse Litvak,

21   guilty.

22          As to the charge in Count Two of Securities Fraud,

23   we, the jury, unanimously find the defendant, Jesse Litvak,

24   guilty.

25          As to the charge in Count Three of Securities Fraud,

 1  we, the jury, unanimously find the defendant, Jesse Litvak,
 2  guilty.
 3          As to the charge in Count Four of Securities Fraud,
 4  we, the jury, unanimously find the defendant, Jesse Litvak,
 5  guilty.
 6          As to the charge in Court Five of Securities Fraud,
 7  we, the jury, unanimously find the defendant, Jesse Litvak,
 8  guilty.
 9          As to the charge in Count Six of Securities Fraud,
10  we, the jury, you unanimously find the defendant, Jesse
11  Litvak, guilty.
12          There is no Count Seven.
13          As to the charge in Count Eight of Securities Fraud,
14  we, the jury, unanimously find the defendant, Jesse Litvak,
15  guilty.
16          As to the charge in Count Nine of Securities Fraud,
17  we, the jury, unanimously find the defendant, Jesse Litvak,
18  guilty.
19          As to the charge in Count Ten of Securities Fraud,
20  we, the jury, unanimously find the defendant, Jesse Litvak,
21  guilty.
22          As to the charge in Count Eleven of Securities
23  Fraud, we, the jury, unanimously find the defendant, Jesse
24  Litvak, guilty.
25          As to the charge in Count Twelve of Troubled Asset

6

1    Relief Program fraud, we, the jury, unanimously find the

2    defendant, Jesse Litvak, guilty.

3          As to the charge in Count Thirteen of false

4    statement in a matter within the jurisdiction of the United

5    States Government, we, the jury, unanimously find the

6    defendant, Jesse Litvak, guilty.

7          As to the charge in Count Fourteen of False

8    Statement in a matter within the jurisdiction of the United

9    States Government, we, the jury, unanimously find the

10   defendant, Jesse Litvak, guilty.

11         As to the charge in Count Fifteen of False Statement

12   in a matter within the jurisdiction of the United States

13   Government, we, the jury, unanimously find the defendant,

14   Jesse Litvak, guilty.

15         As to the charge in Count 16 of false statement in a

16   matter within the jurisdiction of the United States

17   Government, we, the jury, unanimously find the defendant,

18   Jesse Litvak, guilty.

19         And it is signed by the foreperson, dated at New

20   Haven, Connecticut, the 7th day of March, 2014.

21         THE COURT:  Thank you.  Ladies and gentlemen of the

22   jury, is that your verdict so say you all.

23         THE JURY: Yes.

24         THE COURT:  Does the government request polling of

25   the jury?

**A60**

```
1              MR. GLOVER:  No, your Honor.

2              THE COURT:  The defense?

3              MR. SMITH:  Yes, your Honor.

4              THE COURT:  The request has been made, ladies and

5     gentlemen, because you all responded but even I couldn't look

6     at you all at the moment you opened your mouth and said what

7     I heard to be yes.  There's a procedure known as polling.

8     What that entails, Diahann is going to ask each of you.

9     She'll say juror number one, is that your verdict?  You will

10    answer whatever the answer is.  Go down.  Each juror would

11    answer in response to Diahann's question.  So, Diahann, would

12    you do that?

13             THE CLERK:  Juror One, is that your verdict?

14             THE JUROR: Yes.

15             THE CLERK:  Juror Two, is that your verdict?

16             THE JUROR: Yes.

17             THE CLERK: Juror Three, is that your verdict?

18             THE JUROR:  Yes.

19             THE CLERK:  Juror Four, is that your verdict?

20             THE JUROR: Yes.

21             THE CLERK: Juror Five, is that your verdict?

22             THE JUROR: Yes.

23             THE CLERK: Juror Six, is that your verdict?

24             THE JUROR:  Yes.

25             THE CLERK:  Juror Seven, is that your verdict?
```

8

```
1              THE JUROR: Yes.
2              THE CLERK:  Juror Eight, is that your verdict?
3              THE JUROR: Yes.
4              THE CLERK: Juror Nine, is that your verdict?
5              THE JUROR:  Yes.
6              THE CLERK:  Juror Ten, is that your verdict?
7              THE JUROR:  Yes.
8              THE CLERK:  Juror Eleven, is that your verdict?
9              THE JUROR: Yes.
10             THE CLERK: Juror Twelve, is that your verdict?
11             THE JUROR: Yes.
12             THE COURT:  Thank you.  The Court directs that the
13   verdict be recorded and made a part of the record of this
14   case.
15             With that statement, ladies and gentlemen, that
16   completes your duties, and in a moment, I will discharge you.
17   Before I do that, though, I have to extend to you my sincere
18   appreciation for your attentiveness and obviously careful
19   deliberations over this case.  It is never easy to serve as a
20   juror, but as I explained to you at the beginning on the
21   selection of the jury, it is necessary to our system of
22   justice, and I just want to thank you very much for your
23   service.
24             It is my practice after every jury is finished and I
25   have discharged you and you're free to go, I like to come
```

1

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF CONNECTICUT

3    _____
     United States of America   )July 23, 2014
4              Government  )10:00 a.m.
     v.                         )
5    Jesse C. Litvak            )3:13cr19(JCH)
                Defendant.  )
6    _____)

7
                            141 Church Street
8                            New Haven, Connecticut

9            SENTENCING HEARING

10
     B E F O R E:
11            THE HONORABLE JANET C. HALL, U.S.D.J.

12

13   A P P E A R A N C E S:

14   For The Government  :    Jonathan N. Francis
                              Christopher Mattei
15                            U.S. Attorney's Office-NH
                              157 Church St., 23rd floor
16                            New Haven, CT 06510

17
     For the Defendant   :
18                            Patrick Smith
                              John Michael Hillebrecht
19                            DLA Piper US LLP-NY
                              1251 Avenue of the Americas,
20                            27th Floor
                              New York, NY 10020-1104
21
                              Ross Garber
22                            Shipman & Goodwin
                              One Constitution Plaza
23                            Hartford, CT  06103-1919

24

25

**A63**

173

1    that we may raise that may result in a reduced sentence.

2    That's the fourth issue.

3              We think the three issues that we framed are

4    substantial, that's our motion.  And we move for bail pending

5    appeal.

6              THE COURT:  I'm about to say something again that I

7    shouldn't say -- I will restrain myself.

8              MR. SMITH:  I'm very mindful --

9              THE COURT:  You are going to have a hard time

10   sustaining the sentence I imposed on appeal.

11             MR. SMITH:  We're very thoughtful and mindful of --

12             THE COURT:  I'm not being critical of you.  I'm

13   saying that's not a serious grounds for appeal.

14             MR. SMITH:  I want to be complimentary to your

15   Honor --

16             THE COURT:  You don't need to be.

17             MR. SMITH:  Very thoughtful and mindful of the

18   thoughtful sentence you imposed, but I feel we need to make

19   the motion.  Those are the grounds.

20             THE COURT:  Attorney Francis, to the first three

21   grounds, would you respond to those as he has a serious

22   question on getting a reversal or a new trial, whatever on

23   those.  I think he argued sufficiency of the evidence on

24   materiality and the intent defraud and I'm sorry --

25             MR. FRANCIS:  Experts.

**A64**

1          THE COURT:  The proof of the fact there wasn't any

2     really loss here.

3          MR. FRANCIS:  The experts were precluded.

4          THE COURT:  Were precluded, right.  Okay.

5          MR. FRANCIS:  So whether or not it raises a question

6     of law or fact, apparently he disagrees, but the standard in

7     the statute is likely of prevailing on these.  Your Honor's

8     decisions on these three points are completely consistent

9     with the Second Circuit and Supreme Court.  The facts as

10    phrased in order to torture them into being able to make

11    these arguments, your Honor, those facts to obtain unless the

12    arguments they were making were premised on the factual

13    misstatements or misunderstanding of what the circumstances

14    was.  It seems there is practically no chance of success on

15    these three arguments, much less likelihood of success.

16    Although they are creative and do justice to counsel's

17    creativity and hard work, they are unlikely to prevail in the

18    Second Circuit.  And bail in this circumstance would be,

19    pending appeal, would be unwarranted under the statute.  I

20    agree that there's no likelihood of flight to the extent that

21    your Honor posed a question, we have no dispute.

22         THE COURT:  On the first three points raised by

23    Attorney Smith, we have argued about them.  I have decided

24    them several different times, most recently in the ruling

25    post trial.  You know, anyone can make a mistake and I put

1    myself right of top of list.  Obviously, my goal is not to

2    make a mistake.  I don't want people to have to go through

3    this again to start with.  Also just because that's just.

4    And so I hope I haven't made any mistakes, but I cannot see a

5    mistake or a combination of mistakes that would result in the

6    reversal of the convictions on all 15 counts.  The TARP

7    fraud, I think it's the first charge in the country.  I mean,

8    maybe I got it wrong.  We sort of -- not made it up.  It had

9    to be written by us.  But there's other counts that, you

10   know, in many respects it's a fact finding by the jury.  And

11   there certainly was sufficient evidence for them to draw the

12   inferences they needed to draw.  There was evidence on the

13   record.  So I think -- I don't think.

14        My ruling is to deny the oral motion for release

15   pending appeal because I do not find a substantial question

16   of law or fact that's likely to result in a new trial or

17   reversal or a lower sentence.  Obviously, you are able to go

18   to the circuit.  They'll take a look at it.  If they see

19   something that they think is going to result in a likely or

20   at least a serious question for them, they obviously can give

21   you this relief, but I could not.  Again, I'm not -- I know

22   I'm far from perfect, but I just can't any basis on which I

23   can make the finding required by 3143 BB.  I don't have a

24   basis to make that finding, so the motion is denied.  Is

25   there anything further?

**A66**

176

1          I hate to prolong this, but I think I probably

2    failed to sort of sum my consideration of the factors.  And I

3    think the nature and circumstance of the crimes Mr. Litvak

4    committed, particularly in terms of their seriousness, their

5    impact on markets, the impact on the victims, his clients,

6    who as was argued, trusted him.  Indeed even to today still

7    trust him.  All of that is serious and weighs very heavily in

8    determining my sentence and imposing a sentence upon Mr.

9    Litvak.  There is, of course, his history and

10   characteristics, which all, in many respects if you take out

11   this conduct, all weigh very heavily in his favor, in effect,

12   in terms of the balance of these factors.  I think the last

13   factor really that's the most important in this case is the

14   whole deterrence issue, which I struggle with every time in a

15   white-collar case.  I don't have an empirical study.  I don't

16   have data that I have collected, but it's my belief that the

17   sentence should be significantly longer if I believe the

18   person will recidivate or is not a Category I defendant,

19   which is not unusual in fraud cases.  There are defendants

20   who commit multiple frauds.  In those cases, the need to

21   deter that defendant is significant and therefore the

22   sentence has to be long enough to accomplish.  That was not

23   present here, and least not present in my opinion.  That

24   didn't really weigh into my determination.  The general

25   deterrence issue is the one I really grapple with because of

177

 1   the lack of good analysis, good data, to show that I'm pretty
 2   persuaded, but I don't know that I have any evidence to prove
 3   it, but that a term of incarceration is a significant
 4   deterrent effect in white-collar crimes.  I'm not persuaded
 5   that making them long, whatever you define long is, longer
 6   than I made it here is necessary to accomplish that in this
 7   case.  I think sometimes those of us involved in the criminal
 8   justice system lose sight, and we have lost sight, certainly
 9   in drug cases, of how really long sentences are.  I just
10   suggest that you think about what you were doing two years
11   ago and ask yourself what's happened in your life, that will
12   measure to you what a two-year sentence is for this
13   defendant.  I think it's long enough to provide the public
14   deterrence, I will call it, the general deterrence that I
15   need to address.  Those are really how I kind of weighed and
16   considered and in the end balanced to come out to the
17   sentence that I did.
18          Unless there's anything further, the Court will
19   stand in recess.
20          (Whereupon, the above hearing adjourned.)
21
22
23
24
25

178

1

2

3

4

5    COURT REPORTER'S TRANSCRIPT CERTIFICATE

6    I hereby certify that the within and foregoing is a true and

7    correct transcript taken from the proceedings in the

8    above-entitled matter.

9

10   /s/  Terri Fidanza

11   Terri Fidanza, RPR

12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

AO245b (USDC-CT Rev. 9/07)

UNITED STATES DISTRICT COURT

Page 1                                     District of Connecticut

UNITED STATES OF AMERICA                      **JUDGMENT IN A CRIMINAL CASE**

              v.                              CASE NO. *3:13CR19 (JCH)*
                                              USM NO: *21467-014*
Jesse C. Litvak

                                              *Jonathan Francis*
                                              Assistant United States Attorney

                                              *Patrick Smith/Ross Garber*
                                              Defendant's Attorney

**THE DEFENDANT:  was found guilty on counts 1-6, 8-11, 12 and 13-16 of the Indictment.**

Accordingly the defendant is adjudicated guilty of the following offenses:

| Title & Section | Nature of Offense | Offense Concluded | Counts |
|---|---|---|---|
| Title 18, United States Code, Sections 78(b), 78ff | Securities Fraud | December 2011 | 1-6, 8-11 |
| Title 18, United States Code, Section 1031 | Asset Relief Program (TARP) Fraud | December 2011 | 12 |
| Title 18, United States Code, Section 1001 | False Statements | December 2011 | 13, 14, 15, 16 |

The following sentence is imposed pursuant to the Sentencing Reform Act of 1984.  The sentence imposed is a non-guideline sentence based upon the loss tables overstating the guidelines, the nature and circumstances of the offense and the history and characteristics of the defendant.  The sentence is sufficiently long to serve the need for deterrence.

**IMPRISONMENT**

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total of 24 months on each of counts 1-6 and 8-16, all to run concurrently, for a total term of imprisonment of 24 months.

**SUPERVISED RELEASE**

Upon release from imprisonment, the defendant shall be on supervised release for a total term of 3 years on each of counts 1-6 and 8-16, all to run concurrently, for a total term of supervised release of 3 years.  The Mandatory and Standard Conditions of Supervised Release as attached, are imposed. In addition, the following Special Conditions are imposed:
    1.   The defendant shall participate in a program approved by the Probation Office for inpatient or outpatient substance abuse treatment and testing.  The defendant shall pay all or a portion of the costs associated with treatment based on the defendant's ability to pay as determined by the Probation Office.
    2.   Restitution to be determined and Order of Restitution entered upon filing of submission, by the government within 45 days. The defendant shall pay any restitution that is imposed by this judgment, payable immediately, and any amount that remains unpaid at the commencement of the term of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month.  The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court.
    3.   The defendant shall pay the  fine that is imposed by this judgment, payable immediately, if not paid in full within 30 days, interest shall accrue at the legal/T-Bill rate in accordance with the statute,  and any amount that remains unpaid at the commencement of the term of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month. The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court
    4.   The defendant shall not incur new credit card charges above $250 or open additional lines of credit without the prior permission of the Probation Office until the defendant's criminal debt obligation is paid.  The defendant shall not add any new names to any lines of credit, shall not be added as a secondary card holder on another's line of credit, and shall provide the Probation Office with electronic access to any online management of any lines of credit, including lines of credit for businesses/LLC's that are owned, operated or otherwise associated with the defendant.

**A70**

Page 2

    5.  The defendant shall close all other savings/checking accounts, transfer all assets into one main bank account and shall not add any new account holders to that account (the account may include the defendant's spouse if there are joint marital assets/expenses).  The defendant shall provide the Probation Office with electronic "read only" access to any online management of the account.  The defendant shall provide the final statement from each account that is closed to ensure that no funds are dissipated during the closing of existing accounts and opening of the single account.

    6.  The defendant shall permit the Probation Office to monitor investment and retirement accounts, to include coordinating with the account administrator to notify the Probation Office of any activity on the account.

    7.  The defendant shall not encumber personal homes or investment properties without permission of the court, and shall not transfer, sell, give away, barter, or dissipate in any way any assets, including personal property (ie: motor vehicles, recreational vehicles) without the express permission of the Probation Office and notification to the court.

    8.  Upon request, the defendant shall submit a proposed budget (detailing expected income and expenses) to the Probation Office, after which the Probation Office shall communicate his/her approval to the defendant.  The defendant shall adhere to the approved budget and any deviations must be approved before incurring and paying the expense.  Any receipt of income or asset not anticipated by the approved budget shall be reported to the Probation Office within two days of the receipt of the income or asset, or within two days of the defendant's receipt of knowledge that such income or asset will be received, whichever comes sooner.  Such unanticipated income or asset can not be disposed of without prior permission of the Probation Office.

    9.  The defendant shall retain receipts for inspection, upon reasonable notice, any expenditures greater than $250.

    10.  The defendant shall not possess ammunition, a firearm or other dangerous weapon.

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments (as follows) or (as noted on the restitution order).

| | | |
|---|---|---|
| **Special Assessment:** | $1,500.00 | $100 on each of counts 1-6 & 8-16, for a total of $1,500 to be paid immediately. |
| **Fine:** | $1,750,000.00 | The defendant shall pay the fine that is imposed by this judgment, payable immediately, if not paid in full within 30 days, interest shall accrue at the legal/T-Bill rate in accordance with the statute,  and any amount that remains unpaid at the commencement of the term of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month.  The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court |
| **Restitution:** | | Restitution to be determined and Order of Restitution entered upon filing of submission, by the government within 45 days. The defendant shall pay any restitution that is imposed by this judgment, payable immediately, and any amount that remains unpaid at the commencement of the term of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month.  The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court. |

It is further ordered that the defendant will notify the United States Attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs and special assessments imposed by this judgment, are paid.

**A71**

Page 3

**JUDICIAL RECOMMENDATION(S) TO THE BUREAU OF PRISONS**

      The defendant shall be designated to the Satellite Camp at FCI Otisville**.**

**The defendant shall self surrender no sooner than 10/23/2014 and no later than 11/5/2014. In the event the defendant does not receive designation by the Bureau of Prisons by 11/5/2014, the defendant must self surrender to the United States Marshal, at New Haven, Connecticut by noon on 11/5/2014.**

**7/23/2014**                
Date of Imposition of Sentence

/s/Janet C. Hall            
Janet C. Hall
United States District Judge
Date:  7/25/2014

**RETURN**

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____, with a certified copy of this judgment.

_____
                  Joseph P. Faughnan
                  United States Marshal

By  _____
                  Deputy Marshal

*CERTIFIED AS A TRUE COPY*
*ON THIS DATE* _____
*ROBERTA D. TABORA, Clerk*
*BY:* _____
     *Deputy Clerk*

**A72**

# CONDITIONS OF SUPERVISED RELEASE

In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:

## MANDATORY CONDITIONS

■  (1)  The defendant shall not commit another federal, state or local offense;

■  (2)  The defendant shall not unlawfully possess a controlled substance;

☐  (3)  The defendant who is convicted for a domestic violence crime as defined in 18 U.S.C. section 3561(b) for the first time shall attend a public, private, or private non-profit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is available within a 50-mile radius of the legal residence of the defendant;

■  (4)  The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter for use of a  controlled substance;

☐  (5)  If a fine is imposed and has not been paid upon release to supervised release, the defendant shall adhere to an  installment schedule to pay that fine;

■  (6)  The defendant shall (A) make restitution in accordance with 18 U.S.C. sections 2248, 2259, 2264, 2327, 3663, 3663A, and 3664; and (B) pay the assessment imposed in accordance with 18 U.S.C. section 3013;

☐  (7)  (A)  In a state in which the requirements of the Sex Offender Registration and Notification Act  (see 42 U.S.C. §§ 16911 and 16913) do not apply, a defendant convicted of a sexual offense as described in 18 U.S.C. § 4042(c)(4) (Pub. L. 105-119, § 115(a)(8), Nov. 26, 1997) shall report the address where the defendant will reside and any subsequent change of residence to the probation officer responsible for supervision, and shall register as a sex offender in any State where the person resides, is employed, carries on a vocation, or is a student; or

        (B)  In a state in which the requirements of Sex Offender Registration and Notification Act apply, a sex offender shall (i) register, and keep such registration current, where the offender resides, where the offender is an employee, and where the offender is a student, and for the initial registration, a sex offender also shall register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence; (ii) provide information required by 42 U.S.C. § 16914; and (iii) keep such registration current for the full registration period as set forth in 42 U.S.C. § 16915;

■  (8)  The defendant shall cooperate in the collection of a DNA sample from the defendant.

While on supervised release, the defendant shall also comply with all of the following Standard Conditions:

## STANDARD CONDITIONS

(1)  The defendant shall not leave the judicial district or other specified geographic area without the permission of the court or probation officer;

(2)  The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

(3)  The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

(4)  The defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or any other possession or territory of the United States requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living);

(5)  The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

(6)  The defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within five days after such change;

(7)  The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician;

(8)  The defendant shall not frequent places where controlled substances are illegally sold,  used, distributed, or administered, or other places specified by the court;

(9)  The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

(10)  The defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

(11)  The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

(12)  The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

(13)  The defendant shall pay the special assessment imposed or adhere to a court-ordered installment schedule for the payment of the special assessment;

(14)  The defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay any unpaid amount of restitution, fines, or special assessments.


The defendant shall report to the Probation Office in the district to which the defendant is released within 72 hours of release from the custody of the U.S. Bureau of Prisons.  Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision and impose a term of imprisonment, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.


(Signed) _____          _____
                **Defendant**                                                              **Date**


         _____          _____
         **U.S. Probation Officer/Designated Witness**          **Date**

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

---

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 3rd day of October, two thousand fourteen.

Present:    RALPH K. WINTER,
               REENA RAGGI,
               PETER W. HALL,
                     *Circuit Judges.*

-----------------------------------------------------------------------

UNITED STATES OF AMERICA,
                    *Appellee*,

            v.

**ORDER**
No. 14-2902-cr

JESSE C. LITVAK,
                 *Defendant-Appellant*.

-----------------------------------------------------------------------

Defendant Jesse C. Litvak, through counsel, moves for release pending appeal. Upon due consideration, it is hereby ORDERED that the motion is GRANTED because Litvak has raised "a substantial question of law or fact likely to result in . . . reversal." 18 U.S.C. § 3143(b)(1). The conditions of release established by the district court shall remain in full force and effect during the pendency of this appeal.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

**A74**

<u>limine</u> that remain pending in this Ruling.  At the outset, the court notes that this Ruling

is based on the record currently before the court.

## II.     DISCUSSION

   A.     <u>Litvak's Motion <i>in limine</i> to Exclude Evidence that He Acted as an "Agent"</u>
          <u>or "Broker" for Counterparties (Doc. No. 356)</u>

Litvak has filed a Motion <u>in limine</u> seeking to exclude testimony by witnesses and

argument by the government that he acted as an agent of his counterparties in the

residential mortgage-backed security (RMBS) trades described in the Indictment.  <u>See</u>

Mem. of Law in Supp. of Def.'s Mot. <u>in limine</u> to Exclude Evidence that Mr. Litvak Acted

as an "Agent" or "Broker" for Counterparties at 1 ("Def.'s Agent/Broker Mem.") (Doc. No.

356-1).  In this same Motion, Litvak also seeks to exclude the government and its

witnesses from referring to Litvak as a "broker."  <u>Id.</u> at 8.  The government filed an

Opposition to Litvak's Motion, <u>see</u> Gov't Opp. to Def.'s Mot. <u>in limine</u> to Exclude

Evidence that Litvak Acted as an "Agent" or "Broker" ("Gov't's Agent/Broker Opp.")

(Doc. No. 387), to which Litvak timely replied, <u>see</u> Jesse C. Litvak's Reply in Supp. of

the Mot. <u>in limine</u> to Exclude Evidence that Litvak Acted as an "Agent" or "Broker"

("Def.'s Agent/Broker Reply") (Doc. No. 412).  The parties argued their respective

positions on this Motion at length during the oral argument held on June 16, 2016.  <u>See</u>

Minute Entry (Doc. No. 430).  For the reasons that follow, the court now grants in part

and denies in part Litvak's Motion.

---

reservation of the right to argue that the government has opened the door to certain lines of inquiry and testimony is necessary.  Nonetheless, at oral argument on the Motions <u>in limine</u>, the court noted that Litvak had explicitly reserved this right and terminated these Motions as moot in light of the parties' agreement.  <u>See</u> Minute Entry (Doc. No. 430).

Litvak's primary argument in this Motion is that, pursuant to Rules 401, 403, and 701 of the Federal Rules of Evidence, the government should be prohibited from (1) arguing that Litvak was an agent of the counterparties to the RMBS trades at issue in this case, and (2) eliciting testimony from witnesses that they understood Litvak to be acting as their agent during these trades. Much of Litvak's support for this Motion comes from the fact that, before the Second Circuit, the government "conceded that Litvak was acting exclusively as a principal, and not as an agent, in the transactions at issue in this case." <u>United States v. Litvak</u>, 808 F.3d 160, 187 n.32 (2d Cir. 2015). Therefore, he argues that any reference to "agents" or "agency" in front of the jury would be confusing and prejudicial. Def.'s Agent/Broker Mem. at 4 (Doc. No. 356). He also argues that permitting witnesses called by the government to testify that they understood Litvak to be operating as their agent would be improper under Rule 701. <u>See id.</u> at 6. In response, the government argues that, although "[t]here has never been any dispute that, as a legal matter, firms like Jefferies are 'dealers' engaged in 'principal' trades that have no fiduciary duties to their counter-parties," the court should not bar government witnesses from testifying as to what they "understood [their] relationship with Litvak to be, based on the facts of their interaction." Gov't Agent/Broker Opp. at 1, 2 (Doc. No. 387). According to the government, such testimony is factual, not legal, in nature. <u>Id.</u> at 4.

Given the government's concession that, as a matter of law, Litvak was <u>not</u> an agent of the counterparties during the RMBS trades at issue in this case, it would be highly improper for the government to argue to the jury that Litvak was an agent of the counterparties. The government does not dispute this point. Thus, to the extent

3

Litvak's Motion seeks to preclude the government from arguing to the jury, directly or by analogy, that Litvak was <u>actually</u> an agent of the counterparties during the RMBS trades, that part of the Motion is granted absent objection.

However, the court denies the part of Litvak's Motion that seeks to preclude witnesses from testifying about their <u>perception</u> of the relationship between Litvak and themselves, even if, in the course of such testimony, they colloquially say that they understood Litvak to be their "agent." Such testimony is both relevant and probative,[2] as it could plausibly be part of the government's efforts to "establish the materiality of the information Litvak misrepresented," and could likewise "contribute[ ] to the inference that Litvak was acting with fraudulent intent." Gov't's Agent/Broker Opp. at 9 (Doc. No. 387). Furthermore, because these witnesses are testifying to their own point of view— <u>i.e.</u>, what they understood their relationship to Litvak to be, based on the events leading up to these trades as they experienced them—this testimony is unlikely to confuse the jury or to be unduly prejudicial to Litvak, and any confusion or prejudice that could result can be ameliorated by cross-examination of the witnesses, the testimony of an expert witness for the defense, instruction to the jury that the witness's testimony is not the law, or all three. Because the testimony of witnesses for the government about their perceptions is (1) relevant, and (2) more probative than prejudicial, the evidence at issue is admissible under Rules 401 and 403 of the Federal Rules of Evidence.

---

[2] As the Second Circuit noted while holding that Marc Menchel should have been permitted to testify on "the agent/principal distinction" at the first trial, "[t]he nature of Litvak's relationship with the alleged victims formed the context in which the jury had to consider whether the portfolio managers and traders who testified reflected the views of a reasonable investor." <u>Litvak</u>, 808 F.3d at 187.

Nor should the evidence at issue be excluded as improper lay opinion testimony under Rule 701, as Litvak urges. In support of this argument, Litvak cites United States v. Garcia for the proposition that, "[i]f [a lay] opinion rests 'in any way' upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." Garcia, 413 F.3d 201, 215 (2d Cir. 2005) (citation omitted). Litvak argues that allowing lay witnesses to testify about their understanding of their relationship to Litvak runs afoul of this principal because "testifying about the legal status of the relationship between Mr. Litvak and his counterparties requires 'specialized knowledge.'" Def.'s Agent/Broker Reply at 4 (Doc. No. 412). In this argument, Litvak conflates evidence of what the legal status of the relationship between himself and the counterparties actually was (e.g., what that relationship was as a matter of law) with evidence about how the counterparties perceived their relationship with Litvak to be. While the former may rely on "scientific, technical, or other specialized knowledge," Garcia, 413 F.3d at 215, the latter does not. As noted above, no one disputes that, as a matter of law, Litvak was not the agent of his counterparties. That fact does not mean that individual counterparty witnesses are offering impermissible lay opinion testimony when they state that, based upon their experience of events and facts relevant to this case, they understood Litvak to be working on their behalf, even if, in the course of that testimony, they use the word "agent" in its colloquial sense to describe their understanding. Because the testimony the government seeks to offer about these witnesses' view of their relationship to Litvak is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge

within the scope of Rule 702," Fed. R. Evid. 701, this testimony is admissible under Rule 701.  Litvak's Motion in limine on this point is denied.

The court also denies Litvak's Motion to preclude the government and witnesses from referring to Litvak as a "broker."  As the government argues—and Litvak concedes—at the last trial the term "broker" and Litvak's preferred term of "dealer" were often used interchangeably.  See Def.'s Agent/Broker Reply at 5 (Doc. No. 412).  In light of this fact, Litvak concedes that he "does not ask the Court to take on the burden of policing witnesses' use of these terms[, n]or does he ask that all references to the term 'broker' be stricken from documentary evidence."  Id.  According to Litvak, he seeks merely to have "the government use the proper terminology in referring to Mr. Litvak's role."  Id.  However, the court sees little reason to police the government's use of a term that Litvak concedes would not be prejudicial in the mouths of witnesses or on the face of the government's documentary evidence, especially when the government will likely want to refer to the testimony of those witnesses and the content of those documents in their original language.  To the extent Litvak wants to draw out the distinction between dealers and brokers—and the importance of that distinction for this case—he can do so through cross-examination of the witnesses or the presentation of expert testimony. Any residual prejudice that could arise from jurors importing their understanding of what a "broker" is from their experiences in their day-to-day lives can be cured, if necessary, by an instruction to the jury, either at the time of the testimony or prior to their deliberations.  For these reasons, the court concludes that use of the term "broker" in this case is permissible under Rule 401 and is not excludable under Rule 403 (in particular, because use of the term is not unfairly prejudicial, confusing, or misleading to

the jury), and therefore denies Litvak's Motion in limine to exclude references to Litvak as a "broker" at trial.

In sum, this Motion in limine is granted in part and denied in part. The government will not be permitted to argue that Litvak was the agent of his counterparties as a matter of law, but witnesses will be permitted to testify to their understanding that Litvak was working on their behalf during the trades at issue in this lawsuit even if, in the course of such testimony, they colloquially refer to Litvak as their "agent." In addition, witnesses and the government will be permitted to refer to Litvak as a "broker" or "broker-dealer."

B.      Litvak's Motion *in limine* to Exclude Evidence about the Identity of
         Investors in Counterparty Funds (Doc. No. 357)

Litvak has filed a Motion in limine seeking to exclude "any evidence about the identity of any of the investors in the funds managed by Mr. Litvak's counterparties, including, but not limited to, the federal government." Mem. of Law in Supp. of Def.'s Mot. in limine to Exclude Evidence about the Identity of Investors in Counterparty Funds at 2 ("Def.'s Investor Identity Mem.") (Doc. No. 357-1). In this same Motion, Litvak also asks the court to strike "surplusage" in the Indictment "relating to the identity of investors in the counterparty funds." Id. at 9. The government filed an Opposition to Litvak's Motion, see Gov't Opp. to Def.'s Mot. in limine to Exclude Evidence of Alleged Victims' Investors ("Gov't Investor Identity Opp.") (Doc. No. 386), to which Litvak timely replied, see Jesse C. Litvak's Reply in Supp. of the Mot. in limine to Exclude Evidence about the Identity of Investors in Counterparty Funds ("Def.'s Investor Identity Reply") (Doc. No. 409). The parties argued their respective positions on this Motion during the oral

befell them by taking additional actions. The court agrees with the parties that this is the line that must be drawn pursuant to the principles of law outlined above, as well as Rules 401 and 403 of the Federal Rules of Evidence. In light of the foregoing, the court grants the government's Motion to the extent that Motion sought to preclude Litvak from offering evidence or making argument about what government witnesses should have done, and denies the Motion to the extent it sought to preclude Litvak from offering evidence or making argument about what government witnesses did and reasonable investors do.

F.    Government's Motion *in limine* to Preclude Evidence Regarding Other Broker-Dealers (Doc. No. 372)

The government has filed a Motion in limine seeking "an order precluding the defendant . . . from introducing evidence or argument regarding events or practices at broker-dealer firms other than Jefferies, absent some factual link to Litvak." Gov't's Mot. in limine to Preclude Evidence Regarding Other Broker-Dealers ("Gov't's Other Broker-Dealers Mot.") (Doc. No. 372). Litvak filed an Opposition to the government's Motion, see Jesse C. Litvak's Opp. to Gov't's Mot. in limine to Preclude Evidence Regarding Other Broker-Dealers ("Def.'s Other Broker-Dealers Opp.") (Doc. No. 392), to which the government timely replied, see Gov't's Reply Mem. in Supp. of its Mot. in limine to Preclude Evidence Regarding Other Broker-Dealers ("Gov't's Other Broker-Dealers Reply") (Doc. No. 405). The parties argued their respective positions on this Motion during the oral argument held on June 16, 2016. See Minute Entry (Doc. No. 430). For the reasons that follow, the court now grants in part and denies in part the government's Motion.

In their briefing and again at oral argument, the parties represented that the evidence that is the subject of this Motion in limine falls into three categories: (1)

evidence that counterparties knew they were being lied to by traders like Litvak, or that counterparties "switched hats" from being investors to being broker-dealers and themselves engaged in the kinds of misrepresentations Litvak allegedly made; (2) evidence related to an "industry practice" of making misrepresentations of the kind Litvak is alleged to have made to counterparties; and (3) evidence related to changes companies in the industry made to their training and compliance programs after Litvak was indicted. See Def.'s Other Broker-Dealers Opp. at 1-2 (Doc. No. 392); Gov't's Other Broker-Dealers Reply at 2 (Doc. No. 405). Although the government has stated that Litvak believes the aforementioned categories of evidence "somehow bear on materiality or intent," Gov't's Other Broker-Dealers Mot. at 1 (Doc. No. 372), Litvak himself suggests that the evidence at issue is most relevant to the element of materiality, see Def.'s Other Broker-Dealers Opp. at 3 (Doc. No. 392). The court will consider each of these categories separately and in turn.

The first category of evidence primarily relates to statements by government witnesses that tend to suggest they were aware of, and did not care about, misrepresentations of the kind allegedly made by Litvak.[8] This evidence is highly relevant to the question of whether Litvak's alleged misrepresentations would have been material to a reasonable investor, and is therefore admissible under Rule 401. This evidence is also significantly more probative than prejudicial, confusing, or misleading, and therefore should not be excluded under Rule 403. At oral argument,

---

[8] It bears emphasizing that this analysis is predicated on the assumption that the evidence at issue will show that the government witnesses knew or suspected they were being lied to, and indicated in some manner that that fact was not important or significant to them. Evidence that shows simply that Litvak or other traders lied to the counterparties or similarly situated individuals on other occasions does not fall within the scope of this analysis; such evidence falls within "category two," discussed infra at 26.

25

**A82**

the parties appeared largely to agree that this evidence should be admitted for the reasons described above.

The second category of evidence relates to the "industry practice of making misrepresentations to customers about price." Def.'s Other Broker-Dealers Opp. at 2 (Doc. No. 392) (quoting the government). In his briefing, Litvak appears to suggest that this evidence is comprised of "[f]act testimony from some of the investors interviewed by the government" that "they were aware of the 'industry practice'" of making misrepresentations of the kind charged in Litvak's Indictment. Id. If this is, in fact, all the evidence that Litvak wishes to offer of an industry practice, the court would admit this evidence for the reasons described in the analysis with respect to the first category of evidence at issue in this Motion: the court concurs with Litvak that evidence that investors similarly situated to the counterparties in this case were aware that traders similarly situated to Litvak made misrepresentations of the kind Litvak is alleged to have made and were indifferent to that fact (or discounted the information provided by traders on that basis) is relevant to the materiality of the misrepresentations charged in the Indictment. This is because, as noted at multiple points above, materiality is judged by an objective standard, from the perspective of a reasonable investor. See Litvak, 808 F.3d at 175, 184. Fact testimony from other investors that they were aware of, and did not care about, misrepresentations like the ones charged in the Indictment could tend to show that an objective, reasonable investor would not view such misrepresentations as material. Any possibility that information about investors other than the counterparties in this case could confuse the issues or mislead the jury is outweighed by the probative

value of the information discussed.  For these reasons, this evidence is admissible under Rule 401 and is not amenable to exclusion under Rule 403.

However, the government appears to think that, notwithstanding Litvak's representations in his briefing, the evidence Litvak seeks to introduce under the auspices of "category two" is not limited to evidence that other investors were aware of, and were indifferent to, misrepresentations of the kind charged in the Indictment.  In its briefing, the government suggests that Litvak will seek to introduce evidence about actions and events at firms other than Jefferies.  See Gov't's Other Broker-Dealers Mot. at 2 (Doc. No. 372).  In other words, the government appears to think that Litvak may attempt to introduce evidence that other broker-dealers similarly situated to Litvak at companies other than Jefferies made the same kinds of misrepresentations Litvak is alleged to have made.  To the extent Litvak made any argument about the relevance of such evidence in his briefing or at oral argument on this Motion, his response would appear to be that evidence of an "industry practice" as established by testimony regarding the actions of other broker-dealers is relevant because the fact that the whole industry engaged in these kinds of misrepresentations makes it less likely that reasonable investors would rely on this information.

The problem with Litvak's argument is that he skips a necessary, logical step: the fact that many (or all) RMBS broker-dealers engaged in the kinds of misrepresentations charged in the Indictment does not affect the likelihood of a reasonable investor viewing those misrepresentations as material[9] (or immaterial)

---

[9] This section discusses the question of whether evidence of the kind described above is relevant to materiality, because Litvak has represented that materiality is the element of securities fraud to which this evidence relates.  However, some of this evidence could also, at least arguably, be relevant to the

unless investors were aware that traders made these kinds of misrepresentations. Put another way, the fact that people in Litvak's position regularly lied does not tend to make it more likely that objective, reasonable investors viewed those lies as immaterial unless there is also reason to believe those same reasonable investors were aware the lies were happening. For this reason, the court will exclude as irrelevant under Rule 401 evidence that broker-dealers at firms other than Jefferies regularly engaged in misrepresentations of the kind charged in the Indictment unless the defense can connect those misrepresentations to knowledge by investors.

Even if statements by other broker-dealers that they regularly engaged in the kinds of misrepresentations charged in the Indictment were relevant within the meaning of Rule 401, however, the court would exclude that evidence as confusing, misleading, and prejudicial under Rule 403. At the end of the day, this case is about Jesse Litvak. It is not a trial of the entire RMBS industry, and while some evidence about the RMBS industry is relevant and not outweighed by Rule 403 factors, not all evidence about the RMBS market is such. There is little probative value to evidence that tends to show that the whole RMBS industry engaged in the kind of conduct for which Litvak has been indicted (again, absent some showing that investors were aware of the fact that broker-dealers regularly engaged in this conduct), and the presentation of this evidence bears

---

element of intent. See Litvak, 808 F.3d at 188-190 (stating that evidence that Litvak's supervisors were aware other broker-dealers at Jefferies engaged in the kind of conduct charged in the Indictment could support an argument that Litvak lacked intent to defraud). To the extent that Litvak will seek to introduce evidence of the conduct of broker-dealers at companies other than Jefferies to support an argument that he lacked an intent to defraud, the court would likely find that evidence to be marginally relevant within the meaning of Rule 401. However, given that the probative value of evidence of the conduct of broker-dealers at firms other than Jefferies—if there is no evidence that Litvak was actually aware of this conduct—appears exceedingly slight, and the risk that the introduction of this evidence will cause undue delay, confuse the issues, mislead the jury, and prejudice the government is high, see discussion infra at 29-30, the court would exclude this evidence under Rule 403.

an enormous risk of confusing and misleading the jury with respect to the task before

them.  The introduction of such evidence would also prejudice the government and

cause undue delay because, as the government notes, it will be forced to litigate "a 'trial

within a trial' with regard to other traders' fraudulent conduct."  Gov't's Other Broker-

Dealers Reply at 4 (Doc. No. 405).  For all of these reasons, the court concludes that

the probative value of evidence that there was an "industry practice"[10] of making the

kinds of misrepresentations charged in the Indictment is "substantially outweighed" by

the risk that evidence will cause "unfair prejudice, confus[e] the issues, mislead[ ] the

jury, [cause] undue delay, [and] wast[e] time," Fed. R. Evid. 403, and therefore will

exclude that evidence.

The third category of evidence relates to "changes that dealers have made to

training and compliance programs in recent years in response to the charges the

government filed in this case."  Def.'s Other Broker-Dealers Opp. at 2 (Doc. No. 392).

Litvak has represented that two of his experts "may opine about these changes,"

including "changes in compliance programs that have been reported about in

connection with the Nomura case."  Id.  At oral argument, Litvak contended that this

evidence is relevant because it tends to show that the kinds of misrepresentations

charged in the Indictment weren't viewed as being significant by people in the industry

until Litvak was indicted.  According to Litvak, the fact that these kinds of training and

---

[10] At oral argument, Litvak expressly disavowed any intention to raise an "everybody did it" defense, which means that this Ruling should have little bearing on Litvak's trial strategy.  As the text of this section should make clear, the court has endeavored to draw a line between evidence that could be relevant to materiality or intent (e.g., evidence that Jefferies had a standard operating procedure of condoning conduct like Litvak's, or evidence that investors were aware that broker-dealers regularly engaged in such conduct) with evidence that is only relevant to a defense based on the alleged fact that many other broker-dealers engaged in this conduct, too (i.e., evidence that other broker-dealers regularly lied to investors).

compliance programs were established <u>after</u> Litvak's Indictment is relevant to the question of whether misrepresentations like the ones charged in the Indictment were viewed by people in the industry as being material <u>before</u> Litvak's Indictment. For substantially the same reasons articulated in connection with the court's analysis of "category two" evidence, the court disagrees.

As noted in the preceding section, the court does not view the actions and beliefs of other broker-dealers similarly situated to Litvak to be relevant within the meaning of Rule 401 on the element of materiality, because that element does not ask what kinds of statements an objective, reasonable <u>broker-dealer</u> would view as being material, but rather what an objective, reasonable <u>investor</u> would view as being material. Thus, evidence that tends to show that other broker-dealers also engaged in the kind of conduct alleged in Litvak's Indictment—whether that evidence takes the form of direct testimony from other broker-dealers or the more attenuated form of evidence about compliance programs instituted by these companies after Litvak was indicted—is simply not relevant unless accompanied by evidence that investors were aware of these misrepresentations. Thus, the court will exclude this evidence under Rule 401.

Even if this evidence was marginally relevant, however, the court would exclude it under Rule 403. Evidence about compliance programs instituted after Litvak was indicted at firms other than Jefferies is disconnected both factually and temporally from the conduct at issue in this lawsuit. Its probative value, if any, is marginal. But this same evidence carries a high risk of confusing the issues, misleading the jury, and causing delay, for the reasons explained above with respect to "category two" evidence.

Because the probative value of the evidence is substantially outweighed by these other factors, the court will also exclude the evidence pursuant to Rule 403.

In sum, the government's Motion in limine is granted in part and denied in part. The Motion is denied to the extent the government sought to preclude evidence related to whether counterparty witnesses or investors similarly situated to counterparty witnesses viewed misrepresentations like the ones charged in the Indictment as material. Some of this evidence may bear on whether there was an "industry practice" of broker-dealers making the kinds of misrepresentations charged in the Indictment, but again, such evidence must come from the perspective of investors, given that the element of materiality is assessed from the perspective of an objective, reasonable investor. The Motion is granted to the extent the government sought to preclude evidence related to misrepresentations by other broker-dealers at companies other than Jefferies, so long as this evidence is not either (1) factually connected to Litvak (i.e., that he was aware of these misrepresentations in a way that could bear on the element of intent), or (2) supported by evidence that specific investors were aware of these misrepresentations (which could be relevant to the element of materiality).

## III. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the pending Motions in limine as follows:

Litvak's Agent/Broker Motion (Doc. No. 356) is **GRANTED IN PART** and **DENIED IN PART**. The government will not be permitted to offer evidence or argument intended to show that, as a matter of fact and law, Litvak was actually the agent of his counterparties, but the government's witnesses are permitted to testify, on the basis of

1

```
 1              UNITED STATES DISTRICT COURT.

 2               DISTRICT OF CONNECTICUT

 3    _____
      United States of America   )January 5, 2017
 4               Government  )9:15 a.m.
            v.                )
 5    Jesse C. Litvak           )3:13cr19(JCH)
                 Defendant.   )
 6    _____)

 7
                            141 Church Street
 8                          New Haven, Connecticut

 9         DAY ONE OF TRIAL

10

11    B E F O R E :
                 THE HONORABLE JANET C. HALL, U.S.D.J.
12               AND JURY OF 16

13    A P P E A R A N C E S :

14    For The Government  :   Jonathan Francis
                              William Nardini
15                            Heather Cherry
                              U.S. Attorney's Office
16                            157 Church St., 23rd floor
                              New Haven, CT 06510

17

18    For the Defendant  :   Dane Butswinkas
                              C. J. Mahoney
19                            Adam Harber
                              Katherine Trefz
20                            Elise Baumgarten
                              Krystal Commons
21                            Williams & Connolly
                              725 12th St., N.W.
22                            Washington, DC 20005-5901

23                            Michael Chase
                              Shipman & Goodwin
24                            One Constitution Plaza
                              Hartford, CT  06103

25
```

193

1    that separately.

2        Q.    This is what you are asking him to do when you say

3    put the bonds in the chat provide this information?

4        A.    Yes.    Provide this information.    If we're the only

5    two in the chat, it wouldn't have been to my team.

6        Q.    You say you can get your guys started on them.    Who

7    are your guys?

8        A.    So we have analysts who spend the day analyzing the

9    bonds that we're looking to buy or sell.

10       Q.    Let's talk about this analysis.    We're going to take

11   a break from this document.    We'll come back to it.

12             Tell us about the analysis that AllianceBernstein

13   does this four analysts?

14       A.    So in analyzing a RMBS bond, basically what you were

15   trying to do is to forecast how many folks -- how many of the

16   mortgages inside of the bond, how many of those folks are

17   going to keep paying on their mortgage, how many of them are

18   going to prepay their mortgage.    And how many of them might

19   default and through doing all of that, we come up with, you

20   know, a forecast of what the price and yield would look like

21   under different scenarios.

22       Q.    Explain to us how you go about doing that.

23       A.    So we have a quantitative model that basically means

24   that we try to use what we know about borrowers and history,

25   their FICO scores which is just a credit score, how much

**A90**

194

1    their house is worth relative to their mortgage or what we

2    call the loan to value and we look at the history of all of

3    that, and we did a lot of mathematical analysis to see how

4    that leads, what percentage of times that leads to somebody

5    prepaying their mortgage, continuing to pay or defaulting.

6        Q.    And these models I assume it is not like a physical

7    model so what does that word "model" mean?

8        A.    It means big mathematical equations.

9        Q.    Where do you get those?

10       A.    We have hired, you know, people who specialize in

11   doing that to analyze the historical data and trends, you

12   know, people defaulting and prepaying to develop these

13   forecasting tools or modeling tools.

14       Q.    Now, this is -- you said "we," this is

15   AllianceBernstein done this?

16       A.    Yes.

17       Q.    So does it share -- does AllianceBernstein share its

18   analysis techniques and models in the industry?

19       A.    No.

20       Q.    Do you share them with Mr. Litvak or did you?

21       A.    We might share occasionally some of the results but

22   not the details of the interworkings of it, but we might

23   share some of it.  Just in terms of like it is helpful for

24   him to understand what kind of bonds we want to buy versus

25   don't want to buy.

195

1    Q.   So what's the result of for instance these
2  particular five bonds, you were going to have your guys get
3  started on them.  What's the output of all of this work, this
4  analysis for AllianceBernstein?
5    A.   Typically it is a matrix of prices that we could
6  potentially buy it at and different resulting yields under
7  different scenarios.  That's typically the output, if you
8  will.
9    Q.   Why are you doing all of this?
10   A.   Because we want to buy bonds that are going to
11 perform the best that, you know, there's a lot of bonds to
12 choose from, and we want to pick bonds that we think are
13 going to fundamentally have the best mortgage borrowers in
14 them.  We want to know what the right price is to pay for
15 those bonds.
16   Q.   So Mr. Litvak is showing five bonds, would
17 AllianceBernstein necessarily be interested in buying all
18 five of these?
19   A.   Not necessarily, no.
20   Q.   How does modeling help AllianceBernstein, analysis
21 of AllianceBernstein decide which bonds it wants to buy?
22   A.   So we do this analysis.  We also have something we
23 call the fundamental score card where we would look at all
24 the different mortgages were and ranked the whole universe of
25 RMBS bonds into quartile, and that helped us sort it out so

1    we would focus on bonds that were in our upper quartile.

2        Q.    What's the point of picking certain bonds to be

3    interested in?  What's the ultimate goal of the all of this

4    analysis?

5        A.    To get the best results for our investors, to get

6    the best yield, and the best returns and make the most money

7    we could.

8        Q.    This block that I highlighted the time stamp is

9    14:55:55.  It continues onto the next page, not as a block,

10   but Mr. Litvak continues to write.  He writes I think these

11   levels are spot on within maybe half a point, pt, these

12   levels are still four to five points off the high as we saw

13   in early Jan whereas hybrids and fixed are at/through those

14   highs and then right now, he writes right now I'm only

15   showing these to you.  That first thing he wrote about these

16   levels being spot-on.  Can you translate that for us?

17       A.    I think what he's saying is the offers on the bonds

18   that you were just showing, he thinks that those offers are

19   at the market level.  Meaning where transactions have been

20   taking place recently.

21       Q.    Let me go bark to that.  It is a little hard on the

22   eyes when it is all yellow.  I will unhighlight it.  I want

23   to talk about the block that I zoomed in on the screen.

24            I will pick the HVMLT0610 bond that you had been

25   writing about with Mr. Litvak earlier.  What is the

1          UNITED STATES DISTRICT COURT.

2           DISTRICT OF CONNECTICUT

3    _____
     United States of America   )January 6, 2017
4               Government  )9:07 a.m.
          v.                )
5    Jesse C. Litvak          )3:13cr19(JCH)
               Defendant.   )
6    _____)

7
                              141 Church Street
8                             New Haven, Connecticut

9          DAY TWO OF TRIAL

10          (WITH SEALED PORTION)

11   B E F O R E:
                    THE HONORABLE JANET C. HALL, U.S.D.J.
12                  AND JURY OF 14

13   A P P E A R A N C E S:

14   For The Government  :   Jonathan Francis
                             William Nardini
15                           Heather Cherry
                             U.S. Attorney's Office
16                           157 Church St., 23rd floor
                             New Haven, CT 06510

17

18   For the Defendant  :   Dane Butswinkas
                             C. J. Mahoney
19                           Adam Harber
                             Katherine Trefz
20                           Elise Baumgarten
                             Krystal Commons
21                           Williams & Connolly
                             725 12th St., N.W.
22                           Washington, DC 20005-5901

23                           Michael Chase
                             Shipman & Goodwin
24                           One Constitution Plaza
                             Hartford, CT  06103

25

**A94**

305

1  own profitability, it is trading as a principal?

2      A.   Yes.

3      Q.   And when a broker dealer is acting as a principal,

4  it makes money off the difference between what they can buy a

5  bond for and what they can sell a bond for; is that correct?

6      A.   Yes.

7      Q.   There's no separate commission charge in those

8  circumstances?

9      A.   No.  It's in the price.

10     Q.   It is all markup?

11     A.   Yes.

12     Q.   In fact, markup and dealer profit are used somewhat

13 interchangeably?

14     A.   That's fair.

15     Q.   In those situations, the markup is fully embedded in

16 the total price you pay?

17     A.   Yes.

18     Q.   There are no separate charges?

19     A.   That's right.

20     Q.   One price to the fund includes whatever profit the

21 dealer is making?

22     A.   That's right.

23     Q.   As a dealer, you are going to buy at one price and

24 sell at a higher price?

25     A.   That's right.

**A95**

306

1    Q.   And in order trades, for example, like HarborView

2    2006 and LXS 2007, it is okay for the dealer to quote you a

3    price that is higher than it might be able to buy the bond

4    from its seller?

5    A.   Sure.

6    Q.   That's how the dealers make money off of what you

7    call the spread?

8    A.   Yes.

9    Q.   In order trades, it is pretty much normal practice

10   for a dealer to quote a higher price than he can actually buy

11   the bond for so he can make profit?

12   A.   Yes.

13   Q.   Each and every time that you purchase bonds from

14   Jefferies, Jefferies was trading on its own account?

15   A.   I wouldn't know that.  That was my assumption, but I

16   wouldn't know it.

17        MR. BUTSWINKAS:  Your Honor, may I approach the

18   witness?

19        THE COURT:  Yes, you may.

20        MR. BUTSWINKAS:  Thank you.  I don't think I need

21   to.  Could you put up, Andrew, just for identification

22   purposes Exhibit 2088, please.

23   BY MR. BUTSWINKAS:

24   Q.   Mr. Canter, you have given testimony before relating

25   to this case, have you not?

1    A.    I have.

2    Q.    Sworn testimony?

3    A.    Yes.

4    Q.    Where you were under oath?

5    A.    Yes.

6    Q.    Let me direct your attention to page 505 of this

7    document.  Starting at line 22.  If you can follow along with

8    me.  Were you asked this question and did you give this

9    answer?  Question:  And you understood when you were dealing

10   with Jefferies, each and every time on each trade in this

11   case, that Jefferies was trading for its own account as a

12   principal on the dealer side of the house, right?

13         Do you see that question?

14   A.    Yes.

15   Q.    And you answered yes; isn't that true?

16   A.    Yes.

17   Q.    Not on broker side, correct, sir?

18   A.    Say again.

19   Q.    Not on the broker side?

20   A.    No.

21   Q.    You said that your standard practice is to pay the

22   broker dealer -- at one point you said 4 to 8 ticks and

23   another time you said 4 ticks.  Do you want to clarify that?

24   A.    Four ticks on the bid list was a standard number.

25   We didn't really have a standard number on order trades.

308

1    Could be zero, could be 4.  That was typical.  Sometimes it

2    was a little bit higher in order trades.

3       Q.   Was this a written agreement that you had with

4    broker dealers?

5       A.   No.

6       Q.   I didn't see it any of the electronic chats that the

7    Government showed you.  Was it in the some electronic

8    communication that you had with Mr. Litvak?

9       A.   No.

10      Q.   I think you testified yesterday that this was an

11   agreement that you had with the broker dealers that were

12   approved by AllianceBernstein to do work with them; is that

13   right?

14      A.   It was with the larger dealers.  I don't know that

15   we had the agreement with every single dealer.  Some of them

16   are quite small that we didn't do a lot of business with.

17      Q.   And is this standard agreement for pricing with

18   these broker dealers in these multi-million dollar

19   transactions written down someplace?

20      A.   No.

21      Q.   You said you talked to Mr. Litvak about this

22   agreement, but not by electronic chat; is that right?

23      A.   Yes.

24      Q.   When did you that talk to him about it?

25      A.   I think when we first launched the fund.

**A98**

309

```
 1        Q.    The first time you saw Mr. Litvak was at a -- I
 2   think you said at a conference?
 3        A.    Yes.
 4        Q.    And you spoke to him there for less than 10 minutes;
 5   isn't that right?
 6        A.    No.
 7        Q.    Did you talk to him about this standard agreement
 8   then?
 9        A.    I don't recall.
10        Q.    Then another time you were at a dinner with
11   Mr. Litvak and a bunch of people; is that right?
12        A.    I don't know what you are referring to.
13        Q.    Did you -- you don't remember any dinners with him?
14        A.    I did have dinner with him, but I don't know what
15   you're --
16        Q.    Did you talk to them about the standard agreement at
17   a dinner that you had?
18        A.    I don't remember.
19        Q.    Was it on the phone or in person?
20        A.    When we talked about this?
21        Q.    Yes.
22        A.    I don't remember.
23        Q.    And there isn't any document that the jurors could
24   look at to see that agreement in writing, am I correct about
25   that?
```

**A99**

310

```
 1        A.   Yes.

 2        Q.   So the dealer brings you a bond that it bought at

 3   one price and sells to you at a higher price?  That's the

 4   process?

 5             MR. FRANCIS:  Objection.  Asked and answered.

 6             THE COURT:  I will allow it.  It sounds like he's

 7   starting again.

 8             THE WITNESS:  Yes.

 9   BY MR. BUTSWINKAS:

10        Q.   That's how they get paid?

11        A.   Yes.

12        Q.   That's not a commission?

13        A.   Technically, no.

14        Q.   You're familiar with an organization called SIFMA,

15   are you not?

16        A.   I am.

17        Q.   S-I-F-M-A, right?

18        A.   Yes.

19        Q.   It stands for what?

20        A.   Off the top of my head, I'm not sure.

21        Q.   Do you remember the name Securities Industry

22   Financial Markets Association?

23        A.   Yes.

24        Q.   It is a trade association in your industry?

25        A.   Yes.
```

1      A.   Yes.

2      Q.   You are trying not to buy under that yield bogey, as

3   I think you testified earlier?

4      A.   That's right.

5      Q.   On the three bonds that are this board over here

6   that I have written, none of them were bought at below your

7   yield bogey, were they?

8      A.   I don't believe so, no.

9      Q.   The HarborView 2006 purchase that you made from

10  Jesse met your yield bogey, didn't it?

11     A.   It did.

12     Q.   The LXS 2007 bond that you bought from Jesse met

13  your yield bogey?

14     A.   Yes.

15     Q.   And the HarborView 2007 bond met your yield bogey?

16     A.   Yes.

17     Q.   As part of your investment strategy at

18  AllianceBernstein, you used quantitative forecasting?

19     A.   Yes.

20     Q.   And you combine your quantitative forecasts with

21  what you call fundamental research?

22     A.   Yes.

23     Q.   Would you tell the jury what fundamental research

24  is?

25     A.   Sure.  So the quantitative analysis deals much more

**A101**

327

1    with analyzing historical data, and the fundamental analysis

2    would deal more with looking at softer things, not hard data

3    necessarily, so some of it is, but things like who the

4    servicer is on the bond, meaning what company is interacting

5    with the actual homeowners, what states the different

6    borrowers are in.  And we may views about which states are

7    better to have risk in, meaning would we rather be exposed to

8    homeowners in California or Florida.  And that may not be

9    reflected in the quantitative analysis, so we developed a

10   view different than -- that's our fundamental view different

11   than the quantitative hard data analysis.

12       Q.   The reason that you combine your quantitative

13   forecasts with your fundamental research is to exploit

14   inefficiencies in the fixed income market?

15       A.   Yes.

16       Q.   And you hold yourself as having a research style

17   that is bottom up; is that correct?

18       A.   Not solely, but yes.

19       Q.   What does that mean?

20       A.   Which part?

21       Q.   Research style that is bottom up?

22       A.   It means that we're looking at -- when we look at

23   bonds, we're looking at them individually and we're analyzing

24   them individually.  We're not just looking at, okay, which

25   way are housing prices going.  That would be sort of top

**A102**

328

1    down.   This is bottom ups.   We're looking at each individual

2    bond, you know, sort of individually.

3        Q.    Your bottom up research is influenced by what you

4    just referred to the top down research?

5        A.    Yes.

6        Q.    That's work that's done by your macroeconomic

7    research group; is that right?

8        A.    Yes.

9        Q.    And others?

10       A.    And others.

11       Q.    Your investment process relies heavily on

12   proprietary research; is that correct?

13       A.    Yes.

14       Q.    Research that generates investment returns?

15       A.    We hope so.

16       Q.    And the process begins with the proprietary expected

17   return forecast?

18       A.    Yes.

19       Q.    And that comes from your quantitative research team;

20   is that correct?

21       A.    I'm not sure that they necessarily -- would

22   necessarily come from the quantitative team.

23       Q.    They are involved in that?

24       A.    So the quantitative team builds a model that helps

25   us forecast, and then the fundamental team determines how

**A103**

329

```
1    exactly to use that in our analysis that gets us to our end
2    sort of result of what we think of the bond.
3         Q.   It allows you to narrow your focus?
4         A.   Yes.
5         Q.   And identified securities that appear to be the most
6    or the least attractive?
7         A.   Yes.
8         Q.   And that is built on?  You don't stop there, right?
9    Strike that.
10             You don't stop there, do you?  There's more work
11   that's done?
12        A.   I'm sorry.  You have to -- stop where?
13        Q.   Let me ask it this way.  You just described a lot of
14   work to the jury that you do and you build on that work by
15   more in-depth analysis by your fundamental research teams?
16        A.   Yes.
17        Q.   And those teams focus on forecasting forward-looking
18   expected returns?
19        A.   Yes.
20        Q.   Which either confirm or refute your quantitative
21   model findings?
22        A.   Yes.
23        Q.   So you're double checking your work?
24        A.   I wouldn't call it double checking.
25        Q.   What do you do when it refutes your model findings?
```

**A104**

1    A.   It's just part of the process.  I don't -- it -- we

2  -- we look at both quantitative and fundamental and try to

3  make the best decision we can on any one bond.

4    Q.   You are trying to see if whether those two separate

5  analyses are consistent with one other, right?

6    A.   Correct.

7    Q.   You are looking to see does one conflict with the

8  other and does the other conflict with the first, right?

9    A.   Yes, that's right.

10    Q.   You are trying to see consistency because that will

11  help you in your judgment?

12    A.   Right.  So if we have quantitative and fundamental

13  both pointing in the right direction, that's better than if

14  we have the two disciplines, if you will, on opposite

15  sides.

16    Q.   So after the quantitative forecast and after the

17  fundamental forecast, you have the monthly research review

18  sessions?

19    A.   When you say -- are you referring to

20  AllianceBernstein in general or --

21    Q.   I'm talking about the meetings of your most senior

22  research and portfolio management professionals have regular

23  meetings.

24    A.   That's true, but was not true for the PPIP team.

25    Q.   Didn't you tell your Government -- didn't you tell

331

1    the Government that that's the way the process worked?

2        A.    That was the way the process worked until the PPIP

3    team was walled off into a separate unit.

4        Q.    So at the time you proposed this program to the

5    Government, that's how it worked?

6        A.    Yes.

7        Q.    You also have a portfolio management team, right?

8        A.    Yes.

9        Q.    And they make some final research

10   recommendations from all the work that you described?

11       A.    The research team makes research recommendations and

12   the portfolio management teams decides how to implement those

13   recommendations.

14       Q.    They turned all of that into an appropriate

15   portfolio risk target?

16       A.    Yes.

17       Q.    They do this with the use of proprietary portfolio,

18   what you all call optimization tools?

19       A.    Again, I'm not sure that applied to the PPIP fund

20   once it got started.

21       Q.    Let me direct your attention, if I may, to

22   Defendant's Exhibit 2137, which is already in evidence.  Page

23   459, please.  Let me direct your attention to the to the

24   paragraphs -- Andrew, if you can blow that up for me, please.

25   And the paragraph just above that.  I'm sorry.  My mistake,

**A106**

406

```
1        Q.   Okay.  Let's talk about HarborView 2007.  Another
2   guy at AllianceBernstein actually had the discussions with
3   Mr. Litvak about that bond, right, not you?
4        A.   Yeah.
5        Q.   That was Mr. Schick?
6        A.   Yes.
7        Q.   And did Mr. Schick have any in-person meetings with
8   Mr. Litvak about that bond?
9        A.   Not while that negotiation was going on, no.
10       Q.   Did Mr. Schick have any phone conversations with
11  Mr. Litvak?
12       A.   I don't know.
13       Q.   If he did, you don't know what was said?
14       A.   Correct.
15       Q.   And you weren't -- you didn't say anything in the
16  chats that Mr. Litvak had with Mr. Schick about the
17  HarborView 2007 bond, did you?
18       A.   Not that I saw.
19       Q.   And the total markup on that bond was also less than
20  1 percent, wasn't it?
21       A.   Again, I'm -- I just don't have these facts
22  committed to memory.
23       Q.   The total price that AllianceBernstein paid on all
24  three of these bonds was supported by your internal
25  analytics?
```

**A107**

407

1     A.    Yes.

2     Q.    The total price that you paid on all three of these

3    bonds was consistent with what your independent judgment told

4    you was a good price?

5     A.    Yes.

6     Q.    And consistent with what your internal pricing

7    analysis had told you was a good price?

8     A.    Good and met our yield bogey.

9     Q.    And you had a lot of information that you looked at

10   to determine that the prices you paid for these three bonds

11   were good prices?

12    A.    Yes.

13    Q.    In terms of your independent judgment and your

14   internal analytics, you don't feel you overpaid for these

15   bonds?

16    A.    I don't feel I overpaid in terms of -- that the

17   analytics supported those prices, no.

18    Q.    And regardless of anything that Jesse said to you

19   with respect to any of these three bonds, none of these bids

20   you believed were too high to pay for that bond on that day;

21   isn't that right?

22    A.    That's true.

23    Q.    And ultimately, AllianceBernstein bought these bonds

24   because you liked the bonds and you liked the price?

25    A.    Yes.

408

1    Q.    And on each of those bonds, you paid less than the

2    maximum amount that you would have been prepared to pay?

3    A.    I don't recall.

4    Q.    Perhaps?

5    A.    Perhaps.

6    Q.    What was the maximum price you were prepared to pay

7    for HarborView 2006?

8    A.    I don't recall.

9    Q.    How about LXS 2007?

10   A.    I don't recall.

11   Q.    How about HarborView 2007?

12   A.    I don't recall.

13   Q.    In your many meetings with the Government, did you

14   see any document that the jury could look at if they wanted

15   to know the answer to that question?

16   A.    I don't think so, no.

17   Q.    What were really talking about here is not that you

18   didn't get a good price but that a larger slice of the total

19   price went to Jefferies than you thought at the time?

20   A.    Yes.

21   Q.    And less went to the company that sold Jefferies the

22   bond than you thought at the time?

23   A.    Or less AllianceBernstein, depending on how you look

24   at it.

25   Q.    Whether you could have bought at some lower price

409

1    from Jefferies, you have no idea?

2        A.    On these three particular trades?

3        Q.    Yes, sir.

4        A.    That's correct.

5        Q.    For example, on a BWIC trade like HarborView 2007,

6    if Jesse had just put in your bid as opposed to a lower bid,

7    you would have got the bond, added the same markup and paid

8    exactly what you paid?

9        A.    I'm sorry.  I think I need to correct my answer.  I

10   forgot that the last bond listed there was a bid list bond.

11   So I -- my view would be on a bid list bond that -- I don't

12   know for certain that I could have gotten it at a better

13   price, but it is likely that I could have if I had bid

14   through somebody who was being honest with me.

15       Q.    It is possible, but you are not sure?

16       A.    Unless that person was being dishonest --

17       Q.    Can you answer the question I posed to you?  If

18   Jesse had just put in your bid as you expected him to do, you

19   would have got the bond at that bid price?

20       A.    Correct.

21       Q.    And you would have added the same number of ticks

22   that you added?

23       A.    Correct.

24       Q.    You would be in the identical situation that you are

25   in today?

**A110**

410

1      A.    Yes.

2      Q.    The concern about putting in a lower bid is that you

3  might lose the bond, right?  If he puts in a bud that is too

4  low, the bond might slip away?

5      A.    Right, and that's not what we asked him to do.

6      Q.    That didn't happen?  The bond didn't slip away?

7      A.    Maybe not that particular one.

8      Q.    On ones we're talking about here, the bond didn't

9  slip away, did it?

10     A.    No.

11     Q.    Nothing about the investment performance of these

12 three bonds changed at all given what you later learned about

13 Jefferies' actual acquisition cost; isn't that right?

14     A.    That's right.

15     Q.    Those new facts had no direct impact on the fund as

16 of the trade date; isn't that right?

17     A.    That's right.

18     Q.    The total price that AllianceBernstein paid on all

19 three bonds was a price that your internal analytics told

20 you was in the best interest of the fund?

21     A.    Yes.

22     Q.    The total price you paid for all three bonds was a

23 price that your judgment told you was in the best interest of

24 the fund?

25     A.    Yes.

**A111**

411

1    Q.   Otherwise, you be wouldn't have bought them at these

2    total prices?

3    A.   Fair enough.

4    Q.   You still believe today that the total prices you

5    paid for these bonds were in the best interest of your fund

6    to pay?

7    A.   Yes, given what I knew, yes.

8    Q.   On the day of each of those purchases, you satisfied

9    yourself that the total price Jefferies was selling to you at

10   was the best available price for those bonds that day?

11   A.   I did.

12   Q.   In terms of best execution, the price that you got

13   was the best available for that day for those three bonds?

14   A.   I don't know that for certain.  I know that we would

15   have checked to see if that was the case, but it is possible

16   that transactions happened in the marketplace that we weren't

17   aware of.

18   Q.   Sitting here today looking back, solely in terms on

19   the price, you would buy all three of these bonds at the same

20   total price that you paid then?

21   A.   Yes.

22   Q.   But you have to be cautious, don't you, about

23   information that you get in the marketplace?

24   A.   You mean from dealers?

25   Q.   For example.

412

1     A.    Yes.

2     Q.    Especially information that is unverified?

3     A.    Sure.

4     Q.    You have to be careful not to give it undue weight

5     in your analysis; is that fair?

6     A.    In the analysis part of it, yes.

7     Q.    And you try not to overrule your internal analysis

8     with information that you can't verify, right?

9     A.    The internal analysis doesn't really deal with what

10    the market price is or is not.  The internal analysis deals

11    with what our return to the investors may be.  It doesn't

12    deal with what the going market price is.

13    Q.    Let me ask the question more directly.  Isn't it

14    correct that at the time period when you were interacting

15    with Mr. Litvak, you knew that there were negotiating tactics

16    in the market that shaded the truth?

17    A.    Sure.

18    Q.    And so, therefore, you were especially careful when

19    you were weighing information that you got that could not be

20    verified?

21    A.    Sure.

22    Q.    That makes perfect sense for a reasonable investor

23    of your type?

24    A.    Yes.

25    Q.    For these qualified institutional buyers, that is

**A113**

413

1    how sophisticated investors like that think about these

2    questions?

3         A.    Sure.

4         Q.    And you had prior instance, I think you talked about

5    on direct, when a trader had been misleading to you about

6    their profit margin?

7         A.    Yes.

8         Q.    So you knew incidences like that were out there in

9    this market?

10        A.    I do.

11        Q.    For example, in March of 2010, you learned that a

12   trader at Caprock had misled you about the profit that they

13   were making on a trade?

14        A.    Yes.

15        Q.    And so that type of experience informs your judgment

16   as you go forward as a buyer and seller in the RMBS market;

17   is that true?

18        A.    I'm not sure.   I think I had that impression before

19   that experience.

20        Q.    I'm sorry, sir?

21        A.    I believe I had that impression before the

22   experience with Caprock.

23        Q.    So you didn't even need to have that extra

24   experience to already know I better have my antenna up?

25        A.    Correct.

**A114**

414

1      Q.    I better be careful about volunteered information?

2      A.    Yes.

3      Q.    I better view it with skepticism?

4      A.    Yes.

5      Q.    You knew, for example, that at the time you were

6    buying bonds from Jesse there was a tactic that some traders

7    used calling backing up bids?

8      A.    Yes.

9      Q.    And that's a practice where the trader takes your

10   bid, puts in a lower bid to try to get the bond for lower so

11   it can make extra profit?

12     A.    Yes.

13     Q.    And that practice was something that you knew about

14   being in existence in the RMBS market when you were

15   negotiating with Jesse?

16     A.    I knew it existed.

17     Q.    And when the traders did this, the concern is that

18   if they go in with too low a bid trying to make extra money

19   for themselves, they might lose the bond?

20     A.    Right.

21     Q.    We know that didn't happen here on the HarborView

22   2007 bond because you got the bond?

23     A.    Yes.

24     Q.    Now, there are a lot of -- I think you alluded to

25   this earlier.  This market has its own language?

424

1   alliance.

2       Q.   Explain why.

3       A.   Because at this -- at the date of this Bloomberg

4   chat, we were liquidating the PPIP fund so we were no longer

5   in the process of buying a lot of bonds, we were in the

6   process of selling the bonds and returning all the money to

7   investors and the Treasury Department.  And so higher prices

8   when you are selling -- when you are interested in selling

9   more than buying, higher prices are good.

10      Q.   One form of color that sometimes gets disseminated

11  in this market is called cover; is that right?

12      A.   Yes.

13      Q.   When a bidder wins an action, for example, the price

14  that they won the auction at is usually not disclosed in the

15  market?

16      A.   Yeah, usually not, but sometimes it is.

17      Q.   But the second place bid often is?

18      A.   It certainly -- it is -- I don't think it is as much

19  anymore, but back then I think it was more often.

20      Q.   And that second bid is called cover?

21      A.   Yes.

22      Q.   You have heard the phrase "false cover"?

23      A.   I don't -- that particular phrase, I don't think is

24  sort of market lingo.

25      Q.   You understand what it refers to?

**A116**

425

1      A.   Yes, yes.

2      Q.   Explain to the jury what it refers to.

3      A.   When -- after an auction occurs, the seller of the

4    auction can release through Bloomberg messages to the dealers

5    some commentary about what the second place bid was, and they

6    can then turn around and release that information to all of

7    the potential customers out there.  And if they do that, if

8    they are not straightforward about that, I guess you can use

9    the term false, but I think it is usually not very -- it's

10   usually not precise cover, sometimes it is released.

11     Q.   When it is precise cover, it is a lie about what the

12   second place price was?

13     A.   I don't think I have heard that term before, but

14   what you are saying makes sense.

15     Q.   There were instances that you are aware of that when

16   an auction is completed, people in this market have

17   disseminated cover prices that were false?

18     A.   Yes.

19     Q.   That happens from time to time?

20     A.   Sure.

21     Q.   It happened a lot back then?

22     A.   Again, I don't know how often it happens, but it

23   certainly happened and people are aware about it and talk

24   about it.

25     Q.   One reason that happen is because there might be a

**A117**

426

1    significant gap between the winning bid price and the second
2    place price, right?
3        A.   Yes, that's one reason.
4        Q.   And so in those instances, someone might lie about
5    the second place price to make it seem like the first place
6    price was an accurate price for that bond, right?
7        A.   Yes.
8        Q.   That's the idea?
9        A.   I think that happens, yes.
10       Q.   Sellers, for example, out there, they don't want the
11   second place price that was way down here released because it
12   makes them look like idiots for buying way up here, right?
13       A.   Yeah, and typically it is when the dealers buy the
14   bond for their own inventory that they are sensitive to that
15   because they eventually need to turn around and sell it.  And
16   so that's usually why the sensitivity occurs.
17       Q.   So that false second place bid price is being used
18   to buck up that other purchase price in the market, right?
19       A.   I wouldn't use that wording, but it's there to --
20   again, if it is -- if you put out second place commentary,
21   you may do it in a way that makes it easier for the dealer to
22   eventually sell the bond.
23       Q.   There's a lot of false pricing information out and
24   about in this market, isn't there, or there was back then?
25       A.   I think that's right.

**A118**

```
1              UNITED STATES DISTRICT COURT.

2                DISTRICT OF CONNECTICUT

3   _____

    United States of America   )January 9, 2017
4               Government      )9:28 a.m.
          v.                    )
5   Jesse C. Litvak            )3:13cr19(JCH)
              Defendant.        )
6   _____)

7
                                141 Church Street
8                               New Haven, Connecticut

9           DAY THREE OF TRIAL

10

11  B E F O R E:
                    THE HONORABLE JANET C. HALL, U.S.D.J.
12                  AND JURY OF 14

13  A P P E A R A N C E S:

14  For The Government  :    Jonathan Francis
                             William Nardini
15                           Heather Cherry
                             U.S. Attorney's Office
16                           157 Church St., 23rd floor
                             New Haven, CT 06510
17

18  For the Defendant   :    Dane Butswinkas
                             C. J. Mahoney
19                           Adam Harber
                             Katherine Trefz
20                           Elise Baumgarten
                             Krystal Commons
21                           Williams & Connolly
                             725 12th St., N.W.
22                           Washington, DC 20005-5901

23                           Michael Chase
                             Shipman & Goodwin
24                           One Constitution Plaza
                             Hartford, CT  06103

25
```

**A119**

514

1    Q.   Where they are trying to figure out what's the

2    accurate price for this particular bond?

3    A.   Right.

4    Q.   And they will also reach out into the market, just

5    as you said York does, to broker-dealers and other market

6    participants to get pricing information on that particular

7    bond?

8    A.   Correct.

9    Q.   They will assess all of that information

10   independently and provide it to York; is that right?

11   A.   Yes.

12   Q.   On a monthly basis?

13   A.   Yes.

14   Q.   On each bond in the portfolio?

15   A.   Yes.

16   Q.   So that means for the DSLA bond, that was done

17   monthly for every month that you had owned that bond?

18   A.   Yes.

19   Q.   And obviously, since, as you said you -- on direct

20   you have this duty to your investors, it's super important

21   that those pricing calculations be as accurate as possible?

22   A.   Yes.

23   Q.   In fact, in all the decisions that you make at York,

24   you want to make sure, to the best of your ability, that you

25   are making the decisions on reliable information?

**A120**

515

```
 1         A.    Yes.

 2         Q.    You try to double check your work?

 3         A.    Yes.

 4         Q.    And verify what you are doing?

 5         A.    Yes.

 6         Q.    You don't want to give undue weight to information

 7    that you can't verify, for example?

 8         A.    We do the best that we can.

 9         Q.    Now, the most recent mark on the DSLA bond at the

10    time you were negotiating with Mr. Litvak was 54?

11         A.    Um-hum.

12         Q.    Is that right?

13         A.    I think so.

14         Q.    That mark would have come at the end of the prior

15    month?

16         A.    Yes.

17         Q.    So just about a week earlier, the company had done

18    all of the things that you described that it does to price

19    that bond, and it priced it at 54?

20         A.    Yes.

21         Q.    That would mean internally looking at all of the

22    information that you just described, right?

23         A.    Yes.

24         Q.    Then externally, turning to a third-party pricing

25    company to figure out what's the price at which that bond
```

**A121**

518

1      Q.    And York holds itself out, as I think you described,

2   to its investors as a sophisticated investor?

3      A.    Yes.

4      Q.    It holds itself out to its investors as having a

5   sophisticated ability to analyze distressed assets?

6      A.    Yes.

7      Q.    Like residential mortgage-backed securities?

8      A.    Yes.

9      Q.    And York is, if you know, a qualified institutional

10  buyer?

11     A.    Yes.

12     Q.    Could you explain to the jury what that is?

13     A.    It means that we are considered sophisticated enough

14  to make investment decisions about complicated securities and

15  bonds and stocks, that sort of thing.

16     Q.    I'm sorry, I didn't mean to interrupt you.  To do

17  that independently based on your expertise and experience?

18     A.    Yes.

19     Q.    And York holds itself out to its investors as having

20  an edge in independent research?

21     A.    Yes.

22     Q.    It relies for its investment decisions on

23  quantitative research?

24     A.    Yes.

25     Q.    And qualitative research?

**A122**

519

1    A.    Yes.

2    Q.    To make informed independent investment judgments?

3    A.    Yes.

4    Q.    About what to buy?

5    A.    Um-hum, yes.

6    Q.    About what to sell?

7    A.    Yes.

8    Q.    How much to buy it for?

9    A.    Yes.

10    Q.    And how much to sell it for?

11    A.    Yes.

12         MR. BUTSWINKAS:  I would like to show just for

13    identification purposes just to Ms. Corso Defendant's 2114.

14    May I approach the witness?  I want to give her a hard copy.

15         THE COURT:  You may.

16    BY MR. BUTSWINKAS:

17    Q.    Ms. Corso, I'm giving a hard copy and ask you if you

18    can look through it and then identify it?

19    A.    Sure.  This is a market document for the York Credit

20    Opportunities Fund.

21    Q.    Do you see the date is December 2009?

22    A.    Yes.

23         MR. BUTSWINKAS:  Your Honor, I offer Defendant's

24    Exhibit 2114.

25         MS. CHERRY:  No objection.

**A123**

520

1          THE COURT:  2114 is a full exhibit.

2     BY MR. BUTSWINKAS:

3          Q.   Ms. Corso, how is a document like this used?

4          A.   It is distributed to our investors or potential

5     invest -- potential and current investors.

6          Q.   For what purpose?

7          A.   To solicit investments in our fund.

8          Q.   Let me turn you to page 14 in that.  It will come up

9     on the screen.  You don't have to use a hard copy, but you

10    are able to if you prefer.  There's a description of the

11    investment process at York Capital.  Have you seen this

12    before?

13         A.   Yes.

14         Q.   It starts out with idea generation.  Do you see that

15    on the left?

16         A.   Yes.

17         Q.   And I take it that the things in the box under idea

18    generation are things that York talks about when it is

19    soliciting investors?

20         A.   Yes.

21         Q.   Like being able to track financial events, for

22    example?

23         A.   Yes.

24         Q.   And having extensive industry knowledge, for

25    example?

**A124**

521

1      A.   Yes.

2      Q.   And keeping up with a trade journals and the

3  industry news letters?

4      A.   Yes.

5      Q.   Then the second step in investment process is idea

6  analysis.

7      A.   Yes.

8      Q.   And under that are the things that York focuses on

9  for that stage in the investment process; is that right?

10     A.   Yes.

11     Q.   For example, having expertise in valuation?

12     A.   Yes.

13     Q.   And what is margin of safety?

14     A.   Margin of safety would be understanding your

15  risk/reward.  If you are going to buy something, you wouldn't

16  want to buy something that could go to zero.  You would want

17  to buy something that you feel comfortable owning.

18     Q.   Being careful about what you buy?

19     A.   Yes.

20     Q.   And then third is maintaining an expertise in the

21  industry that you might be investing in?

22     A.   Yes.

23     Q.   Analyzing it carefully?

24     A.   Yes.

25     Q.   And then scenario analysis decision tree, would you

**A125**

522

1    explain what that is?
2        A.   Understanding your investments, assuming different
3    scenarios play out for better or for worse.
4        Q.   So it's part of the analysis that goes into
5    investment judgment?
6        A.   Yes.
7        Q.   And that's a sophisticated process, isn't it, at
8    York?
9        A.   Yes.
10       Q.   It involves computer modeling, for example?
11       A.   Yes.
12       Q.   Internal analytics?
13       A.   Yes.
14       Q.   The company looks at a mountain of data before it
15   makes judgment about what to invest?
16       A.   Yes.
17       Q.   It looks at a mountain of data before it decides
18   what price it will buy something at, for example?
19       A.   Yes.
20       Q.   It looks at a mountain of data before it decides
21   what price it will sell something at?
22       A.   Yes.
23       Q.   And then at the bottom of this idea analysis, it has
24   liquidity analysis.  Would you explain what that is?
25       A.   I would say it is just understanding, you know,

1  where you can buy and sell something.

2      Q.   The next stage in the investment process at York is

3  called idea refinement.  Do you see that?

4      A.   Yes.

5      Q.   Would you explain what that is?  Let me ask the

6  question more specifically.  The first bullet point is

7  identify catalyst/trade timing.  What does it mean by trade

8  timing?

9      A.   York tends to be -- a lot of our investments are

10  geared towards an event.  So that's what that means.  Buying

11  something with the idea of an event happening.

12      Q.   Making sure that timing is an important component of

13  the equation?

14      A.   Usually.  It's an event-driven trade.

15      Q.   And the identify risk/reward.  We talked about that

16  a little bit already.  And then third is relative versus

17  absolute value.  Will you explain to the jury what that

18  means?

19      A.   Relative value means if you are looking at two

20  different bonds and identifying which one is more attractive

21  than the other.  Absolute value is looking at an investment

22  on its own.

23      Q.   So as in the residential mortgage-backed securities

24  area, it means looking at Bond A versus Bond C (sic) and Bond

25  C?

540

1  know of that would shed any light on what those

2  communications were or weren't?

3      A.    I'm sorry, I don't.

4      Q.    The price of 61 on the DSLA bond was in line with

5  York's internal analytics; is that correct?

6      A.    Yes.

7      Q.    It was in line with your analysis of the curves?

8      A.    I think so.

9      Q.    If the levels that Jesse had suggested were too low,

10 you would have just passed on the sale?

11     A.    Yes.

12     Q.    You had -- you and your colleagues had complete

13 control over that decision?

14     A.    Yes.

15     Q.    And the price of 61 was consistent with what the

16 internal analytics were telling you was a good price?

17     A.    Yes.

18     Q.    Consistent with what your curves were telling you

19 was a good price?

20     A.    Yes.

21     Q.    You used, I think you said earlier, a number of

22 different broker-dealers; is that right?

23     A.    Yes.

24     Q.    More than 10?

25     A.    I don't know.

**A128**

541

1    Q.    This is the only trade you ever did with Jesse?

2    A.    I think so.

3    Q.    So you didn't know him particularly well, for

4    example?

5    A.    No.

6    Q.    I take it there are plenty of traders out there that

7    you had traded with multiple times?

8    A.    We didn't do a lot of trading.

9    Q.    So maybe not?

10   A.    Maybe not.

11   Q.    And when you found out that Jesse had marked up in

12   his sale to his purchaser different than he had told you, you

13   said that you might be willing to work with him again if he

14   worked his way back into your good graces?

15   A.    In so many words, yes.

16   Q.    And any profit margin to Jefferies on that bond came

17   from its sale in the other transaction, right?

18   A.    Yes.

19   Q.    So no part of the proceeds of your sale of that bond

20   to Jefferies went to any fees or any costs?

21   A.    No.

22   Q.    Or any ticks?

23   A.    Any what?

24   Q.    Ticks.

25   A.    No.

542

1     Q.    No part of this internal profit was any kind of

2   charge-back back to York?

3     A.    No.

4     Q.    You were paid exactly what you were told you would

5   be paid, 61?

6     A.    Yes.

7     Q.    And when Jefferies acquires a bond, it bears the

8   risk of what happens with that bond?

9     A.    Yes.

10    Q.    For example, if this other transaction falls

11  through, that's Jefferies' problem?

12    A.    Yes.

13    Q.    That can happen?

14    A.    Yes.

15    Q.    When Jefferies buys a bond, it owns it as a

16  principal?

17    A.    Yes.

18    Q.    It can hold it or sell it?

19    A.    Yes.

20    Q.    It is entitled to every cent of the profit it earns

21  if it sells it?

22    A.    Yes.

23    Q.    And I take it that if Jesse had said I have a place

24  in my inventory for this bond and I will buy it from you at

25  61 and that's my bottom line, you would have sold it?

**A130**

543

1      A.    Yes.

2            MS. CHERRY:   Objection.

3            THE COURT:   Basis?

4            MS. CHERRY:   Calls for speculation.

5            THE COURT:   I will allow the answer to stand.

6    BY MR. BUTSWINKAS:

7      Q.    I take it that if the price of 61 has not been

8    consistent with the internal analytics, you would not have

9    done the trade?

10     A.    Correct.

11     Q.    If your price of 61 was not consistent with the

12   fundamentals of the bond as you saw them, you would not have

13   done the trade?

14     A.    Correct.

15     Q.    You thought trading at 61 was in the best interest

16   of your investors?

17     A.    Correct.

18     Q.    And that was based on all of the work that you have

19   described?

20     A.    Yes.

21     Q.    At the time you were deciding to sell, you knew that

22   York was carrying the bond on its books as a price of 54?

23     A.    Yes.

24     Q.    That was a factor that played into this analysis --

25     A.    Yes.

544

1        Q.    -- about whether to sell and at that price?

2        A.    Yes.

3        Q.    At the time you were deciding to sell, you knew what

4    the financial impact on York would be if you consummated the

5    sale?

6        A.    Yes.

7        Q.    And that was a factor in your analysis of whether to

8    sell?

9        A.    I think ultimately, you know, where the bond is

10   marked is not as relevant to the price you are going to sell

11   it because you might not agree with the mark.

12       Q.    Did you express any disagreement with the mark to

13   any of your people at York?

14       A.    I don't remember.

15       Q.    Because you said it is important, as you said

16   earlier, that those marks be accurate?

17       A.    Yes.

18       Q.    And if there's somebody with your expertise that

19   thinks the mark is wrong, then you have to speak up?

20       A.    Yes.

21       Q.    You don't remember doing that?

22       A.    No.

23       Q.    Now, what was your bottom line price?

24       A.    Can you repeat the question?

25       Q.    What was your bottom line price on the DSLA price?

545

1    A.    My bottom line price?

2    Q.    Yes.

3    A.    What do you mean by that?

4    Q.    Would you have sold it for 60?

5    A.    I don't know.

6    Q.    Would you have sold it in the 50s?

7    A.    I don't think so.

8    Q.    Is there a document that would have the answer to

9    that question for the jury?

10   A.    I don't know, but the e-mail exchange posted earlier

11   suggested that I was interested in selling it at a 60 area to

12   low 60s price.

13   Q.    You mean the e-mail that Mr. Litvak sent you?

14   A.    Yes.

15   Q.    Where you said perfect?

16   A.    Yes.

17   Q.    Would there have been a document that existed that

18   would have shown the range of prices that were acceptable to

19   you?

20   A.    It probably existed, but I don't know if it exists

21   today.

22   Q.    But there probably was a document that showed that

23   at one point in time?

24   A.    Yes.

25   Q.    When you finished this sell -- sorry.  Let me start

546

1  that again.

2          When you completed the sale to Jefferies at 61, you

3  thought that was a great price?

4      A.   Yes.

5      Q.   And you shared quickly the terms of that sale with

6  your colleagues?

7      A.   I think so.

8      Q.   Like Mr. Vrattos?

9      A.   Yes, I think so.

10     Q.   I am sure I'm going to mess this up.

11 Ms. Manischewitz?

12     A.   Yes.

13     Q.   Is that right?

14     A.   You go it.

15     Q.   Who is Mr. Vrattos?

16     A.   He is the portfolio manager of the fund, of the

17 Credit Opportunities Fund.

18     Q.   Ms. Manischewitz, who is she?

19     A.   She's another partner of the firm.

20     Q.   And Mr. Wachtel who we saw earlier, you shared the

21 information about the sale with him?

22     A.   I think so.

23          MR. BUTSWINKAS:  Your Honor, I would like to put on

24 the screen just for identification purposes and draw the

25 Court's attention to this document as well, Defendant's

697

1              UNITED STATES DISTRICT COURT.

2                DISTRICT OF CONNECTICUT

3    _____
     United States of America    )January 10, 2017
4                   Government   )9:28 a.m.
             v.                   )
5    Jesse C. Litvak             )3:13cr19(JCH)
                 Defendant.      )
6    _____)

7
                                 141 Church Street
8                                New Haven, Connecticut

9          DAY FOUR OF TRIAL

10

11   B E F O R E:
                     THE HONORABLE JANET C. HALL, U.S.D.J.
12                   AND JURY OF 14

13   A P P E A R A N C E S:

14   For The Government  :    Jonathan Francis
                              William Nardini
15                            Heather Cherry
                              U.S. Attorney's Office
16                            157 Church St., 23rd floor
                              New Haven, CT 06510

17

18   For the Defendant   :    Dane Butswinkas
                              C. J. Mahoney
19                            Adam Harber
                              Katherine Trefz
20                            Elise Baumgarten
                              Krystal Commons
21                            Williams & Connolly
                              725 12th St., N.W.
22                            Washington, DC 20005-5901

23                            Michael Chase
                              Shipman & Goodwin
24                            One Constitution Plaza
                              Hartford, CT  06103

25

**A135**

735

1    what your bottom line is?

2        A.    When I don't know the other side -- when I don't let

3    the other side know what my bottom line is.  Bottom line

4    meaning what?

5        Q.    The maximum price at which you are willing to

6    purchase.

7        A.    Not until the very end.  Yeah.  That's fair.  There

8    is a lot of instances where I wouldn't let the counter-party

9    know what my maximum price is that I'm willing to pay.

10       Q.    That's a pretty basic negotiation strategy?

11       A.    It is one of the basic negotiation strategies.

12       Q.    And buyers obviously want to, as you said, pay less?

13       A.    Buyers would want to pay less.

14       Q.    And the party across the table, the seller, they

15   always want you to pay more?

16       A.    They would always want me to pay more, correct.

17       Q.    Their interests across the table are not aligned

18   with one another?

19       A.    They are not aligned, no.

20       Q.    I take it you have to have a level of skepticism as

21   you go through these negotiations?

22       A.    I do have, yeah.

23       Q.    Especially about volunteered information, for

24   example?

25       A.    About any information, I would say, communicated to

**A136**

736

```
1    you.
2         Q.   There's a general perception in the RMBS market that
3    it can be less than truthful at that time?
4         A.   What could be less than truthful?
5         Q.   Information that is exchanged.
6         A.   Sorry.  Can you repeat that?
7         Q.   Yes, sir.  During that period of time when you were
8    at Magnetar, I am just going to focus on 2009 to 2011, there
9    was a general perception in the market that there was a lot
10   of information out there that was less than truthful?
11        A.   That some information could be less than truthful,
12   yes.
13        Q.   That's one of the reasons why you approach these
14   negotiations with skepticism?
15        A.   That would be one of the reasons, yes.
16             MR. BUTSWINKAS:  No further questions, Your Honor.
17             THE COURT:  Brief redirect.
18                         REDIRECT EXAMINATION
19   BY MS. CHERRY:
20        Q.   Mr. Lemin, good morning.
21        A.   Hello.
22        Q.   You were asked about Magnetar's proprietary models.
23   Do you remember that?
24        A.   Yes.
25        Q.   Mr. Butswinkas just asked you.
```

**A137**

```
1                  UNITED STATES DISTRICT COURT.

2                     DISTRICT OF CONNECTICUT

3      _____
       United States of America    )January 10, 2017
4                     Government   )9:28 a.m.
              v.                   )
5      Jesse C. Litvak             )3:13cr19(JCH)
                    Defendant.     )
6      _____)

7
                                   141 Church Street
8                                  New Haven, Connecticut

9            DAY FOUR OF TRIAL

10

11     B E F O R E:
                     THE HONORABLE JANET C. HALL, U.S.D.J.
12                   AND JURY OF 14

13     A P P E A R A N C E S:

14     For The Government  :    Jonathan Francis
                                William Nardini
15                              Heather Cherry
                                U.S. Attorney's Office
16                              157 Church St., 23rd floor
                                New Haven, CT 06510
17

18     For the Defendant   :    Dane Butswinkas
                                C. J. Mahoney
19                              Adam Harber
                                Katherine Trefz
20                              Elise Baumgarten
                                Krystal Commons
21                              Williams & Connolly
                                725 12th St., N.W.
22                              Washington, DC 20005-5901

23                              Michael Chase
                                Shipman & Goodwin
24                              One Constitution Plaza
                                Hartford, CT  06103

25
```

**A138**

741

1           THE COURT:  Mr. Norris, yes.  Mr. Norris, sir, if
2    you would come up to the witness stand area.  It's just to my
3    left where I'm pointing.  When you arrive, I'd ask if you'd
4    remain standing.  The clerk here is going to administer an
5    oath to you.  Thank you.
6                          BRIAN NORRIS,
7      having been called as a witness, was first duly sworn and
8                 testified on his/her oath as follows:
9           THE WITNESS:  I do.
10          THE CLERK:  Please state your name, spell your last
11   name, and give your city and state of residence.
12          THE WITNESS:  Brian Norris, N-O-R-R-I-S.
13   Louisville, Kentucky.
14          THE COURT:  You may be seated, sir, and good morning
15   to you.
16          THE WITNESS:  Good morning.
17          THE COURT:  Whenever you're ready, Attorney Cherry.
18          MS. CHERRY:  Thank you.
19                      DIRECT EXAMINATION
20   BY MS. CHERRY:
21       Q.   Good morning, Mr. Norris.
22       A.   Good morning.
23       Q.   If you can please tell the jury where you work.
24       A.   I work at Invesco Advisors in Louisville, Kentucky.
25       Q.   And what is Invesco Advisors?

**A139**

742

1      A.    It's an investment management firm.  Our clients

2    hire us to invest in the financial market for them.

3      Q.    And what is your title at Invesco?

4      A.    Senior portfolio manager.

5      Q.    What do you do there?

6      A.    So in our office in Louisville, the portfolio

7    managers have dual roles.  The first of which is as a

8    portfolio manager we kind of oversee the investments of the

9    funds that are assigned to us.  So we oversee them to ensure

10   that they are in line with client expectations as well as our

11   own strategy at the time.  And then secondarily, we also

12   serve as traders for specific sectors of the market that we

13   focus on.

14     Q.    And how long have you been there?

15     A.    Since March of 2001.

16     Q.    Can you give the jury a little bit of your

17   educational background?

18     A.    Sure.  I went to the University of Louisville.  I

19   graduated with a finance degree in 1998.  I worked for a

20   smaller firm in Louisville after that for a few years before

21   moving on to Invesco in 2001.  And also have the charter

22   financial analyst designation, which I achieved roughly, say,

23   12 years ago.

24     Q.    Who are the types of investors in the Invesco

25   fund?

743

1      A.    It's mostly what we call institutional investors, so

2   pension plans and 401(k) plans, banks, insurance companies,

3   government entities.  We also do have a little bit of high

4   net worth as well, so individuals, but mostly institutional

5   assets.

6      Q.    And did you trade non-agency RMBS bonds as part of

7   your role in Invesco?

8      A.    Yes, I do.

9      Q.    And do you use broker-dealers to trade the RMBS

10  bonds?

11     A.    Yes.

12     Q.    About how many broker-dealers do you use?

13     A.    In a typical year, we'll transact with up to 30

14  different broker-dealers.

15     Q.    Can you describe the criteria or the way that you

16  choose what broker-dealers to work with?

17     A.    Sure.  So Invesco proper has a department that will

18  analyze broker-dealers both for their -- you know, their

19  financial statements to ensure that they are worthy

20  counter-parties for Invesco, as well as any kind of

21  regulatory issues.  Usually our compliance or legal

22  department will look into that just to make sure there's

23  nothing in the way of regulatory issues that could prevent

24  them from finishing a transaction with us.  So Invesco proper

25  will do that analysis.

**A141**

744

1    We'll get a list of, you know, 100 different firms

2  that we could trade with.  Then once it gets to my desk,

3  we'll look at the firms that are -- you know, that we think

4  have expertise in the sectors that we're trading, first that

5  we can trust and firms that are kind of active in the markets

6  that we're active in.

7    Q.   You said "we" will look at.  Who is "we"?

8    A.   My group in the Louisville office.  We have 18

9  different people in our -- what we call our structured

10 securities group in Louisville.

11   Q.   Did you execute trades with the broker-dealer

12 Jefferies?

13   A.   Yes, we have.

14   Q.   And who would you work with at Jefferies?

15   A.   Typically, what we do is each client such as Invesco

16 would be assigned a salesperson by the broker-dealer.  So

17 typically who I work with is the salesperson that is

18 assigned to our account.  And then there are also instances

19 that we will deal directly with a trader of a particular

20 security.

21   Q.   So have you dealt directly with Mr. Litvak when you

22 traded?

23   A.   Yes.  Yes, I have.

24   Q.   How frequently did you trade with Mr. Litvak?

25   A.   Not very frequently.  Jefferies wasn't one of our

**A142**

745

1    top firms that we dealt with.  Again, like I said, out of our

2    say up to 30 that we transact with on a given year, Jefferies

3    is generally around 15th or so -- 15 to 20 place.

4                MS. CHERRY:  Your Honor, I would like to offer

5    Exhibit 43B.

6                THE COURT:  Any objection to 43B?

7                MR. BUTSWINKAS:  No, Your Honor.

8                THE COURT:  43B is a full exhibit and may be

9    published.

10   BY MS. CHERRY:

11       Q.   Mr. Norris, can you tell us what this document is?

12       A.   It is a transcript of Bloomberg messages between

13   myself and Mr. Litvak on July 1, 2010.

14       Q.   And is there a reason why you used -- why you used

15   Bloomberg message and you don't always use the phone?

16       A.   I like to use Bloomberg messages because -- or

17   messages in general just because it kind of tracks the

18   conversation.  You know, we're typically dealing with a lot

19   of different firms at one time, so, you know, talking on the

20   phone kind of also makes you rely on your memory and

21   sometimes that can be a little bit more difficult to track.

22   So using messages is a little more efficient.

23       Q.   I'm going to go to the second page of this document.

24   Can you tell the jury what Mr. Litvak sent to you?

25       A.   Yes.  It is a list of bid lists for that particular

**A143**

746

1    day.

2         Q.   And what's a bid list?

3         A.   A bid list is a kind of an auction process that

4    sellers of bonds will send out with a specific time that they

5    want the bid or the buying price back by.  So it is a way for

6    sellers to show their bonds to a large group of people to

7    ensure they get the best price that's available.

8         Q.   And there's a whole lot of bonds on this list.  How

9    does Invesco decide which bonds it might be interested in?

10        A.   It's a bit of a two-step process.  As portfolio

11   manager, it is my job to know the types of bonds that we're

12   looking at on that particular day or for a particular

13   strategy.  So I can look through the list of bonds and, you

14   know, whittle it down a little bit to then where I send that

15   list of bonds to our credit research team that will take a

16   look and analyze whether it is a good fit for our portfolios.

17        Q.   The information you get back from the credit

18   research team, what do you do with that information?

19        A.   So they'll run the bonds through their various

20   models.  And what that does is it -- then they have a report

21   that they send back to me for each specific bond that we're

22   interested in.  That report will show various characteristics

23   of the bond that I may be interested in as a trader.  And one

24   of those is kind a price and yield table that shows us what

25   the yield on -- or the return on that been bond would be at

**A144**

1    various price points.

2        Q.   This price yield table, how do you decide where on

3    the price yield table to buy a bond for?

4        A.   We'll do quite a bit of work before we bid a bond to

5    determine where we think it will trade.  And so, you know,

6    once we have an idea of where we think the bond will trade or

7    where it is available to buy, we'll then try to buy it or try

8    to send in a price that -- to buy it as cheaply as we can.

9        Q.   Going to start on the bottom of the first page.  At

10   15:15:21, what do you write to Mr. Litvak?

11       A.   We can bid 79-24 on the SARM05-21 7A1.

12       Q.   What does that mean?

13       A.   That's the price that we are willing to pay for this

14   particular bond that's on a bid list for that day.

15       Q.   It was on a bid list from the previous page?

16       A.   I believe so, yes.

17       Q.   Why don't we take a look?  We look at the 3:00 p.m.

18   bid list.  Is that the bond you were referring to?

19       A.   Yes.

20       Q.   So if we go back to the first page.  How does

21   Mr. Litvak respond when you tell him you can bid 79-24 on the

22   SARM bond?

23       A.   He responds, using, BRB.

24       Q.   When you Mr. Litvak says "using," what do you think

25   he's going to do with the bid?

748

1     A.    He's going to send that bid to the seller, the 79-24

2     bid as a price to try to buy the bond.

3     Q.    So in this type of trade in this type of

4     transaction, is Jefferies taking a position on the same bond?

5     A.    No.   They serve -- on a bid list, the broker-dealer

6     will just serve as an intermediary between two sellers.

7     Because the two sellers -- I'm sorry.  The two parties that

8     are selling and buying the bond don't know who is doing the

9     selling and buying, so we use a broker-dealer to serve as an

10    agent in between.

11    Q.    So how would you describe Mr. Litvak's role?

12    A.    As an agent.  Agency trade.

13    Q.    Going to move up.  At 15:16:16, you tell Mr. Litvak,

14    thanks, got some room, too.  Why would you share with

15    Mr. Litvak that you have got some room?

16    A.    A couple different reasons.  One, I know that the

17    bid that I sent him was for a 3:00 p.m. bond and I sent it

18    late.  So for efficiency purposes, I let him know that it is

19    possible that I could pay more for the bond if necessary.  So

20    if another buyer comes in at a higher price than mine, I just

21    want him to know that he can quickly come back to me and I

22    will be able to improve my bid to try to buy the bond.

23    Q.    Is it unusual for you to share this type of

24    information?

25    A.    I wouldn't say it is unusual.  It is not something

**A146**

1    that's done all the frequently.  In this instance, obviously,

2    I did.  You know, you kind of let somebody know that you feel

3    like you can trust that won't use that information against

4    you.  So you know, if I don't need to improve my bid then I

5    don't want to, certainly.  But again, for efficiency

6    purposes, just to let him know that he can quickly come back

7    to me and I will be able to pay a higher price.

8         Q.   When you told him that you had room.  To be clear,

9    how did you expect Mr. Litvak to use this information?

10        A.   I expected him to keep it to himself and not to

11   share it with the seller until it becomes necessary for me to

12   improve.

13        Q.   And if we move up to 15:20, Mr. Litvak tells you,

14   winner, bro.  How do you read that?

15        A.   That my 79-24 bid was the highest bid for that bond,

16   so we are buying it.

17        Q.   He continues, he had two other guys that were at 79

18   and trying to improve, but he just sold them to us.  Then

19   Mr. Litvak says, I bid your level.  What does that mean?

20        A.   That means that he used 79-24 as the bid that he

21   sent to the seller.

22        Q.   And then he says, so we'll work for whatever you

23   want, big man.  What do you understand that to mean?

24        A.   That's kind of the beginning of the negotiation on

25   his commission for the trade, for the transaction itself.  So

**A147**

750

1    he's saying -- you know, he bid it 79-24.  So in order for

2    Jefferies to make any money serving as the intermediary, I

3    would then have to pay something on top of that price.

4        Q.   Just going back to I bid your level.  Could

5    Mr. Litvak have not bid your level?

6        A.   There's two different ways that broker-dealers can

7    earn a commission on a transaction such as this.  They can,

8    you know, bid our level, which is what happened here.  Then

9    after the fact, I will negotiate a transaction or a

10   commission fee for them and I will pay slightly higher than

11   this.  Or the second way to do it is to say, you know, I will

12   back up the bid.  So they'll actually send a lower price to

13   the seller and their commission will be the difference

14   between that lower price and the price that I sent him.

15       Q.   But in this transaction, your understanding was that

16   he did not back up the bid?

17       A.   That's correct.

18       Q.   Moving up at 15:24:38, you respond, wow, that was

19   fast, nice work.  6 ticks cool, 79-30 to me.  How do you read

20   that?

21       A.   Yes.  So 6 ticks is my suggestion for the commission

22   for his service as the broker, and then I just added that 6

23   ticks to the 79-24 and said 79-30 to me, which would be the

24   price that Invesco pays.

25       Q.   Back at -- during this time frame in 2010, what was

**A148**

751

1    the standard commission that Invesco would pay on these

2    BWIC-type trades?

3        A.   In a formal circumstance, we would typically pay

4    between 4 and 8 ticks for a transaction such as this.

5        Q.   So moving up, Mr. Litvak at 15:26 says, your timing

6    was perfect, 3:00 p.m. BWIC and he's good about trading

7    things fast.  So we got in there right at the right time.

8    Good teamwork.  6/32 is a great.  Thanks, BN.

9          When Mr. Litvak says 6/32 is great, how did you read

10   that?

11       A.   He agrees to my suggestion for the commission of 6

12   ticks, 6/32.  So we agree on that.

13       Q.   Then he says, thanks, BN.  Who is BN?

14       A.   BN is my initials.

15       Q.   I think you engage in some smalltalk.  Is that

16   basically the end of the transaction?

17       A.   Yes.

18       Q.   And so what do you understand Mr. Litvak to be

19   buying the bond at?

20       A.   Given all this information, we understand that

21   Mr. Litvak bought the bond at 79-24 and we are buying it at

22   79-30, and he's making 6 ticks as the commission.

23       Q.   Would it have mattered to you if you had known that

24   Jefferies bought the bond for 79-16?

25       A.   Yes, absolutely it would.

752

1    Q.   Why would it have mattered to you?

2    A.   Because then we could buy the bond cheaper for our

3 clients.

4    Q.   Would you have knowingly paid 14 ticks of commission

5 on this trade?

6    A.   It is highly unlikely we would pay that much on this

7 type of transaction.

8    Q.   Would it have been important if you knew that Litvak

9 was making 14 ticks on this trade?

10   A.   Yes, absolutely it would be important.

11   Q.   Again, why would it be important?

12   A.   Because it is significantly more than what we would

13 typically pay for this type of transaction, so it is more

14 money that our clients are paying for the bond.

15   Q.   If I tell you the difference between 14 and 6 ticks

16 is about $73,000, does that change your answer?

17   A.   No.  That's significant.

18   Q.   Why is that?

19   A.   It is a significant amount of money for our clients

20 that we're paying on the top of what we could have paid.

21   Q.   Thank you.  I'm going to move on to another trade.

22        MS. CHERRY:  I'd like to offer Exhibit 442D.  442D.

23        MR. BUTSWINKAS:  No objection.

24        THE COURT:  Full exhibit.  It may be published.

25 BY MS. CHERRY:

**A150**

753

1      Q.   Can you see that, Mr. Norris?

2      A.   Yes.

3      Q.   What is this document?

4      A.   It is another transcript of Bloomberg messages

5  between myself and Mr. Litvak on June 24, 2010.

6      Q.   And what's the subject of the e-mail?

7      A.   June 24 non-agency list.  So it's another list of

8  bid lists for that day.

9      Q.   So if we go down to the bottom.  Is that a bid list?

10     A.   Yes.  There appears to be a couple different lists

11 on this screen shot, both for 2 p.m.

12     Q.   At 14:17:04, what do you write?

13     A.   FHASI07-AR1 A1 at $80.

14     Q.   How do you read that?

15     A.   That's -- I am sending him a bid for that particular

16 bond that's on the bid list that day.

17     Q.   Was that on the list?

18     A.   Yes.  It was on the 2 p.m. list.

19     Q.   I can pull that up.  Is it on the lower 2 p.m. list?

20     A.   Yes.  The second bond on the lower list.

21     Q.   And how does Mr. Litvak respond to your bidding $80

22 on the FHASI bond?

23     A.   With "K".  I understood to be okay.

24     Q.   Then at 14:19, how do you respond to Mr. Litvak?

25     A.   I say, just realized it is late.  Sorry about that.

**A151**

754

1  Q.   Then at 14:53, Mr. Litvak comes back to you and he
2  says, we bought 'em, big man.  What's your understanding of
3  what he's saying there?
4  A.   That we bought the bond.  That Invesco bought the
5  bond, that our price was the highest price available.
6  Q.   When he says "we," who do you think he's referring
7  to?
8  A.   I guess -- well, usually when we say "we" in the
9  context, it is he and I are buying it, so --
10  Q.   You don't know yet what price he bought it at?
11  A.   No.
12  Q.   Then he says 78-5 plus cover.  What's that?
13  A.   So 78 -- a plus is a half of a tick or a half a 32,
14  so 78 and 5 and a half ticks was the cover, and the cover is
15  the second best bid that was sent to the seller.
16  Q.   So can we just go back to the plus again.  So a plus
17  is smaller than a tick?
18  A.   Yes, it is a half of a tick.
19  Q.   It is like 1/64th?
20  A.   Yes.
21  Q.   And in your experience, people trade in such small
22  increments, including half a tick?
23  A.   Sure.  Fraction of ticks are commonly traded.
24       MS. CHERRY:   I would like to offer Government's
25  Exhibit 442E, Your Honor.

**A152**

755

```
1              THE COURT:  Any objection?
2              MR. BUTSWINKAS:  No objection, Your Honor.
3              THE COURT:  442E is a full exhibit.
4    BY MS. CHERRY:
5         Q.   Mr. Norris, what is this?
6         A.   This is a transcript of what we call Bloomberg chat,
7    which is an IB, Instant Bloomberg, between myself and
8    Mr. Litvak on June 24.
9         Q.   And is June 24 the same date where we just looked at
10   your bid for the FHASI bond?
11        A.   Yes.
12        Q.   If I scroll down to 18:58:02, is this what
13   Mr. Litvak just told you in that Bloomberg message?
14        A.   Yes, it is.
15        Q.   How do you respond?
16        A.   My response is, well, Rome wasn't built in a day.
17        Q.   What does that mean?
18        A.   It could be two different things.  One is that the
19   bond was a relatively small position so it would take lots of
20   them to build a portfolio of bonds.  The second
21   interpretation, I guess it could be that the cover itself,
22   the second best bid was a little bit further back from my bid
23   than I would have liked in a normal circumstance.
24        Q.   What does that mean further back from your bid that
25   you would have liked?
```

**A153**

756

1    A.   It means that perhaps I could have bought the bond a

2    little bit cheaper than I did, because the second-best bid

3    was almost 2 points back of my bid.

4    Q.   At 19:00:14, you asked Mr. Litvak, do you go in at

5    80 or back it up?  Why would you ask him that?

6    A.   So this is -- you know, the start of the discussion

7    about his commission for the trade.  Typically, this would be

8    discussed, you know, prior to the transaction or prior to the

9    bid list going final, but I think just in the interest of

10   time we didn't get a chance to discuss that prior to.

11   Q.   Then Mr. Litvak responds, I bid 78-26 and quickly

12   says 79-26.  LOL.  How do you understand that?

13   A.   I understand that to mean that he sent the price of

14   79-26 to the seller.  The 78-26 was just a typo.

15   Q.   And how much did you bid?

16   A.   I sent him $80 even.

17   Q.   And so would this be considered backing up a bid?

18   A.   Yes.

19   Q.   At this point, what do you think Mr. Litvak bid for

20   the bond?

21   A.   79-26.

22   Q.   You respond, well, either way I get, but that was

23   ballsy.  What do you mean by "ballsy"?

24   A.   Generally if a broker-dealer is going to back up our

25   bid by a significant amount, that that conversation would

**A154**

1    take place with myself beforehand just to ensure that I was

2    still comfortable with him doing that.  But that -- since

3    that didn't take place, I thought, well, that would be a

4    little strange.

5        Q.   And Mr. Litvak replies, BBERG.  What is that?

6        A.   I took that to mean to check my Bloomberg messages.

7             MS. CHERRY:  Your Honor, I would like to offer

8    Government's Exhibit 442F, please.

9             MR. BUTSWINKAS:  No objection.

10            THE COURT:  442F is a full exhibit and may be

11   published.

12   BY MS. CHERRY:

13       Q.   Mr. Norris, what is this exhibit?

14       A.   This is a transcript of Bloomberg messages between

15   myself and Mr. Litvak.

16       Q.   And what's the date?

17       A.   June 24, 2010.

18       Q.   That's the same date as when you bid on the FHASI

19   bond?

20       A.   Yes.

21       Q.   And looking at this message, what is it?  Can you

22   tell the jury what it is, what he forwarded you?

23       A.   It appears that he forwarded me the messages between

24   himself and the seller of this particular bond.

25       Q.   Is that typical that he would forward this kind of

**A155**

758

1   document to you?

2       A.    No.   Like I said before, buyers and sellers

3   generally don't know who the buyers and sellers are.   That's

4   information that is typically kept at the broker-dealer level

5   and it is not shared with others.

6       Q.    And before Mr. Litvak sent you this the document,

7   did you have any idea who the seller of the FHASI bond was?

8       A.    No, I did not.

9       Q.    Is there any way you could have figured out who the

10  seller was?

11      A.    It is possible if, you know, there are -- in a

12  mutual fund that's traded on the New York Stock Exchange, you

13  can see -- with -- like the previous quarter's holdings.   So

14  I guess through some pretty exhaustive research you could

15  kind of see if the size of this bond matched up with a

16  particular mutual fund.   But generally, it is not something

17  that we really concerns ourselves with.

18      Q.    Do you typically know who the seller is?

19      A.    No, no.

20      Q.    If you look at the first message that was sent --

21  that Mr. Litvak sent to Mr. Kienzle at 14:18:33.   Does that

22  have any information about the FHASI bond?

23      A.    Yes, it is the same bid list that we were looking at

24  previously, the second bond on the list.   Shows that

25  Mr. Litvak sent him a 79-26 bid.

759

1      Q.  Is that the amount that Mr. Litvak told you he bid

2  for the bond?

3      A.  Yes.

4      Q.  If you go up to 14:47 where Brian Kienzle sends a

5  message to Mr. Litvak saying, Jesse, you win.  How much --

6  does this refer to the FHASI bond?

7      A.  Yes, it does.

8      Q.  And --

9      A.  So the seller is telling Jesse that his bid was the

10  highest.

11      Q.  What was the bid there?

12      A.  79-26.

13      Q.  Is that what Mr. Litvak told you he bought the bond

14  for?

15      A.  Yes.

16      Q.  So your understanding is -- your understanding of

17  the transaction is -- I will take that back.

18          What do you understand -- what did Invesco buy the

19  bond for?

20      A.  Invesco is buying the Bond for $80 even.

21      Q.  How much is Jefferies making on this trade?

22      A.  Jefferies is making the difference between 80 and

23  79-26.  That would be 6/32.

24          MS. CHERRY:  I would like to offer Government's

25  Exhibit 441D.

**A157**

760

1           THE COURT:  Any objection?

2           MR. BUTSWINKAS:  No objection, Your Honor.

3           THE COURT:  All right.  Exhibit 441D is a full

4    exhibit and may be published.

5    BY MS. CHERRY:

6        Q.   On your right, Mr. Norris, 441D.  Can you see that?

7        A.   Yes.

8        Q.   And what does that look like?

9        A.   It is a transcript of Bloomberg messages between

10   Mr. Litvak and the seller, Brian Kienzle.

11       Q.   What's the date?

12       A.   June 24, 2010.

13       Q.   And if you look at the bottom of this message, how

14   does this compare to the message that Mr. Litvak forwarded

15   you?

16       A.   Yes.  The bid on the second bond, the FHASI that I

17   bid on, is off by 2 ticks 79-26 versus 79-24.

18       Q.   But everything on this list is exactly the same?

19       A.   It appear --

20           MR. BUTSWINKAS:  Objection.  Leading.

21           THE WITNESS:  Sorry.

22           THE COURT:  It is.

23   BY MS. CHERRY:

24       Q.   Is there anything different?  Is there anything else

25   different on this list?

**A158**

1      A.    Not that I can tell, no.

2      Q.    If I move up on 442F and 441D, in both documents at

3   14:47:05, is there anything there that appears different?

4      A.    Yes.  Again, the bid that was sent is off by 2

5   ticks.

6      Q.    Does anything else appear different to you on this

7   comparison?

8      A.    It does not, no.

9      Q.    Now, if you knew at the time that Mr. Litvak wasn't

10   telling you the truth about the bid, would that have been

11   important to you?

12      A.    Absolutely.

13      Q.    Why is that?

14      A.    Well, going back to how we select brokers first, you

15   know, we believe that we only deal with broker-dealer that we

16   can trust during the transaction.  And also, the difference

17   of 2 ticks is again -- you know, it is more money that our

18   clients are having to pay for a particular bond.

19      Q.    So to be clear, the bid on the document you got, how

20   much was that?

21      A.    The document that I received, the bid was 79-26.

22      Q.    And the bid on the document on the right, what is

23   that?

24      A.    79-24.

25      Q.    And the difference is just 2 ticks.  Does 2 ticks

762

1   matter?

2       A.   Yes, it does.

3       Q.   Why does 2 ticks matter?

4            MR. BUTSWINKAS:  This has been asked and answered,

5   Your Honor.

6            THE COURT:  I don't know exactly in this form.  I

7   will allow it.

8            THE WITNESS:  Two ticks for a bond investor is still

9   a significant amount of money and it's -- you know, we're

10  always trying to buy bonds as cheaply as we can for our

11  clients.  And so every tick matters, every fraction of a tick

12  matters.

13  BY MS. CHERRY:

14      Q.   If I told you 2 ticks was only $276, does it still

15  matter?

16      A.   Absolutely, it does.

17      Q.   Why is that?

18      A.   Again, not only is it more money that our clients

19  are buying -- are paying for the bond, but it's also a matter

20  of trust between myself and the broker.

21           MS. CHERRY:  May I have a minute, Your Honor?

22           THE COURT:  You may.

23           MS. CHERRY:  Thank you.  No further questions, Your

24  Honor.

25           THE COURT:  I guess we have an extra minute, ladies

**A160**

```
 1   and gentlemen, but I think we'll take our break.  Counsel can

 2   take the extra minute to get set up and be ready to go.  You

 3   are excused at this time until 11:30.  Thank you very much.

 4            And, sir, you also can step out, but you have to be

 5   back by 11:30.  Thank you very much.

 6            (In the absence of the jury at 11:13 A.M.)

 7            THE COURT:  Everyone may be seated.  Anything I need

 8   to take up?

 9            MR. BUTSWINKAS:  Not from the defense, Your Honor.

10            THE COURT:  Okay.  We'll be back at 11:30 and we'll

11   start with the cross.  Stand in recess.

12            (Whereupon, a recess was taken from 11:15 A.M. to

13   11:34 A.M.)

14            THE COURT:  Ready to get the jury.

15            (In the presence of the jury at 11:34 A.M.)

16            THE COURT:  Welcome back, ladies and gentlemen of

17   the jury.  Everybody be seated.  We're ready to begin the

18   cross-examination of the witness by defense counsel.

19            THE CLERK:  Jurors are having a hard time hearing

20   counsel.

21            THE COURT:  Attorney Butswinkas, if I can ask you to

22   keep your voice up so we can all hear you.  Is the light on,

23   the green light?

24            MR. BUTSWINKAS:  Yes.

25            THE COURT:  Thank you very much.
```

**A161**

764

1          MR. BUTSWINKAS:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. BUTSWINKAS:

4       Q.   Mr. Norris, my name is Dane Butswinkas.  I'm one of

5    the lawyers for Mr. Litvak.  We have never met, have we?

6       A.   No.

7       Q.   You met with the Government to prepare for your

8    testimony, though?

9       A.   Yes.

10      Q.   A number of times?

11      A.   A few times, yes.

12      Q.   Before you bought the SARM bond --

13          MR. BUTSWINKAS:  Your Honor, may I approach before I

14   ask a question?

15          THE COURT:  Yes.

16          MR. BUTSWINKAS:  I want to write the name of the

17   bond on the easel so we know we're talking about the same

18   thing.

19   BY MR. BUTSWINKAS:

20      Q.   I will ask you from here.  You talked about on your

21   direct that you submitted a bid for this bond at 79-24; is

22   that right?

23      A.   Yes.

24      Q.   And that you had done your homework before you

25   decided that bid, I take it?

**A162**

765

1      A.    Yes.

2      Q.    And that is based on your internal analytics; is

3  that right?

4      A.    Yes.

5      Q.    And whatever pricing color you can get from the

6  market?

7      A.    Yes.

8      Q.    And a mountain of other data points?

9      A.    Yes.

10     Q.    And Jesse had no influence on that bad of 79-24;

11 isn't that right?

12           THE COURT:  Could everybody hear the question over

13 my sneezing?  Maybe you should state it again.

14 BY MR. BUTSWINKAS:

15     Q.    Jesse had no role in creating this bid of 79.24?

16     A.    He did not.  It is 79 dash 24, not dot 24.

17     Q.    79 dash.  Thank you for that correction.  So at the

18 time you made this bid, you were happy if this bid were

19 submitted in the BWIC 79-24?

20     A.    Sorry.  Say that one more time.

21     Q.    At the time you submitted this bid to Jesse to

22 submit it to the BWIC, you were happy with that bid of 79-24?

23     A.    Yes.

24     Q.    You expected that if that bid prevails, 79-24, you

25 would pay 6 ticks on that?

**A163**

766

1    A.    That was negotiated after the fact, but that was

2  within the general range that we typically paid, yes.

3    Q.    You had that expectation at the time you submitted

4  this bid at 79-24?

5    A.    That we would pay a commission on top, yes.

6    Q.    Like 6 ticks?

7    A.    Yes.

8    Q.    And so if Jesse had followed your instruction and

9  put in the bid of 79-24 that you authorized, you would have

10 paid 79-30?

11   A.    Yes.

12   Q.    Just like you did?

13   A.    Yes.

14   Q.    Now, Invesco has a list of approved broker-dealers,

15 I think you said?

16   A.    That is correct, yes.

17   Q.    And Jefferies was one of the worthy counter-parties

18 on that list?

19   A.    Yes.

20   Q.    And the broker-dealer is on the other side of these

21 transactions from you; is that right?

22   A.    That's -- yes, yes.

23   Q.    As a counter-party?

24   A.    Yes.

25   Q.    And you negotiate principal-to-principal?

**A164**

767

1      A.    In a BWIC situation, they serve as the intermediary.

2  So we view that as an agency trade.

3      Q.    Under PPIP, doesn't the broker have to be acting as

4  a principal?

5      A.    Under PPIP.  I guess -- I'm not sure.

6      Q.    Didn't you reach out to some of your broker-dealers

7  with forms that they had to fill out to make sure that they

8  knew they were acting as a principal and not an agent?

9      A.    I don't recall doing that, no.

10     Q.    Let me show to the witness for identification

11  purposes Defendant's Exhibit 2178.  Mr. Norris, do you see

12  this document on your screen?

13     A.    I see a message, yes.

14     Q.    You see that below the line there's an e-mail from

15  you as original sender?

16     A.    Yes.

17     Q.    And do you see that at -- goes to a broker-dealer?

18     A.    Yes.

19     Q.    And let me direct your attention to the second page.

20  This is a proposed certificate of PPIP compliance that you

21  sent to the broker-dealer, isn't it?

22     A.    It appears to be that, yes.

23     Q.    Does this refresh your recollection that you reached

24  out to broker-dealers to let them know that when they are

25  acting on your behalf under PPIP, they are acting as a

**A165**

768

1    principal and not an agent?

2        A.   Give me a second just to read it.  That's what it

3    appears to be, yes.

4            MR. BUTSWINKAS:  I offer Defendant's Exhibit 2178.

5            THE COURT:  Any objection to 2178?

6            MS. CHERRY:  Can we have a copy of the exhibit?

7            THE COURT:  Sure.

8            MS. CHERRY:  No objection, Your Honor.

9            THE COURT:  All right.  Then 2178 is a full exhibit

10   and may be published.

11           MR. BUTSWINKAS:  If I may publish this with the

12   jury, please, on page 1.

13   BY MR. BUTSWINKAS:

14       Q.   Mr. Norris, this is from August of 2009.

15       A.   Okay.

16       Q.   Do you see that?

17       A.   Yes.

18       Q.   During the PPIP program?

19       A.   It is around that time, yes.  I don't recall exactly

20   when it started, but --

21       Q.   Fair enough.  You see your name as a original

22   sender, Brian Norris of Invesco?

23       A.   Yes.

24       Q.   And you say, please take a look at the attached and

25   let me know if this is something you could/would sign on a

**A166**

1      quarterly basis for PPIP.  Timely response requested.

2      Thanks.  Did I read that correctly?

3          A.    Yes, you did.

4          Q.    If you can move to page 2 of this.  This document

5      that you sent to the broker-dealer is called Quarterly

6      Certificate of PPIP Compliance, correct?

7          A.    Yes.

8          Q.    And the first thing you asked of the broker-dealer

9      is that he or she authorize -- say that they are

10     authorized to execute the document in paragraph 1?

11         A.    Yes.

12         Q.    And then you say the broker-dealer is acting on its

13     own behalf as principal in all trades in non-agency RMBS or

14     CMBS.  Do you see that?

15         A.    I do see it, yes.

16         Q.    That's the understanding that you had with

17     broker-dealers for the PPIP program?

18         A.    It is not a document that I produced.  I know I said

19     -- it appears that I sent it out, but it is not -- I guess it

20     is not something that I recall or actually -- you know, you

21     say "you," but it wasn't me, it was Invesco, from Compliance

22     and Legal.

23         Q.    Fair enough.  So from Compliance and Legal, their

24     point of view was these broker-dealers were acting as

25     principals and not agents?

770

1       A.    That appears to be the case, yes.

2       Q.    I want to talk about -- strike that.

3           I want to ask you questions about the period leading

4 up to your 79-24 SARM bid.

5       A.    Okay.

6       Q.    Obviously, it is a long time ago, so if you can't

7 remember, you can just tell me. Before you bid, you knew the

8 prices that would meet your yield threshold?

9       A.    Generally, the case, yes. When I was talking

10 earlier, our credit research team will send us the report

11 that shows, you know, that has the price and yield table on

12 it that will show the necessary yield and prices that equate

13 to those yields.

14       Q.    I think that you said that your credit research team

15 would run through their various models?

16       A.    Yes.

17       Q.    And they would look at the various characteristics

18 of the bond?

19       A.    Yes.

20       Q.    Including price and yield?

21       A.    The yield would be the output of the model, but

22 yes.

23       Q.    And I think you described it as quite a lot of work?

24       A.    It's -- you know, they do a pretty exhaustive

25 analysis of the bond, yes.

**A168**

771

```
1       Q.   And I take it that if the price that you can buy the
2   bond at is below your yield target, you walk away?
3       A.   The -- I'm sorry.  The price that I can buy the bond
4   at is below the yield?
5       Q.   It doesn't --
6       A.   If the yield is below the target, then I don't buy
7   the bond.  Not the price.
8       Q.   Let me ask the question again.  If the yield of the
9   bond you were about to buy at that price is below your yield
10  target, then you walk away?
11      A.   That's correct.
12      Q.   And the all-in price that you paid for the SARM bond
13  was comfortably within your yield target?
14      A.   That is correct.
15      Q.   In fact, a price above 80 would have been
16  comfortably within your yield target?
17      A.   I don't know that offhand, no.
18      Q.   79-24 was not the maximum you were willing to pay
19  for the SARM bond, was it?
20      A.   That's correct.
21      Q.   And you don't know as you sit here today what the
22  maximum you were willing to pay was?
23      A.   No, I do not.
24      Q.   In your preparation for your testimony, you didn't
25  see any documents that you can signal us to that would have
```

**A169**

772

1    that on it?

2        A.    The credit research team's report would have that

3    information on it.

4        Q.    And we know that 79-24 was not as high as you were

5    willing to go because you said, as you pointed out earlier, I

6    got some room?

7        A.    That's correct.

8        Q.    And when you bought the SARM bond at 79-30 total

9    price, to your knowledge it was not available to you at a

10   better price than what you bought it for in the market?

11       A.    To my knowledge now, I know that it was.  I could

12   have potentially gone to a different broker-dealer to buy the

13   bond cheaper.

14       Q.    Had you reached out to any broker-dealers to see if

15   you can get that bond at the time, do you remember?

16       A.    Well, generally on a bid list you would only go to

17   one broker-dealer to send your bid in.

18       Q.    So you had not?

19       A.    I don't recall, but generally that's not the case.

20       Q.    And you remember there was a financial crisis in

21   2008?

22       A.    Yes.

23       Q.    And the value of -- strike that.

24           The pricing of the residential mortgage-backed

25   securities declined?

**A170**

773

1    A.    Yes.

2    Q.    Dramatically in many instances?

3    A.    Yes.

4    Q.    And bonds were being sold at discounts?

5    A.    That's correct.

6    Q.    And in 2009 through '10, Invesco was looking to

7    uncover value in the RMBS market?

8    A.    Yes.

9    Q.    Invesco thought the market was undervaluing RMBS; is

10   that correct?

11   A.    We felt that the prices had fallen too far for what

12   was the value of the bonds, yes.

13   Q.    Invesco wanted to take advantage of these

14   discounts?

15   A.    We wanted to invest in the sector, yes.

16   Q.    You thought that the prices at which you could

17   purchase these bonds did not actually reflect the value of

18   the bond itself?

19   A.    That's correct.

20   Q.    And Invesco was not interested in participating in

21   short-term fluctuations in the market, right?

22   A.    Generally, we tend to be long-term investors.   We

23   don't try to transact quickly in and out of positions.   That

24   is our philosophy.

25   Q.    More of a buy and hold philosophy?

774

1    A.    For the most part.  I mean, we will -- we will sell

2   if things appear to be overvalued, but generally we like to

3   buy and hold.

4    Q.    And the SARM bond that you testified about, for

5   example, you bought at about a 20 percent discount?

6    A.    Discount to par to its -- that's correct.

7    Q.    And Invesco, I think you described on your direct

8   examination, provides basically expertise in investment; is

9   that right?

10   A.    We believe so, yes.

11   Q.    And an investment strategy?

12   A.    We believe so, yes.

13   Q.    And determining the best things to buy?

14   A.    Yes, we believe so.

15   Q.    The right prices at which to buy them?

16   A.    For the most part.  You know, I can't say that we

17   always are able to do that.  But we do -- that is what we

18   strive to do, yes.

19   Q.    Invesco had at this time -- and maybe still today,

20   but I'm focusing on this time period 2008 to 2011, had

21   expertise in valuing residential mortgage-backed

22   securities?

23   A.    We believe so, yes.

24   Q.    And Invesco was a qualified institutional buyer?  Do

25   you remember that?

775

1    A.    Yes.

2    Q.    That's a sophisticated investor, an institution?

3    A.    Yeah, I don't know the exact definition, but

4  generally speaking you have to have a certain level of

5  investable assets and that sort of thing.

6    Q.    Have you heard that called a QIB?

7    A.    Yes.

8    Q.    And QIBs can invest in things that regular people

9  can't?

10    A.    That's correct.

11    Q.    And Invesco manages money, I think you said for

12  clients?

13    A.    Yes.

14    Q.    And you described some of the clients.  And you

15  said, I think, you have had now a lot of experience in

16  investments?

17    A.    That I personally have a lot of experience in

18  investments?  Yes, I have been with Invesco since 2001, so --

19    Q.    Did you say that you are a senior portfolio

20  manager?

21    A.    That is my current title, yes.

22    Q.    When did you get that title?

23    A.    Within the last couple, maybe three years.

24    Q.    And one of the things that Invesco did was submit an

25  application to participate in the PPIP program?

776

1          A.    That is correct.

2          Q.    You had some level of involvement in that process?

3          A.    I don't recall necessarily having a significant

4     amount of -- you know, that was generally handled by our

5     marketing and sales professionals and the more senior

6     investment people, but there's chance that, you know, they

7     asked me to look at something to make sure it sounded

8     reasonable, yes.

9          Q.    Let me just show you, for identification purposes,

10    Your Honor, Defendant's Exhibit 2321.  And if I may have a

11    hard copy to show the witness.

12               MR. BUTSWINKAS:  Your Honor, may I approach?

13               THE COURT:  You may.

14    BY MR. BUTSWINKAS:

15         Q.    Mr. Norris, the first page of this document is on

16    your screen, but I am going to show you the whole document.

17    Handing the witness the hard copy of Defendant's Exhibit

18    2321.

19               Would you take a look at that document, the hard

20    copy, and as much or as little as you want to see if you can

21    identify what the document is?

22         A.    Okay.  It appears to be -- I guess I don't know if

23    it is our official application.  I guess it does say it on

24    the front page, application for the RFP from the Treasury to

25    participate in the PPIP program.

777

```
1         Q.   Is this something that you would have reviewed?
2         A.   I don't specifically recall reviewing it.  It is
3    possible that I saw it, yes.
4              MR. BUTSWINKAS:  Your Honor, I offer Exhibit 2321.
5              THE COURT:  Any objection to 2321?
6              MS. CHERRY:  Is it possible that we can get an
7    unredacted version of this document?
8              MR. BUTSWINKAS:  Yes, of course.  Let me lay a
9    foundation for that, Your Honor.  He need a minute, Your
10   Honor, fairly --
11             THE COURT:  That's fine.
12             MS. CHERRY:  It is a fairly long document with a
13   significant amount of redactions.  We would like some time to
14   review it.
15             THE COURT:  Can you move on to something else?
16             MR. BUTSWINKAS:  Yes, Your Honor, I can certainly.
17   And just so the Court knows, this was redacted by the party
18   that produced it to us, Your Honor, not us.
19             THE COURT:  Understood.
20   BY MR. BUTSWINKAS:
21        Q.   Mr. Norris, the proprietary platform that you use at
22   Invesco, is it called Q-Tech?
23        A.   At the time of these trades, that was -- that was
24   our analytical system that we used, yes.
25        Q.   That was proprietary to the company?
```

**A175**

778

```
1        A.    We did build that internally, yes.
2        Q.    It was something that you maintained confidentiality
3   over?
4        A.    Yes.
5        Q.    And something that the company did not share with
6   the public?
7        A.    Yeah, we shared its existence with the public.  We
8   used it in marketing materials, that kind of thing, but we
9   did not allow the public to utilize it, no.
10       Q.    When you say you shared it in marking materials and
11  such, that is to say to potential investors that we have an
12  edge because of our proprietary model?
13       A.    Yes.
14       Q.    That we can pick better investments than the next
15  company down the street?
16       A.    We believe so, yes.
17       Q.    And price investments better than the next company
18  down the street?
19       A.    The Q-Tech wasn't really a pricing service.  Well,
20  investment managers have to have a third-party pricing
21  service price their bonds.
22       Q.    So did -- Invesco had access to a third-party --
23  what you call pricing service?
24       A.    Yes.
25       Q.    And which pricing service did you use, if you
```

**A176**

1    recall, during this time period?

2        A.    I believe it was IDC.  I can't be certain on that,

3    but that's who we have used for a number of years now.

4        Q.    Do you remember that Treasury required PPIP

5    participants to have a third-party pricing service to price

6    bonds?

7        A.    I don't specifically recall that, but it certainly

8    makes sense that they would.

9        Q.    Those pricing services are independent of the

10   investment management firm?

11       A.    That's correct.

12       Q.    So if it was IDC, for example, IDC is a separate

13   company from Invesco?

14       A.    Yes.

15       Q.    And it has expertise in pricing securities?

16       A.    Yes, that's their job, yes.

17       Q.    So they look at their own mountain of data to figure

18   out what the best pricing on securities is?

19       A.    That's correct.

20       Q.    One of the reasons that you turn to an independent

21   third party is to make sure that your portfolio is valued

22   properly for your investors?

23       A.    Yeah.  It creates some independence from a

24   regulatory standpoint.  We're not supposed to be marketing

25   our own bonds or marketing our own positions because we

1    could, you know, theoretically inflate them or something like

2    that.  So from a regulatory standpoint, they can require that

3    you hire an independent third party to price the bonds.

4        Q.   So you can turn to these third-party pricing

5    services to get an accurate price at which a bond would trade

6    in the market?

7        A.   I wouldn't necessarily say that.  I mean, there are

8    times that they are fairly inaccurate.  Particularly, in this

9    time frame that we're discussing right now.  We are just

10   coming out of the crisis, financial crisis, and the pricing

11   services struggled to kind of keep up with the significant

12   movements and prices on the bonds.

13       Q.   So would you generally defer to your internal

14   analytics?

15       A.   Yes.

16       Q.   In your internal analytics, do you analyze the

17   fundamentals of the bond?

18       A.   Yes, we do.

19       Q.   You do that to help determine the price that you

20   would be willing to pay?

21       A.   That's correct.

22       Q.   In fact, that's the purpose of the internal

23   analytics?

24       A.   Right, right.

25       Q.   You don't do all of that work by yourself, as I

781

1    think you pointed out earlier?

2        A.    We have a credit research term that does the

3    fundamental analysis, yes.

4        Q.    The credit research team that you talked about does

5    quantitative work the bonds?

6        A.    Yes.

7        Q.    And you largely rely on them to determine price with

8    their work?

9        A.    What they do is they look at the fundamental

10   characteristics of the bonds.  So these particular bonds are

11   made up of pools of residential mortgages.  So, you know,

12   anybody's mortgage then gets pooled together and the payments

13   -- monthly payments on those mortgage pools feed up through a

14   bond and get paid out to investors, to people that own the

15   bond.

16            So what the credit research team does is try to

17   determine how those payments are going to look in the future.

18   Borrower characteristics of whether they are going to prepay

19   their mortgage or default on their mortgage or, you know, the

20   direction of interest rates.  That's the kind of work that

21   they do.  So what they try to do is determine the actual

22   value of a bond at any particular price.

23       Q.    And then they look at an endless number of

24   characteristics of the underlying mortgages?

25       A.    They do have a model that allows them to somewhat

**A179**

782

1    quickly go through bonds, but, yes, it does have quite a bit
2    of data backing the model.
3        Q.   In fact, when they produce their research, it can be
4    hundreds and hundreds of pages?
5        A.   For a particular bond?
6        Q.   Yes.
7        A.   That, I don't know.  That's not something that they
8    send to us that I recall.
9        Q.   You have a pricing group at Invesco?
10       A.   We do, yes.
11       Q.   And they track pricing information about bonds,
12   among other things?
13       A.   Yes.  They are our liaison between the trading desk,
14   which would be my department, and the third-party pricing
15   service.
16       Q.   And you had a structured securities team in 2009?
17       A.   Yes, that's the group that I am in.
18       Q.   In 2009, you were part of the structured securities
19   team?
20       A.   That's correct.
21       Q.   And the internal analytics that you talk about,
22   that's done with sophisticated computer models, isn't it?
23       A.   The credit research team develops their models to --
24   to analyze the bonds, yes.
25       Q.   Let me show you -- if you could put up on the screen

1    for identification purposes Defendant's Exhibit 2079.  And I

2    would like to hand a hard copy to the witness, if I may, Your

3    Honor?

4              THE COURT:  Yes.

5              MR. BUTSWINKAS:  May I approach, Your Honor?

6              THE COURT:  You may.

7    BY MR. BUTSWINKAS:

8         Q.   I'm handing you Exhibit 2079, a hard copy of it.

9         A.   Okay.

10        Q.   It's all yours.

11        A.   Thanks.

12        Q.   And I would ask, if you would, Mr. Norris, to take a

13   look at that and identify the document.

14        A.   Well, the first page is an e-mail between -- well,

15   from a member of our credit research team to our entire

16   structured securities team.

17        Q.   And that would include you?

18        A.   Yes.

19        Q.   And then what is the attachment?

20        A.   The attachment is the profile, the credit research

21   profile page that we rely on, has the price and yield table.

22   And after that, I'm not sure what all of this is.

23        Q.   Is that the data that is the product of the credit

24   research team's work?

25        A.   It appears to be a lot of data, yes.

784

1      MR. BUTSWINKAS:  Your Honor, I would offer

2    Defendant's Exhibit 2079.

3          THE COURT:  Any objection to 2079?

4          MS. CHERRY:  No objections, Your Honor.

5          THE COURT:  2079 is a full exhibit.

6    BY MR. BUTSWINKAS:

7      Q.   They do a lot of work, sir, don't they?

8      A.   Yeah.  I mean, certainly all of this is automated,

9    but they do.  When they are analyzing a bond, it could take

10   -- they can do it quickly, within 30 minutes, sometimes it

11   could take a little bit longer than that.

12     Q.   And that's the product?

13     A.   Well, generally, I only get sent this first page,

14   which is the -- kind of what we call the profile page.  I'm

15   not sure exactly what the rest of this is sent to me for.  It

16   looks like a -- well, I'm not sure what it is.

17     Q.   What is your understanding of -- is that information

18   the backup for the first page?

19     A.   That's certainly possible, yes.

20     Q.   This is an analysis of the SARM bond, isn't it?

21     A.   Yes, it is.

22     Q.   And I think you talked about different factors that

23   are looked at by the credit research team, including

24   characteristics of the individual mortgages, right?

25     A.   There are additional factors, yes.

**A182**

785

1    Q.    Let's talk about the mortgages for a second.   They

2    look at things like prepayment rates?

3    A.    Yes.

4    Q.    Default rates?

5    A.    Yes.

6    Q.    Loss severity?

7    A.    Yes.

8    Q.    LTV?

9    A.    Loan-to-value, yes.

10   Q.    And the number of performing loans, for example?

11   A.    Yes.

12   Q.    The ratings on the deal?

13   A.    Yes.

14   Q.    Because a lot of these deals had been Triple A rated

15   securities?

16   A.    At issuance, a lot of them were rated Triple A, yes,

17   and have since been downgraded during the financial crisis.

18   Q.    You took the question right out of my mouth.  By the

19   time you were buying them, they had been downgraded?

20   A.    For the most part, yes.

21   Q.    They no longer retained their Triple A rating?

22   A.    That's correct.

23   Q.    That's one of the reasons why they were offered at

24   such discounts?

25   A.    Right.

**A183**

786

1      Q.   Because the lower credit rating shows them as more
2   risky purchases?
3      A.   That's correct.
4      Q.   You look at the bond balance when you are studying
5   these potential investments?
6      A.   Specify what you mean by "bond balance."
7      Q.   The outstanding balance on the bond, what's left to
8   be paid off.
9      A.   Right.  That difference between the original and
10   current face is what's left.  We're not always offered the
11   entire piece of the bond.
12      Q.   You also look at the types of collateral, what kind
13   of loans there are?
14      A.   Yes.
15      Q.   For example, you look at a prime rate mortgage a
16   little bit differently than a subprime rate mortgage?
17      A.   Yes.
18      Q.   And an Alt A mortgage a little bit different than
19   those other two?
20      A.   Yes.
21      Q.   And a no-DOC loan a little different than those?
22      A.   Yes, so we certainly take a look at all of that
23   information.
24      Q.   So there's a lot of analysis done at the mortgage
25   level?

**A184**

787

1       A.    That's correct.

2       Q.    You look at who the issuer is?

3       A.    We -- the issuer isn't necessarily a real strong

4    indicator of how the bond is going to perform.  The servicer

5    can be a little bit better of an indicator.  So that would be

6    more of a focus for us.

7       Q.    You look at the servicer for the mortgage?

8       A.    That's correct.

9       Q.    You also look at the geography of the mortgages,

10   right?

11      A.    That's correct.

12      Q.    You are looking at what part of the country the

13   mortgage is because the economic conditions in that part of

14   the country could have a specific impact on those mortgages?

15      A.    That's correct.

16      Q.    And as we see, it is a lot of analysis?

17      A.    There's a lot of data points, yes.

18      Q.    And if you had bought the SARM bond at 80, that

19   would have meant good profit potential?

20      A.    If we bought the bond at 80, our base case

21   expectation would be a yield over almost 7 and a quarter

22   percent.

23      Q.    So yes, it would have been good profit potential?

24      A.    I guess it depends on your definition of "good

25   profit."

**A185**

788

1    Q.   You were looking for a 7 percent yield, weren't you?

2    A.   At the time, it is certainly possible.  So that

3  would have been higher than our minimum threshold, yes.

4    Q.   And you determined the price that you're willing to

5  pay based on your own analysis of the bond?

6    A.   We determine -- we determine the price that we want

7  to bid based on our own analysis, yes.

8    Q.   If you could boil it down to the most important

9  variable, it would be potential yield?

10    A.   Yes.

11    Q.   That's what all of the information that's in Exhibit

12  2079 is about?

13    A.   All of this information, yes, it feeds into what our

14  expectations of the yield of the bond are at specific price

15  points.

16    Q.   And the total price that you paid Jefferies for the

17  SARM bond was consistent with what your internal analytics

18  were telling you was a good price?

19    A.   It was consistent with getting us a yield over our

20  minimum threshold.

21    Q.   It was consistent with what your independent

22  judgment was telling you was a good price?

23    A.   What you do mean by "independent judgment"?  My

24  personal?

25    Q.   Yes, sir.

**A186**

1      A.    I'm sorry.  Say the question again.

2      Q.    Yes.  The price that you paid Jefferies for the SARM

3   bond was consistent with what your personal judgment was

4   telling was a good price for that bond?

5      A.    On that day, yes.

6      Q.    On that day.  Thank you for that clarification.  It

7   was inconsistent with what your modeling was telling was a

8   good price for that bond on that day?

9      A.    Again, good profit and good price, it is all -- for

10   an investor, it is all relative.  I mean, we certainly always

11   want to buy things as cheaply as we can.  We would have

12   loved to have bought this bond at 70 if we could and gotten a

13   10 and a half percent yield.  It is hard for me to say yes or

14   no to good price or good profit.

15      Q.    You can't remember whether you reached out to other

16   broker-dealers to see if you can get a better price on this

17   bond?

18      A.    Bid lists are generally sent to a number of

19   dealers because as a seller you want as many potential buyers

20   to see it as possible to ensure that you are trying to get

21   the best price.  So it is possible that I saw this list from

22   other broker-dealers as well.  But like I said, generally

23   it's the case that you don't want to send your bid to

24   multiple broker-dealers because then you could be serving to

25   bid against yourself.  And so you pick one and go with it.

790

1      Q.   What was the pricing color on the SARM bond at the

2    time that you bought it from Jefferies?

3      A.   I don't recall.

4      Q.   Is that something that you would have researched

5    for?

6      A.   Before -- yes, on a bid list we'll generally --

7    before we send in a bid, we'll look to see if any

8    broker-dealers are providing what they call price talk, which

9    is their expectations of where the bond will trade.

10     Q.   You don't remember whether there was or wasn't

11   any?

12     A.   I don't recall, no.

13     Q.   Is that something that you would have tracked

14   electronically?

15     A.   Tracked electronically?  Price talk?

16     Q.   Yes.

17     A.   Sometimes we do, sometimes -- it depends on how busy

18   the day is.  Sometimes, you know, if we're bidding on a lot

19   of different bonds at a lot of different times.  I recall

20   building spreadsheets before to help me track that.  But

21   other days where there isn't as much to do, it's a little bit

22   easier just to kind of maybe write it down or just remember

23   it.

24     Q.   Generally, it is written down someplace, I take it?

25     A.   Generally, it's -- well, it is either recalled or

791

1    tracked some way, yes.

2         Q.   And you talked about broker-dealers that you have

3    worked with.  You worked with upwards of 20 broker-dealers;

4    is that right?

5         A.   Probably even more than that, yes.

6         Q.   Maybe as many as 30?

7         A.   In a given year, I think, yes.

8         Q.   And Jefferies wasn't one of the top firms you worked

9    with?

10        A.   They were -- you know, say if there's 30, they were

11   in the middle third.

12        Q.   You didn't know Jesse well?

13        A.   No.

14        Q.   You never socialized with him?

15        A.   No, I don't believe so.

16        Q.   You never had dinner together?

17        A.   I don't think so.  A lot of times salespeople will

18   come down for dinners and that kind of thing, but I don't

19   recall ever meeting Jesse in that scenario.

20        Q.   You never had visited with him at an industry

21   conference?

22        A.   I don't believe so.

23        Q.   Never been on a panel with him?

24        A.   No.

25        Q.   I take it you never had a lengthy discussion with

792

1    him?
2        A.    I guess, you know, we certainly corresponded with
3    each other via Bloomberg chat or Bloomberg messages, and
4    maybe even on the phone.  So, yeah, I guess it depends on
5    your definition of "lengthy."
6        Q.    Do you remember any phone calls that you ever had
7    with him?
8        A.    I don't recall any off the top of my head, no.
9        Q.    What's the longest conversation you ever remember
10   having with Jesse?
11       A.    I don't -- I don't recall.
12       Q.    More than five minutes?
13       A.    Again, I don't recall if we every spoke on the
14   phone.  Is that what you are focusing on, like a phone
15   conversation?
16       Q.    Start with that, sure.
17       A.    I don't recall ever talking on the phone with him.
18   It is certainly possible that we did.
19       Q.    Have you ever been to his office?
20       A.    I don't believe so.
21       Q.    Has he ever been to your office?
22       A.    I don't believe so.
23       Q.    Have you ever negotiated a bond purchase from
24   Jefferies with Mr. Litvak where you were in person with him?
25       A.    I don't believe so.

**A190**

793

1    Q.    Now, would you agree with me that in this RMBS you

2  have to be wary of what you would call volunteered

3  information?

4    A.    Yes.

5    Q.    Volunteered information has to be taken with a grain

6  of salt?

7    A.    Yes.

8    Q.    And you want to make sure that you don't give

9  volunteered information undue weight in your decision-making?

10    A.    That's correct.

11    Q.    And that's how you operate now and operated then?

12    A.    That's correct.

13    Q.    And that's one of the reasons why you do so much

14  internal work?

15    A.    Yes.  We don't want to rely on other's thoughts on a

16  particular bond.  We want to do our own analysis.

17    Q.    You certainly don't want extensive analysis like you

18  presented to us to be substantially altered by volunteer

19  information?

20    A.    What do you mean "altered"?

21    Q.    Let me rephrase the question.  Let's take

22  broker-dealer projections.  They are not really important to

23  you, are they?

24    A.    What do you mean, projections like price talk or --

25    Q.    Cash flow projections.

794

1       A.    Oh, cash flow projections.  Yeah, I mean, they --

2  they will sometimes send that to us what they think the value

3  of a bond is, and we'll look at it.  You know, we like to

4  gather as much information as we can on a bond, but we don't

5  use that as our analysis, no.  We do our own.

6       Q.    One reason why is because back in that time period,

7  some six years ago, sometimes people intentionally put out

8  misleading information in the market?

9       A.    I believe so, yes.

10      Q.    You were aware of that?

11      A.    Yes.

12      Q.    That's one of the reasons for your skepticism about

13  volunteered information?

14      A.    That's correct.

15      Q.    In fact, you experienced situations where sellers in

16  the RMBS have put out pricing information that's

17  intentionally inaccurate?

18      A.    I have experienced where sellers send to me?

19      Q.    Yes.

20      A.    Well, I don't necessarily know when it -- or it is

21  or isn't inaccurate.  But again, we take it with a grain of

22  salt because we know the potential is there that it is

23  inaccurate.

24      Q.    For example, sellers sometimes lie about what a

25  second bid was after they have sold a bond?

**A192**

795

1      A.    Yes.

2      Q.    These called false cover?

3      A.    It is a false cover, yes.  I wouldn't say it

4    necessarily has a specific term.

5      Q.    You are aware that that was a practice in this

6    market during that time period?

7      A.    Yes, I was aware that it does occur.

8      Q.    And that's another reason why you are especially

9    skeptical about volunteered information?

10     A.    Yes.

11     Q.    And sellers put out false cover to try to protect a

12   buyer, for example?

13     A.    That's one of the reasons, yes.

14     Q.    And so you might have a situation where someone buys

15   a bond at 70 and the real second bid was 65, right?

16     A.    That's possible, yes.

17     Q.    In that situation, there's a great disparity between

18   the winning bid and the second bid, right?

19     A.    Correct.

20     Q.    And that might be one of the situation where

21   somebody intentionally puts out false cover, namely a false

22   higher bid?

23     A.    That could be a situation, yes.

24     Q.    You are aware that that has happened in the market?

25     A.    Yes.

796

1        Q.    And that's the type of volunteered information --

2    that's the type of false pricing volunteered information that

3    you need to take with a grain of salt?

4        A.    That's correct.

5        Q.    The point of putting out the false cover, the false

6    second price into the market is to assure the market that

7    that winning price was a good price?

8        A.    There's a number of different reasons why someone

9    could send out false cover.  I don't think your -- I don't

10   think the person sending it out is trying to assure the

11   market necessarily of anything.

12       Q.    What are the different reasons why people put out

13   false cover?

14       A.    It's generally a relationship thing with -- between

15   the two counter-parties.  When you send out false covers,

16   sometimes it is done to protect the buyer so that, you know,

17   the market doesn't expect or doesn't think that -- let's see

18   here.  The point of covers is to tell the market the context

19   of where the bond traded.  And so the buyer, if they paid

20   significantly more than what everybody else was willing to

21   pay for it, sending out a false cover kind of protects that

22   buyer a little bit on their position.

23       Q.    You started to say so the market doesn't expect or

24   think that the price for the bond was really lower than what

25   it was bought for, right?

**A194**

797

1      A.    So that the market -- yeah.  If you send out the

2   accurate cover of 65, then the market, you know, might think

3   that the bond traded closer to 65 than 70.

4      Q.    That could hurt the purchaser?

5      A.    It could.

6      Q.    That's why purchasers might ask that the seller put

7   out false cover?

8      A.    That's correct.

9      Q.    You have experienced that?

10     A.    Yes.

11     Q.    And you talked about BWIC auctions.  That has its

12  own language, right?

13     A.    What do you mean by that?

14     Q.    There's a lot of phrases that are characterizing

15  people's bids that are used in the BWIC auction context?

16     A.    You have to be specific.

17     Q.    You heard the phrase "you are the color" (sic)?

18     A.    "You are the color"?

19     Q.    The color (sic).  The cover.  I'm sorry.

20     A.    Okay.  I have heard the phrase "you are the cover,"

21  yes.

22     Q.    And that's mean the second-best bid?

23     A.    That's correct.

24     Q.    You have heard the phrase "you are in the hunt"?

25     A.    That's correct.

798

1      Q.    That means your bid is competitive?

2      A.    That's correct.

3      Q.    You have heard the expression "jump ball"?

4      A.    Yes.

5      Q.    That means essentially tied with another bidder?

6      A.    Essentially everybody's bid is very close.  "Jump

7  ball" means give me your best shot.

8      Q.    You've heard the expression "you have to improve"?

9      A.    Yes.

10     Q.    That means you are not competitive yet?

11     A.    That means that you are not the best bid.  If you

12  want to buy the bond, you have to send in a higher price.

13     Q.    And the problem -- strike that.

14           One of the things that you have experienced in this

15  market is that sometimes the sellers are not always truthful

16  when they are using these terms?

17     A.    That, I don't know.

18     Q.    That's the type of volunteered information that you

19  would take with a grain of salt, I take it?

20     A.    No.  Generally, when you are dealing with a

21  transaction in realtime, you expect that you are being dealt

22  with fairly and accurately.  The volunteered information that

23  I was discussing -- false cover, they occur after

24  transactions occur.  So kind of later, after, you know, the

25  deals are -- or the transactions have already been finalized.

799

1  Q.  Have you ever had electronic exchanges with any of

2  your colleagues in the market where you have expressed your

3  skepticism about information in the market?

4  A.  I don't specifically recall doing that, but it is

5  certainly possible.

6  Q.  It wouldn't surprise you if you had done that,

7  right?

8  A.  Correct.

9  Q.  So you wouldn't be surprised if you see electronic

10 chats that you have sent where you say "this supposedly

11 traded at a certain amount," because you are skeptical?

12 A.  That's correct, I would not be surprised, yes.

13 Q.  You have done that from time to time?

14 A.  Again, I don't specifically recall an instance, but

15 it wouldn't surprise me.

16 Q.  Now, Invesco buys a lot of bonds?

17 A.  Yes.

18 Q.  You can say depends on what you mean by a "lot."

19 But whatever we mean by a "lot," it buys a lot?

20 A.  Sure.

21 Q.  It sells a lot?

22 A.  Yes.

23 Q.  And you have been a buyer and a seller?

24 A.  That's correct.

25 Q.  And buyers have asked you to put out false cover

800

1    information?

2        A.    That's correct.

3        Q.    You have done that?

4        A.    Yes.

5        Q.    So there have been situations where you have gone

6    out to the market and done what you have just described as

7    putting out false cover?

8        A.    Right, which is, you know, information after the

9    transactions have occurred.

10       Q.    I take it that you expect that type of information

11   to be taken with a grain of salt?

12       A.    I do.

13       Q.    Whether you say it or whether someone else says it?

14       A.    That's correct.

15       Q.    When you complete a purchase, you receive a broker

16   notification report?

17       A.    You will have to --

18       Q.    Let me show you the document.  Defendant's Exhibit

19   621, please, just for identification.  Do you have

20   Exhibit 621 in front of you?

21       A.    I do, yes.

22       Q.    Is it large enough for you to be able to read it?

23       A.    Yes.

24       Q.    Can you identify what that is?

25       A.    It is a broker notification report.  It is --

1    generally, that's a report that our operations department

2    handles, so it is what we consider our back office.  They,

3    you know, verify all the details of the trade basically.

4         Q.   So the broker notification report is a document

5    that's generated to capture the essential terms of the trade

6    and go to the back office?

7         A.   That's correct.

8              MR. BUTSWINKAS:  Your Honor, I would ask to admit

9    Defendant's Exhibit 621.

10             THE COURT:  Any objection to 621?

11             MS. CHERRY:  No objection.

12             THE COURT:  It may be published.  It is a full

13   exhibit.

14             MR. BUTSWINKAS:  Thank you, Your Honor.

15   BY MR. BUTSWINKAS:

16        Q.   Mr. Norris, do you see these from time to time?

17        A.   Back in 2010, yes.  Nowadays, everything is a little

18   more automated, but yes.

19        Q.   Let me see what information you are familiar with on

20   this.  At the top left, it says "CUSIP"?  Do you see that?

21        A.   Yes.

22        Q.   That's just the Uniform Securities identification

23   number?

24        A.   That's correct.

25        Q.   And then it says, securities description, and that's

802

1    the SARM bond?

2         A.    Yes.

3         Q.    The one that you talked about today?

4         A.    Yes.

5         Q.    And then it says coupon, 5.959.  What is that?

6         A.    That's the interest rate on the bond.

7         Q.    And then maturity, 11-25-35.  What is that?

8         A.    That's the final payment date of this particular

9    bond.

10        Q.    Then it says to the right of that, tran type.  I'm

11   assuming that means transaction type.

12        A.    I believe that's the case, yes.

13        Q.    It says buy, because you are buying that bond from

14   Jefferies?

15        A.    That's correct.

16        Q.    And then it shows the purchase price?

17        A.    Yes.

18        Q.    And that's -- 79.9375 is 79-30?

19        A.    That's correct.

20        Q.    Which was the total price for which you bought this

21   bond from Jefferies for?

22        A.    Yes.

23        Q.    And then it has the trade date, which is 7-1-10.

24   That's when you agreed to the price with Jefferies?

25        A.    That's the day we greed to the details, yes.

**A200**

803

1    Q.   The settlement date, about six days later?

2    A.   That's correct.

3    Q.   Then below that, there's some smaller data.  Can

4  you, Andrew, maybe make that larger?

5         So it has port symbol.  Do you know what that is?

6    A.   The account code.  The portfolio code that we use in

7  our system.

8    Q.   Then I jumped to par.  That's what -- the original

9  face value of the bond?

10   A.   Yes.

11   Q.   Of 59 million?

12   A.   Yes.

13   Q.   And then it has a current face of 29 million and

14 change?

15   A.   That's correct.

16   Q.   And of which is about 23 million in principal?

17   A.   Yes.  The principal amount is the current face

18 amount times the price paid for the bond.

19   Q.   And then there is other information about this bond

20 across the page?

21   A.   That's correct.

22   Q.   As you said, this is a document that goes from

23 Jefferies principally to your back office?

24   A.   Well, it might be a document that's produced by our

25 back office and sent to Jefferies.  I'm not exactly sure on

**A201**

804

1    the details there.

2         Q.    And every time Invesco completes a purchase, an

3    internal trade ticket is generated; is that right?

4         A.    I believe so, yes.

5         Q.    It contains the essential terms of the trade?

6         A.    Yes.

7         Q.    The price and any associated costs with the

8    transaction?

9         A.    It should, yes.

10        Q.    It shows the total price?

11        A.    Right.

12        Q.    It doesn't reflect any markup, for example?

13        A.    I don't believe so.

14        Q.    Or any payment for services to a broker-dealer?

15        A.    I don't believe so.

16        Q.    It just reflects total price?

17        A.    I believe that's the case, yes.

18             MR. BUTSWINKAS:  Your Honor, I have no further

19    questions.  Thank you.

20             THE COURT:  Can the issue of the outstanding

21    document for identification wait for lunch?

22             MR. BUTSWINKAS:  It is only a question about

23    admissibility.  I don't need to ask questions of the witness

24    about it.

25             THE COURT:  That's fine.

**A202**

805

1          Redirect, briefly?

2          MS. CHERRY:  If I can have a moment to set up.

3                    REDIRECT EXAMINATION

4    BY MS. CHERRY:

5        Q.   Mr. Norris, you were shown a document that was

6    created by Legal and Compliance that talked about PPIPs and

7    broker-dealers.  Having seen that document, does that change

8    your understanding of -- your understanding that Mr. Litvak

9    was acting as an agent?

10       A.   No, it does not.

11       Q.   And whether Litvak was an agent or principal, did

12   that make a difference to you as to whether you thought

13   Litvak was telling the truth when he said he was using your

14   bid?

15       A.   No, it does not.

16       Q.   And whether Litvak or -- Mr. Litvak, excuse me, was

17   an agent or a principal, did that make a difference to you as

18   to whether you thought you were negotiating to pay Mr. Litvak

19   on top of the price that he told you he bought the bond for?

20       A.   No, that doesn't change.

21       Q.   Mr. Butswinkas showed you a document, Defendant's

22   Exhibit 621.  And on top, it had a price 79 spot 9375.  Is

23   that the same as 79-30?

24       A.   Yes.

25       Q.   And that was a total price that Invesco paid for

**A203**

806

1    that bond?

2        A.    That's correct.

3        Q.    What makes up -- what were the components of that

4    total price?

5        A.    It combines the price that the bond was purchased

6    from the seller with the commission that was paid for that

7    bond -- for that transaction.  Sorry.

8        Q.    I think you said that the most important or one of

9    the most important variables leading to the bid is the

10   potential yield.  What's the relationship between price and

11   yield?

12       A.    So a higher price means a lower yield and a lower

13   price means a higher yield.  And yield is the return that we

14   would expect to get on a particular investment.

15       Q.    What's your goal as to price?

16       A.    You want to buy any security at the lowest possible

17   price you can.

18       Q.    You were asked about not relying on volunteered

19   information.  Was Mr. Litvak's statement to you that he was

20   using your bid info that you relied on?

21       A.    Yes.

22       Q.    Why?

23       A.    That's because we were in the middle of a

24   negotiation on a transaction.  That's not -- that's not

25   information that you take with a grain of salt.  You're

**A204**

807

1     supposed to be acting -- he's supposed to be acting in my

2     best interest and, you know, I accept what he tells me in

3     that instance as the truth.

4          Q.   What about when he said he bid your level, is that

5     information you relied on?

6          A.   Yes.

7          Q.   Why is that?

8          A.   Because that tells me that he -- again, that he bid

9     on the bond at the price that I specified.

10         Q.   Mr. Butswinkas asked you some questions about cover

11    and false cover.  Is cover given before or after a

12    transaction is finalized?

13         A.   It's given after.

14         Q.   And when Mr. Litvak told you that he bid your level,

15    was that before or after the transaction was finalized?

16         A.   That was before.

17         Q.   And when Mr. Litvak said that he bid 79-24 (sic) on

18    the FHASI bond, was that before or after you had finished the

19    negotiations?

20         A.   He told me he bid 79-26 on the FHASI bond.

21         Q.   Thank you.

22         A.   And that was -- that was in the middle of our -- or

23    during our transaction, yes, so I guess before the

24    finalization of the trade, yes.

25         Q.   When he told you that, the transaction had not been

**A205**

808

1    completed yet?

2        A.    That's correct.

3        Q.    There was a question Mr. Butswinkas asked -- asked

4    you if you went to a different broker-dealer to put in a bid

5    or to get more information.  If you had known that Mr. Litvak

6    wasn't bidding your level, your bid, on the SARM bond, would

7    you have gone to a different broker-dealer?

8        A.    If I had known that he wasn't using -- if he was

9    being dishonest with me, yes, I would certainly choose to go

10   to a different broker-dealer that would deal with me in a

11   fair manner, yes.

12       Q.    And you were asked -- Mr. Butswinkas asked you what

13   was your maximum price that you were looking to pay on the

14   SARM bond, and you said you didn't recall.  Were you looking

15   to pay the maximum price for the SARM bond?

16       A.    No.  We strive to pay the minimum price that we

17   can.

18       Q.    And finally, you were asked about altered

19   information.  Who sent you an altered document?

20       A.    Jesse Litvak sent me an altered document.

21           MS. CHERRY:  May I have a moment, Your Honor?

22           THE COURT:  You may.

23           MS. CHERRY:  No further questions, Your Honor.

24           THE COURT:  You may step down, Mr. Norris.  Thank

25   you very much, and you are excused, sir.  Your next witness.

**A206**

```
 1              UNITED STATES DISTRICT COURT.

 2                DISTRICT OF CONNECTICUT

 3    _____
      United States of America    )January 10, 2017
 4                 Government  )9:28 a.m.
              v.             )
 5    Jesse C. Litvak          )3:13cr19(JCH)
                 Defendant.   )
 6    _____)

 7
                         141 Church Street
 8                        New Haven, Connecticut

 9         DAY FOUR OF TRIAL

10

11   B E F O R E:
                 THE HONORABLE JANET C. HALL, U.S.D.J.
12                AND JURY OF 14

13   A P P E A R A N C E S:

14   For The Government  :   Jonathan Francis
                             William Nardini
15                           Heather Cherry
                             U.S. Attorney's Office
16                           157 Church St., 23rd floor
                             New Haven, CT 06510
17

18   For the Defendant  :    Dane Butswinkas
                             C. J. Mahoney
19                           Adam Harber
                             Katherine Trefz
20                           Elise Baumgarten
                             Krystal Commons
21                           Williams & Connolly
                             725 12th St., N.W.
22                           Washington, DC 20005-5901

23                           Michael Chase
                             Shipman & Goodwin
24                           One Constitution Plaza
                             Hartford, CT  06103

25
```

**A207**

859

1       A.    The seller.

2       Q.    Why do you think that Mr. Litvak is paying 57 and a

3    half to the seller?

4       A.    Because he says that he was firm at 57-16, that

5    that's the lowest he's willing to go.

6       Q.    So would it have mattered to you at the time if you

7    had known that Mr. Litvak actually bought the bond at 56 and

8    a half instead of 57 and a half?

9       A.    Yes.

10      Q.    Please explain why.

11      A.    Why is because my 2-tick commission just became 34

12   ticks.

13      Q.    What's wrong with paying 34 ticks?

14      A.    That's a lot more than 2 ticks.

15      Q.    What was your understanding of Mr. Litvak's

16   relationship to you in this trade?

17      A.    He relationship to me, he was my broker in the

18   trade.

19      Q.    Just like the last one we saw?

20      A.    He was acting as my agent.

21      Q.    He's -- intermediary was another word you used?

22      A.    Facilitating the trade, yes.

23      Q.    How did you come to have that understanding?

24      A.    He said that he had a seller that he was -- that he

25   had already traded some of these bonds for the seller, that

**A208**

1   we were negotiating about commission.  It had all the

2   characteristics of that type of trade.

3       Q.   If you had known -- before you said 34 was more than

4   -- 34 ticks was more than 2.  If you had known he was making

5   34 ticks, would that have been something that you wanted to

6   know?

7       A.   Certainly.

8       Q.   Why?  What would you have done with that

9   information?

10      A.   I would have used it to get the commission back to 2

11  ticks.

12      Q.   So if I tell you that the difference between 34

13  ticks and 2 ticks is more than $179,000, does that change

14  your answer?

15      A.   Does it change my answer?

16      Q.   Yes.  Does it change your answer?

17      A.   I think it is consistent with my answer.

18      Q.   Why doesn't that change your answer?  It's $179,000.

19      A.   Right, that I just overpaid, you're saying.

20      Q.   I don't want to --

21      A.   I want to make sure I'm not misunderstanding your

22  question.

23      Q.   Sure.  So if the difference 34 ticks on one hand and

24  2 ticks on the other is $179,000, it is $179,500

25  approximately, does that still matter to you?

**A209**

925

1    A.    Yes.

2    Q.    And that's a multi-strategy hedge fund?

3    A.    Yes.

4    Q.    It invests in securities across the board?

5    A.    Yes.

6    Q.    Including securitized products?

7    A.    Yes.

8    Q.    And other equities?

9    A.    Yes.

10   Q.    Including distressed debt?

11   A.    Yes.

12   Q.    Including what the jury has heard as RMBS?

13   A.    Yes.

14   Q.    Residential mortgage-backed securities?

15   A.    Yes.

16   Q.    And QVT does a lot of analysis on bonds before it

17   purchases them?

18   A.    I would say that's accurate.

19   Q.    And QVT did analysis on the bonds that you testified

20   about when the Government questioned you?

21   A.    Yes.

22   Q.    And it is typical a QVT investment begins with a

23   fundamental analysis of the bonds?

24   A.    Yeah, I would say that's accurate.

25   Q.    What is a fundamental analysis?

**A210**

926

1    A.    So it can vary, but I think in the context of -- are

2    we talking about RMBS bonds here?

3    Q.    That's all we're talking about.

4    A.    Okay.  So in the context of RMBS bonds, I would

5    interpret fundamental analysis to relate to the behavior of

6    the underlying collateral and the assumptions that go into

7    that that ultimately allow us to determine what kind of yield

8    we would receive on it.

9    Q.    The financial characteristics of the underlying

10   mortgages?

11   A.    Yes, I think these a fair reflection.

12   Q.    That's what you mean by collateral?

13   A.    Yes.

14   Q.    The collateral for an RMBS bond is a bundle of

15   mortgages?

16   A.    Correct.

17   Q.    Can be into the thousands of mortgages?

18   A.    Yes.

19   Q.    And in the bonds that you talked about in the

20   Government's examination, those were large bundles of

21   mortgages that were the collateral for those bonds?

22   A.    Yes, I would say large.

23   Q.    Okay.  And you are not claiming that Mr. Litvak

24   misrepresented any of the fundamentals of those mortgages

25   that were the collateral for those bonds, are you?

**A211**

1    A.    No.

2    Q.    And, in fact, you had all of that information

3    accurately to analyze?

4    A.    I missed you at my -- you say -- can you just repeat

5    the question?

6    Q.    Yes, sir.  QVT had all of the fundamental financial

7    characteristics of the underlying mortgages to those bonds to

8    analyze?

9    A.    Yes.

10   Q.    Mr. Litvak didn't misrepresent anything about the

11   product, the fundamentals of the product?

12   A.    No.

13   Q.    You got exactly the bond you thought you were

14   buying?

15   A.    As far as I'm aware, yes.

16   Q.    And QVT has used proprietary software in its

17   analysis?

18   A.    Yes.

19   Q.    And is that proprietary software that is internally

20   developed?

21   A.    Yes.

22   Q.    Did you have a role in the internal development of

23   that software?

24   A.    Yes.

25   Q.    And that's the use of computer modeling?

948

1    A.    Before I completed the trade, you are saying?

2    Q.    Yes, sir.

3    A.    Yes.

4    Q.    And the analytics?

5    A.    Yes.

6    Q.    You bought it for 51.75; is that correct?

7    A.    That seems to be the case, yes.

8    Q.    March 29, 2010, you bought it for cheaper than this?

9    A.    I'm sorry.  I don't recall what the -- do you have

10   the trade ticket from the March 29?

11   Q.    Do you remember being asked about it yesterday?

12   A.    I remember being asked about it, yes.

13   Q.    You don't remember the price?

14   A.    That would be helpful.  The price would be.  I can

15   give you a definitive answer.

16   Q.    With the difficulty remembering the price just from

17   yesterday, I can't even imagine how difficult it would be to

18   remember six years ago, right, sir?

19   A.    Or even three years ago, that's correct.

20   Q.    Let me show you Government's Exhibit 92.  This, I

21   believe, is in evidence, so you can publish it with the jury.

22   And if you can go down to line 19:22:29 through 19:23:19.

23         So let me ask the question, sir.  On March 29, 2010,

24   you bought the same bond that you bought on the 26th for

25   51-06; is that right?

**A213**

949

1      A.    Correct.

2      Q.    18 ticks cheaper than you had bought it three days

3    earlier?

4      A.    Yes.

5      Q.    And I take it that you would not have bought this

6    bond on the 29th if your analysis did not show attractive

7    profit potential?

8      A.    Yes.

9      Q.    And you would not have bought this bond if your

10   analysis didn't show that the total price would meet your

11   target yield?

12     A.    Yes.

13     Q.    And that's true of the LXS bond, as well, isn't it?

14   That is to say you would not have bought that bond if your

15   analysis did not show it to have an attractive profit

16   potential?

17     A.    Yes.

18     Q.    And you would not have bought the LXS bond if the

19   total price that you paid for it would not meet your target

20   yield?

21     A.    Yes.

22     Q.    Would it be fair to say that you are inherently

23   skeptical when you approach negotiations in this industry?

24     A.    Yes.

25     Q.    And you know, for example, that counterparties in

**A214**

950

1    the RMBS market are sometimes not being completely truthful?

2        A.    In certain regards, yes.

3        Q.    And counterparties sitting across -- you don't like

4    that expression.  Counterparties against whom you are

5    negotiating spin information?

6        A.    Yes.

7        Q.    And they shade information in a way that might not

8    be entirely truthful; you experienced that?

9        A.    I have certainly experienced that, yes.

10       Q.    Counterparty have been known to provide false

11   pricing information, false color?

12       A.    I don't -- I guess except for what we're talking

13   about now, I don't know that I have proof of that in

14   instances -- in other instances, so that I don't know that I

15   can --

16       Q.    But you keep your antennas up for that, don't you?

17       A.    I do.

18       Q.    Because you have to be wary of volunteered

19   information?

20       A.    Well, it depends on the situation.

21       Q.    You are aware when you are negotiating against a

22   counterparty that volunteered information may not be

23   100 percent truthful?

24       A.    Again, it depends on the situation.

25       Q.    You're on guard when you hear volunteered

**A215**

951

1    information from a counterparty negotiating against you?

2         A.    Negotiating against me, yes.

3         Q.    And when you spoke with the Government about this,

4    one of the things that you surmised was that Jesse was

5    pretending to pin his bottom line on the seller to him so

6    that he could not have to take blame for his bottom line?  Do

7    you remember telling the Government that?

8         A.    I don't recall that.

9         Q.    Let me put up for the witness -- and, Your Honor,

10   for identification purposes, Defendant's Exhibit 1418, page

11   4, please.  Bottom paragraph.  The sentence --

12         MR. BUTSWINKAS:  Your Honor, can I point out the

13   place to the tech person?

14         THE COURT:  That's fine.

15   BY MR. BUTSWINKAS:

16         Q.    Mr. Wollman, could you read those two sentences to

17   yourself and tell the jury whether that refreshes your

18   recollection that when you met with the Government you

19   thought that Jesse was blaming a seller for his bottom line

20   so that he didn't have to take the blame for his bottom line?

21         A.    No, this does not refresh my recollection.

22         Q.    Now, have you ever invented a fictitious seller to

23   use leverage in a negotiation?

24         A.    Certainly not that I can recall.

25         Q.    So you may have, you don't remember?

**A216**

985

1    Will you both agree that when you are talking about "it,"
2    we're talking about a document that's marked as Exhibit 2324?
3              MR. BUTSWINKAS:  Yes, Your Honor.
4              THE WITNESS:  Well, so this is --
5              THE COURT:  He's been questioning you about that?
6              THE WITNESS:  Right.  Right.  So I was referring to
7    the spreadsheet that this represents.  Obviously, this is a
8    printout of the spreadsheet.  It is not actually the
9    spreadsheet itself, but to the extent that it represents the
10   same thing, yeah.
11             THE COURT:  That's fine.  Because right now nobody
12   has mentioned the number or the document description and I'm
13   afraid that it's not clear that it is 2324.  So that's
14   fine.
15   BY MR. BUTSWINKAS:
16        Q.   Just two more questions, sir.
17             The total price that you paid on the LXS bond was
18   consistent with your internal analytics about whether it was
19   good price?
20        A.   Sorry.  The LXS, we're talking about the LXS bond --
21   which LXS bond?
22        Q.   The one you testified that you bought from
23   Jefferies?
24        A.   We're not talking about the BWIC anymore?
25        Q.   No, we're moving on from that.

**A217**

986

1    The question is, the LXS bond that you bought from

2  Jefferies, the total price that you paid was consistent with

3  what your internal analytics told you was a good price for

4  that bond?

5    A.   Yes.

6    Q.   And with respect to the CWALT bond, the March 30,

7  2010 transaction, the total price that you paid was a price

8  that your internal analytics told you was a good price for

9  the bond?  Same question.

10    A.   It is a price -- it is a price that I was

11  comfortable buying the bond at.

12    MR. BUTSWINKAS:  Nothing further at this time.

13  Thank you.

14    THE COURT:  We broke from 20 of 11:00 to 10 of

15  11:00, right?  So you have just come back.

16    How long do you think you will be on redirect,

17  Attorney Francis?

18    MR. FRANCIS:  10, 15 minutes, Your Honor.

19    THE COURT:  Let's do that and then we'll take our

20  break unless anybody is really unhappy.  If you could do

21  that, Attorney Francis, that would be very good.

22    MR. FRANCIS:  Let me have one moment to get set up.

23    THE COURT:  Absolutely.

24  REDIRECT EXAMINATION BY MR. FRANCIS:

25    Q.   Good morning, Mr. Wollman.

**A218**

| | |
|---|---|
| **Sent:** | 4/01/2010 11:03 AM |
| **To:** | JOEL WOLLMAN (|QVT FINANCIAL,LP|jjoel.wollman@qvt.com); JOSEPH STEFFA (|RBS SECURITIES INC.|JOE.STEFFA@RBSGC.COM) |
| **Subject:** | IB Conversation, 2 participants,   you selling all of your POA?... |

Conversation start time: 04/01/2010 15:02:32 UTC

Conversation end time:   04/01/2010 18:46:46 UTC

Number of Participants: 2

Participants:
        JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net)
        JOSEPH STEFFA (JSTEFFA1@bloomberg.net)

RoomID: CHAT-0x30000011AA14C

04/01/2010 15:02:32 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) entered

04/01/2010 15:02:38 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) invites JOSEPH STEFFA (JSTEFFA1@bloomberg.net):   you selling all of your POA?

04/01/2010 15:02:38 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) entered

04/01/2010 15:02:52 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I asked Maffei to assemble your scraps

04/01/2010 15:02:55 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   have sold a fair amount. other dealers jacking offers big time

04/01/2010 15:02:57 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   and let me take a look

04/01/2010 15:03:02 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   i have a few oddlots left

04/01/2010 15:03:04 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   1-5mm pieces

04/01/2010 15:03:09 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   what names?

04/01/2010 15:03:13 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   maybe matchers?

04/01/2010 15:03:25 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   Jesse sending now actually

04/01/2010 15:04:02 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   i'll keep digging thru. those are just first 2 i came across

04/01/2010 15:07:08 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   where do you think our SAMI (2006-AR7 A1A) is now?

04/01/2010 15:07:53 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   56/58

**Confidential Treatment Requested by**
**QVT Financial LP**

**QVT-LTVK-00000009**

QVT-LTVK-00000009

**A219**



04/01/2010 15:35:49 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I just bot an oddie at 55-28...

04/01/2010 15:36:18 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   there is not a lot of supply of "good" paper

04/01/2010 15:41:31 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   agree

04/01/2010 17:20:19 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   one of the more "reasonable" offers I'm seeing today

04/01/2010 17:20:29 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   20MM LXS 2007-15N 2A1

04/01/2010 17:20:35 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   will run right now

04/01/2010 17:20:37 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   what do you think?

04/01/2010 17:20:46 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I would even split sine higher factor

04/01/2010 17:20:50 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   since

04/01/2010 17:20:57 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   give me a few

04/01/2010 17:21:03 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   sure thing

04/01/2010 17:22:58 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I think they're cheap at 56, offered at 58 (down from 59)

04/01/2010 17:25:58 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   dude i really like this bond at 56.

04/01/2010 17:26:03 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   very cheap there.

04/01/2010 17:26:10 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   yeah, that was my bid

04/01/2010 17:26:22 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   but supposedly just traded at 59

04/01/2010 17:26:31 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   yet will sell to me at 58 (believe as much of that as you will)

04/01/2010 17:26:43 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   buy as cheap as you can, will take any size you want to sell me

04/01/2010 17:27:02 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   do you like them at 58?

04/01/2010 17:27:13 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   i think they are right around 10% yield at 58

04/01/2010 17:27:14 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I still like at 57

04/01/2010 17:27:20 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   yeah, that's what I see

**Confidential Treatment Requested by**
**QVT Financial LP**

**QVT-LTVK-00000010**

QVT-LTVK-00000010

1215-2

04/01/2010 17:27:30 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   so i would take them up to 58, but would like to buy cheaper if possible

04/01/2010 17:27:31 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I've been trying to buy closer to 10.5/11

04/01/2010 17:27:40 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   ok, let me see what I can do

04/01/2010 17:27:56 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   cool. will take whatever you want to sell, but understand if you want to keep

04/01/2010 17:28:23 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I would share with you; would like to get back into the partnering up business

04/01/2010 17:28:31 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   love that

04/01/2010 17:51:39 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   after a bunch of back and forth, I have it at 57-18 to me

04/01/2010 17:51:57 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I think that's as low as I can get them

04/01/2010 17:52:18 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   ok. i buy from you wherever you want to sell

04/01/2010 17:52:25 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   as much or as little as you want to sell

04/01/2010 17:52:42 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   I would pass it through and do half?  Let me just confirm total size

04/01/2010 17:53:04 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   i buy half at 57-24

04/01/2010 17:53:27 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   20 with a tail, so I would give you 10 - I don't need to charge you

04/01/2010 17:53:55 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   i buy 10,000,000 lxs 07-15n 2a1 at 57-24 for corp

04/01/2010 17:54:44 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   you're a good man - will send you a recap; only thing I ask is to hold off for a little bit - this guy is gonna be mad at me if he knows I sold off given his original print at 59 and the back and forth

04/01/2010 17:55:14 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   you ok with that?

04/01/2010 17:55:28 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) posted:   yup. going into the vault

04/01/2010 17:55:33 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted:   thanks bud

04/01/2010 18:46:46 UTC JOSEPH STEFFA (JSTEFFA1@bloomberg.net) exited

**Confidential Treatment Requested by**
**QVT Financial LP**

**QVT-LTVK-00000011**

**A221**

QVT-LTVK-00000011

1215-3

| | |
|---|---|
| **From:** | Unspecified Sender |
| **Sent:** | Thursday, April 1, 2010 11:01 AM |
| **To:** | JOEL WOLLMAN (|QVT FINANCIAL, LP|joel.wollman@qvt.com) <JOELWOLLMAN@bloomberg.net>; JESSE LITVAK (|JEFFERIES & CO., INC|jlitvak@jefferies.com) <JLITVAK1@bloomberg.net> |
| **Subject:** | IB Conversation, 2 participants, hey... |

Conversation start time: 04/01/2010 15:01:26 UTC

Conversation end time: 04/01/2010 17:56:03 UTC

Number of Participants: 2

Participants:
JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net)
JESSE LITVAK (JLITVAK1@bloomberg.net)



RoomID: CHAT-0x30000011AA0F2

04/01/2010 15:01:26 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) entered

04/01/2010 15:01:28 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) invites JESSE LITVAK (JLITVAK1@bloomberg.net): hey

04/01/2010 15:01:28 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) entered

04/01/2010 15:01:28 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: *** JEFFERIES & CO., INC (15781) Disclaimer: Jefferies archives and monitors messages. This message is confidential to the user to which it is addressed. If you are not the addressee you may not copy forward, disclose or otherwise use this message. It may be produced at the request of regulators or in civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies operates as Jefferies International Limited, registration No: 1978621, registered office: Vintners Place, 68 Upper Thames Street, London EC4V 3BJ. Jefferies International Limited is authorised and regulated by the Financial Services Authority.

04/01/2010 15:01:39 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: just checking in

04/01/2010 15:01:45 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: yo

04/01/2010 15:01:47 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: whatever happened with your exclusive yesterday?

04/01/2010 15:01:55 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: btw, any MTA in the cellar?

04/01/2010 15:03:27 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: we ended up trading that rali bond at 57.....seller actually has more behind it and i have convinced him to let me work his whole piece....traded another 25mm here this am and have 25mm left now.....57 trades bonds......

04/01/2010 15:04:05 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: which bond again?

04/01/2010 15:04:10 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: let me look at it this am

04/01/2010 15:04:40 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: rali 07-qh1 a1

04/01/2010 15:04:52 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: ok, running now

04/01/2010 15:05:01 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: good

04/01/2010 15:23:47 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: he actually has 21mm left.....not 25mm.....and i think there is another hf that might come in here on em soon......would much rather print with you than with them.....

04/01/2010 15:24:07 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: yeah, just not loving the bond right now

**A222**

04/01/2010 15:24:12 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: spending a little more time

04/01/2010 15:24:14 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: ok

04/01/2010 16:50:58 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: how bout this one....lxs 07-15n 2a1....just traded 25mm at 59-00....20mm to go on that one.....ahm and gpmf originated.....great avg balances on this one....nice crrs too...oc deal....

04/01/2010 16:51:33 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: let me run it

04/01/2010 16:52:43 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: i am thinking about buying it for myself.....so let me know....if u dont take it...i might....

04/01/2010 16:53:07 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: ok, running

04/01/2010 17:00:20 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: I do like this bond at 57...

04/01/2010 17:01:02 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: let me go show him that bid and see what he says....be right back

04/01/2010 17:01:09 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: let me just firm up

04/01/2010 17:01:13 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: ok

04/01/2010 17:01:28 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: trying to see why I like it that high since it is only 38% C/E

04/01/2010 17:01:37 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: great severities

04/01/2010 17:01:38 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: oc

04/01/2010 17:01:42 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: big avg bal

04/01/2010 17:01:45 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: crr

04/01/2010 17:01:46 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: etc

04/01/2010 17:01:55 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: yeah, but just making sure that makes up for enhancement

04/01/2010 17:02:05 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: k

04/01/2010 17:08:09 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: 57 was a little aggressive - I would pay 56-8 to me

04/01/2010 17:09:28 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: i will show....gonna be hard to get em that low given where we just traded 25mm of em......but i will ask

04/01/2010 17:09:51 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: thanks

04/01/2010 17:16:47 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: yeah....sorry bro....that other print we had on the bonds is making him not do anything down there....he said he would sell at 58 (which means i can buy em 8/32s cheap to that)...he is letting me work for 8/32s on these trades....so 58 to you is gonna be best

04/01/2010 17:21:10 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: ok, let me look

04/01/2010 17:30:15 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: I can talk myself almost back to my original bid of 57

04/01/2010 17:30:25 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: lol.....

04/01/2010 17:30:27 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: so we're 57/58

04/01/2010 17:30:36 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: at 57, I see 10% yield

04/01/2010 17:30:44 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: which is really the limit of where I want to buy things

04/01/2010 17:30:56 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: understood....let me go do my best to beat him up

04/01/2010 17:41:24 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: this blows....i hate being this close and not getting trades done.....he is 57-16 net to me firm.....

04/01/2010 17:41:38 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: i would work skinner than usual on this if it helps

04/01/2010 17:42:48 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: do you think if I get up to 57-08 to me we can get there (dropping below my 10% but I do like this bond)

04/01/2010 17:43:24 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: I think that's where I'm gonna stop out - probably paying more than I should but not much out there

04/01/2010 17:45:17 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: i would normally say yes...but this guy has given me some good orders in the last 24 hrs and he just told me he was firm at 57-16.....if i call him back and go lower he is gonna rip my head off....i just know it.....im lucky that he didnt bwic this sht...and he already is giving me sht that i sold the 1st piece at 59

04/01/2010 17:46:10 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: like i said though...i would be willing to work super skinny just to try and get er done

04/01/2010 17:47:06 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: what is the cheapest you would be wililng to sell to me?

04/01/2010 17:50:47 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: you there?

04/01/2010 17:51:07 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: i would work for 2/32s

04/01/2010 17:52:21 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: and 20MM O/F exactly?

04/01/2010 17:52:42 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: 20.868mm orig

04/01/2010 17:53:58 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: ok, let's do this

04/01/2010 17:55:57 UTC JOEL WOLLMAN (JOELWOLLMAN@bloomberg.net) posted: calling

04/01/2010 17:56:03 UTC JESSE LITVAK (JLITVAK1@bloomberg.net) posted: sounds good....i will go get the bonds....thanks for reaching...if you didnt buy it iw

A224

JEFFTC-000124

JEFF03772887_0003

1345

1              UNITED STATES DISTRICT COURT.

2                DISTRICT OF CONNECTICUT

3    _____
     United States of America    )January 13, 2017
4               Government  )9:13 a.m.
            v.                    )
5    Jesse C. Litvak             )3:13cr19(JCH)
                Defendant.   )
6    _____)

7
                              141 Church Street
8                             New Haven, Connecticut

9          DAY SEVEN OF TRIAL

10

11   B E F O R E:
                    THE HONORABLE JANET C. HALL, U.S.D.J.
12                  AND Jury OF 14

13   A P P E A R A N C E S:

14   For The Government  :    Jonathan Francis
                              William Nardini
15                            Heather Cherry
                              U.S. Attorney's Office
16                            157 Church St., 23rd floor
                              New Haven, CT 06510
17

18   For the Defendant  :    Dane Butswinkas
                             C. J. Mahoney
19                           Adam Harber
                             Katherine Trefz
20                           Elise Baumgarten
                             Krystal Commons
21                           Williams & Connolly
                             725 12th St., N.W.
22                           Washington, DC 20005-5901

23                           Michael Chase
                             Shipman & Goodwin
24                           One Constitution Plaza
                             Hartford, CT  06103

25

A225

1456

1   still owed, or as he put it, it was a around 15, he wasn't

2   sure.

3           Now, I want to contrast Mr. Burnaman, the expert

4   witness that the defense paid, with the five reasonable

5   investors who testified.  I want to point out three

6   characteristics that really are important in assessing their

7   value in this case.  Number one, they were active investors

8   in 2009, 2010 and 2011.  They knew what was happening in the

9   market, how the market operated that day.  They were involved

10  in these trades.  Number two.  They know the facts of this

11  case.  They lived through the facts of this case.  They stood

12  in the rain with Mr. Litvak in these chats in this case.

13  They can tell you how these mattered, not in the abstract but

14  specifically how that played out in this case.  And I submit

15  to you that none of them exhibit any signs of bias one way or

16  the other.  They had no axe to grind.  There was no

17  indication that they had any stake in the outcome of this

18  case.

19          Now, I would like to address this issue of the

20  agent/principal question, and I would like to suggest it is a

21  red herring.  There was a lot of time spent on that.  And the

22  Government has never claimed and does not claim now, let me

23  make it clear, that anybody was -- Mr. Litvak was ever acting

24  as an agent.  What was important was the testimony you heard

25  from the victims that he created the perception.  They

**A226**

1457

1 thought he was acting as their agent.  That's the critical

2 thing.

3          And you will see in the judge's instruction -- the

4 judge is going to instruct you that in this kind of a

5 circumstance, in the RMBS market, the trader at the

6 broker-dealer is not acting as someone's agent.  It is a

7 principal-to-principal trade and has no special duties.  And

8 there was discussion about, well, if I'm a principal, I have

9 no duty of disclosure to you.  I don't have to tell you the

10 price I bought at.  I don't have to tell you the price I'm

11 selling at.  Of course.  Of course.

12          The question isn't did he have to, the question is

13 why did he choose to.  Why did Mr. Litvak choose to establish

14 a relationship of trust to lead them all to think that he was

15 trustworthy?  Why?

16          THE COURT:  You have about five minutes.

17          MR. NARDINI:  Thank you, Your Honor.

18          It was to establish a relationship of trust so that

19 he could make more money.

20          Now, there were a number of issues that the defense

21 raised.  I think it was an eight-point checklist, and I would

22 suggest to you that that's like walking into the used car lot

23 where the guy comes in and says I'd like to see how the car

24 runs.  And they say let me show you the AM stereo.  This is

25 great.  No, I want to know how the car runs.  And they say,

**A227**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 13-CR-19 |
| | : | |
| JESSE C. LITVAK, | : | JANUARY 13, 2017 |
| Defendant. | : | |

**JURY CHARGE**

1

27.    NO AGENCY

In the law, a person is an agent if he is authorized to act on behalf of another, known as a principal.  An agent owes certain duties to his principal.

In the transactions at issue in this case, Mr. Litvak was not the agent of the buyers or sellers of the RMBS.  In other words, when he bought an RMBS from another person, he was not an agent of that seller.  Further, when he sold an RMBS to another person, he was not the agent of that buyer.

A229

35.    COUNTS ONE THROUGH SIX AND EIGHT THROUGH ELEVEN:
       SECURITIES FRAUD—SECOND ELEMENT

If you find that the government has proven beyond a reasonable doubt that a statement was false or omitted, you must next determine whether the fact misstated or omitted was material under the circumstances.  In order for you to find that a misrepresentation or omission was material, the government must prove beyond a reasonable doubt that there was a substantial likelihood that the misstated or omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.

To "significantly alter the total mix of information available" means to meaningfully affect a reasonable investor's consideration about whether to buy or sell, and at what price.  To be material, a misstated fact or omission need not determine any particular outcome.  However, the government must prove beyond a reasonable doubt a substantial likelihood that the disclosure of the truth or the omitted fact would have assumed significance in the deliberations of the reasonable investor.  In other words, in order to be material, the false statement or omitted fact must be of such importance that it could reasonably be expected to cause or induce a reasonable investor to act or not act with respect to the transaction at issue.  Materiality, however, does not require proof of a substantial likelihood that disclosure of the truth or the omitted fact would have caused a reasonable investor to act differently.

The securities fraud statute does not, however, prohibit misstatements or omissions that would be minor, trivial, or unimportant to a reasonable investor.  The word "material" is used to distinguish the kinds of statements that would have been significant to a reasonable investor in making an investment decision, from those that

would be of no real importance to that investor. In order to be material, there must be a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision. However, a false statement cannot be material if it constitutes mere puffing or sales talk that would not, in the view of the reasonable investor, significantly alter the total mix of information available in making an investment decision.

For the purposes of this case, a "reasonable investor" is an investor in the RMBS market. In determining whether the stated or omitted fact is material, you must consider the sophistication of investors in that market and the sorts of information available to investors in that market. You should consider all the evidence about what such a reasonable investor would consider important when making an investment decision, and approach the question of materiality objectively. You must assess whether the false statement or omitted fact was material to a reasonable investor as of the time of the transaction, and not based upon a hindsight view.

The determination of whether something was material requires a careful assessment of the inferences a reasonable investor would draw from the information provided, or not provided, to him, and the significance of those inferences to such an investor. It is a very fact-specific inquiry, which you must undertake.

If you find that, as to a count of securities fraud, the government failed to prove beyond a reasonable doubt this second element, then your deliberation with respect to that count is finished, and you must return a verdict of not guilty as to that count. However, if you find that, as to a count, the government has proven beyond a

reasonable doubt the second element, then you should proceed to consider the third element, intent, on which I will now charge you.

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF CONNECTICUT

 3   _____
     United States of America    )January 27, 2017
 4              Government    )9:30 a.m.
          v.                 )
 5   Jesse C. Litvak          )3:13cr19(JCH)
              Defendant.     )
 6   _____)

 7                              141 Church Street
                                New Haven, Connecticut
 8

 9         DAY FIFTEEN OF TRIAL.

10              (VERDICT)

11   B E F O R E:
                   THE HONORABLE JANET C. HALL, U.S.D.J.
12                 AND JURY OF 13

13   A P P E A R A N C E S:

14   For The Government  :    Jonathan Francis
                              William Nardini
15                            Heather Cherry
                              U.S. Attorney's Office
16                            157 Church St., 23rd floor
                              New Haven, CT 06510
17

18   For the Defendant  :     Dane Butswinkas
                              C. J. Mahoney
19                            Adam Harber
                              Katherine Trefz
20                            Elise Baumgarten
                              Krystal Commons
21                            Williams & Connolly
                              725 12th St., N.W.
22                            Washington, DC 20005-5901

23                            Michael Chase
                              Shipman & Goodwin
24                            One Constitution Plaza
                              Hartford, CT

25
```

**A233**

1769

```
 1              THE CLERK:  As to the charge in Count One of
 2    Securities Fraud, we, the jury, unanimously find the
 3    Defendant Jesse Litvak not guilty.
 4              As to the charge in Count Two of Securities Fraud,
 5    we, the jury, unanimously find the Defendant Jesse Litvak not
 6    guilty.
 7              As to the charge in Count Three of Securities Fraud,
 8    we, the jury, unanimously find the Defendant Jesse Litvak not
 9    guilty.
10              As to the charge in Count Four of Securities Fraud,
11    we, the jury, unanimously find the Defendant Jesse Litvak
12    guilty.
13              As to the charge in Count Five of Securities Fraud,
14    we, the jury, unanimously find the Defendant Jesse Litvak not
15    guilty.
16              As to the charge in Count Six of Securities Fraud,
17    we, the jury, unanimously find the Defendant Jesse Litvak not
18    guilty.
19              As to the charge in Count Eight of Securities Fraud,
20    we, the jury, unanimously find the Defendant Jesse Litvak not
21    guilty.
22              As to the charge in Count Nine of Securities Fraud,
23    we, the jury, unanimously find the defendant Jesse Litvak not
24    guilty.
25              As to the charge in Count Ten of Securities Fraud,
```

1770

1    we, the jury, unanimously find the Defendant Jesse Litvak not
2    guilty.
3              As to the charge in Count Eleven of Securities
4    Fraud, we, the jury, unanimously find the Defendant Jesse
5    Litvak not guilty.
6              Signed by the foreperson dated today.
7              THE COURT:  Ladies and gentlemen of the jury, is
8    that your verdict so say you all.
9              THE JURY:  Yes.
10             THE COURT:  Is there any request for polling of the
11   jury at this time?
12             MR. FRANCIS:  Not from the Government, Your Honor.
13             MR. BUTSWINKAS:  Not from the defense, Your Honor.
14             THE COURT:  All right then at this point, the Court
15   directs that the verdict be recorded and made a part of the
16   record of our court.
17             With that, having said those words, that means your
18   duty is done.  You have completed your service as jurors.
19   You are free to go.
20             Before you leave, however, I want to express to you
21   the Court's genuine gratitude for your service, the case went
22   on for a while, you deliberated for quite a while.  Your
23   service a greatly appreciated.  As I said to you when you
24   were first called, this is one of the few things we can do as
25   citizens and you have done that.  I thank you all very much.

**A235**

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF CONNECTICUT

 3    _____
      United States of America    )April 26, 2017
 4                  Government     )9:30 a.m.
               v.                  )
 5    Jesse C. Litvak              )3:13cr19(JCH)
                  Defendant.       )
 6    _____)

 7                                  141 Church Street
                                    New Haven, Connecticut
 8

 9              SENTENCING HEARING.

10

11    B E F O R E :
                    THE HONORABLE JANET C. HALL, U.S.D.J.
12

13    A P P E A R A N C E S :

14    For The Government  :    Jonathan Francis
                                William Nardini
15                              Heather Cherry
                                U.S. Attorney's Office
16                              157 Church St., 23rd floor
                                New Haven, CT 06510
17

18    For the Defendant  :    Dane Butswinkas
                                C. J. Mahoney
19                              Adam Harber
                                Katherine Trefz
20                              Elise Baumgarten
                                Krystal Commons
21                              Williams & Connolly
                                725 12th St., N.W.
22                              Washington, DC 20005-5901

23                              Michael Chase
                                Shipman & Goodwin
24                              One Constitution Plaza
                                Hartford, CT

25
```

**A236**

1    reason here to decline to consider acquitted conduct.

2            As the Circuit said in the Casey case, 796 F.3d,

3    176, 199, the Court being the Second Circuit Court, they made

4    clear that, quote, there is neither a logical inconsistency

5    between acquittal by a jury, i.e., a finding on the fact not

6    proven by a reasonable doubt, and the factual finding of

7    guilt by a sentencing court, meaning it is not really guilt,

8    but it is by a preponderance that the elements have been

9    proven based on the same evidence.  And that's really exactly

10   what's occurred here.

11           I find by a preponderance of the evidence that

12   Mr. Litvak's actions with respect to each of the charged

13   trades and each of the uncharged conduct, both those

14   introduced at trial and those that are submitted by way of

15   exhibits to the sentencing memo of the Government, that those

16   all satisfy the elements of securities fraud, including

17   materiality by a preponderance of the evidence.  I am of the

18   view that all of this conduct really was part of the same

19   scheme.  It is all in the same nature.  It's -- you know, I

20   don't have everything in front of me, but I'm not sure I can

21   say I had everything in front of me with Mr. Norris.  I mean,

22   there may have been things about his company, were they being

23   pressured to buy more this month, to not buy as much.

24   There's a whole lot of other facts that I don't know even

25   about the convicted conduct, but I think that the test is

58

1    whether -- well, I guess I shouldn't -- shouldn't -- whether

2    the disclosure of the truth of the omitted fact would have

3    assumed significance in the deliberations of the reasonable

4    investor.  And it doesn't require proof of a substantial

5    likelihood that disclosure of the truth of the admitted fact

6    would have caused the reasonable investor to act differently.

7            So it's my conclusion based on a preponderance of

8    the evidence that as to the 76 transactions before me, the

9    convicted count plus the 75, which represent nine acquitted

10   counts, 10 uncharged counts that were at issue in the second

11   trial and 56 other transactions that the misrepresentations

12   by Mr. Litvak about either his acquisition price, his -- in

13   other words, what his firm paid or what he paid to buy the

14   bond or what he was going to sell the bond at or that it was

15   an inventory trade, or not saying it was an inventory trade.

16   In other words, the three ways which are set forth in great

17   detail in my post-trial ruling, the three different lies or

18   types of lies all were material to the victim and there was a

19   loss suffered by them measured the same way I described as to

20   Count Four.

21           And I should say that in reaching that decision

22   about the trades beyond Count Four, I'm not only using

23   testimony from the second trial, but I reminded myself of

24   Mr. Lemin's testimony at the first trial, 647, Line 8 -- I'm

25   sorry -- trial transcript at 647, Line 8 to 647, Line 12.

**A238**

166

1    appeal and, in this case, win on significant issues requiring

2    a retrial.

3         I agree completely -- obviously, that's Alabama

4    versus United States, Wasman at Supreme Court, 104 Sup.Ct.

5    3217 in 1984. I agree completely with that principle, and I

6    hope when I finish and I impose the sentence, that the

7    proceeding that's now taken three or four hours so far will

8    reflect what is the truth, and that is that nothing I'm doing

9    here today to Mr. Litvak has been done because I'm angry he

10   took an appeal or angry I got reversed or I want to punish

11   him for doing any of those things. I certainly hope that

12   what I said and I how I have approached this reflects that.

13   But if it needs saying, I wanted to say that.

14        My obligation today is to decide a sentence today

15   based on the record before me today. That record is not the

16   same as 2014. And if the differences are significant as they

17   relate to sentencing factors, then the sentence does not have

18   to be the same. And I think that's true both as in a lower

19   sentence as well as in a higher sentence. Here, I think that

20   the differences -- I understand, I think, the argument now

21   better than I did on briefs about the acquittal reflects the

22   seriousness factor, it diminishes the seriousness, or the

23   charging or lack of charging, the treatment of other people

24   reflects the seriousness, changes the seriousness. I guess I

25   will say I think that could be the case, but I can't say that

**A239**

167

1    I find that to be the case here in this case.  And maybe it

2    is because my view of the evidence is that Mr. Litvak

3    committed the nine crimes and that the other conduct that's

4    in front of me is also criminal.  It was material.  I know --

5    or I assume respectfully disagrees with me.  His lawyers

6    certainly respectfully disagree with me, but that's just my

7    view of the case.  And so while the argument is a viable

8    argument, it doesn't hit me with weight, I guess.  I don't

9    know how else to say it.  I'm mindful of what you said, but I

10   don't find it weighty in this instance.

11        Also, I think -- again I think there's disagreement

12   from the defense, but I think that his son's circumstances

13   are different.  I'm not saying they are not significant and

14   there aren't still issues.  I'm just saying they are not the

15   same.

16        I think the fact that he sued Mr. Canter is a

17   different fact in front me.  I understand that the position

18   that judge -- that's really bad lawyering, you know.

19   Aggressive lawyering by this employment lawyer and bad

20   lawyering by his first criminal lawyer and not saying, wait a

21   minute, we can't do that without going to the judge.  But the

22   fact of the matter is, at some point he sat with his lawyer,

23   his employment lawyer and said sue Mr. Canter.  Now, my view

24   might be, if it were me, I would say, well, the case is over,

25   right, but his view wasn't that it was over.  His view was he

**A240**

AO245b (USDC-CT Rev. 9/07)

<table>
<tr><td>Page 1</td><td style="text-align:center">UNITED STATES DISTRICT COURT<br>District of Connecticut</td></tr>
</table>

UNITED STATES OF AMERICA

        v.

Jesse Litvak

**JUDGMENT IN A CRIMINAL CASE**

CASE NO. *3:13CR19 (JCH)*
USM NO: *21467-014*

*Jonathan Francis/Heather Cherry*
Assistant United States Attorney

*Dane Butswinkas/C.J. Mahoney*
Defendant's Attorney

**THE DEFENDANT:** found guilty on Count 4 after jury trial.

Accordingly the defendant is adjudicated guilty of the following offense:

| Title & Section | Nature of Offense | Offense Concluded | Count |
|---|---|---|---|
| Title 15, United States Code, Sections 78(b) and 78ff | Securities Fraud | December 2011 | 4 |

The following sentence is imposed pursuant to the Sentencing Reform Act of 1984. The sentence imposed is a variance sentence which reflects the nature and circumstances of the offense and the history and characteristics of the defendant, including his lack of any prior criminal history. The sentence is sufficient, but not greater than necessary to effectuate the purposes of sentencing.

**IMPRISONMENT**

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total of 24 months.

**SUPERVISED RELEASE**

Upon release from imprisonment, the defendant shall be on supervised release for a total term of 3 years. Supervision shall be transferred to the Southern District of Florida. The Mandatory and Standard Conditions of Supervised Release as attached, are imposed. In addition, the following Special Conditions are imposed:

    1. The defendant shall participate in a program recommended by the Probation Office and approved by the court for inpatient or outpatient substance abuse treatment and testing. The defendant shall pay all or a portion of the costs associated with treatment based on his ability to pay as determined by the Probation Office and approved by the court.

    2. The defendant shall pay a fine in the amount of $2,000,000, payable in a lump sum immediately. If the fine is not paid in full within 30 days, interest shall accrue at the legal T-Bill rate. Any amount that remains unpaid at the commencement of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month. The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court.

    3. The defendant shall not incur new credit card charges above $500 or open additional lines of credit without the prior permission of the Probation Office until the defendant's criminal debt obligation is paid. The defendant shall not add any new names to any lines of credit, shall not be added as a secondary card holder on another's line of credit, and shall provide the Probation Office with electronic, read-only access to any online management of any lines of credit, including lines of credit for businesses/LLC's that are owned, operated or otherwise associated with the defendant.

    4. The defendant shall not possess ammunition, a firearm or other dangerous weapon.

    5. As directed by the Probation Office, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the Probation Office to make such notifications and to confirm the defendant's compliance with such notification requirement.

    6. Until his criminal debt obligation is satisfied, the defendant shall close all other savings/checking accounts, transfer all assets into one main bank account and shall not add any new account holders to that account (the account may include the defendant's spouse if there are joint marital assets/expenses). The defendant shall provide the Probation Officer with electronic "read only" access to any online management of the account. The defendant shall provide the final statement from each account that is closed to ensure that no funds are dissipated during the closing of existing accounts and opening of the single account.

    7. The defendant shall not encumber personal homes or investment properties without express permission of the Court, and shall not transfer, sell, give away, barter, or dissipate in any way any assets, including personal property (ie: motor vehicles, recreational vehicles) without the express permission of the Probation Office.

    8. The defendant shall obtain and maintain full time employment.

**A241**

Page 2

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments (as follows) or (as noted on the restitution order).

| | | |
|---|---|---|
| Special Assessment: | $100 | to be paid immediately. |
| Fine: | $2,000,000 | The defendant shall pay a fine in the amount of $2,000,000, payable in a lump sum immediately. If the fine is not paid in full within 30 days, interest shall accrue at the legal T-Bill rate. Any amount that remains unpaid at the commencement of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month. The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court. |

It is further ordered that the defendant will notify the United States Attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs and special assessments imposed by this judgment, are paid.

## JUDICIAL RECOMMENDATION(S) TO THE BUREAU OF PRISONS

**The defendant shall self surrender no sooner than September 11, 2017 and no later than September 22, 2017. In the event the defendant does not receive designation by the Bureau of Prisons by September 22, 2017, the defendant must self surrender to the United States Marshal, at Miami, Florida, by noon on September 22, 2017.** The court strongly recommends the defendant be designated to the camp facility in Pensacola, Florida.

4/26/2017
_____
Date of Imposition of Sentence


/S/Janet C. Hall
_____
Janet C. Hall
United States District Judge
Date: 5/2/17

A242

## CONDITIONS OF SUPERVISED RELEASE

**In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:**

### MANDATORY CONDITIONS

(1)    You must not commit another federal, state or local crime.

(2)    You must not unlawfully possess a controlled substance.

(3)    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

(4)    ■ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

(5)    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

(6)    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

### STANDARD CONDITIONS

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4. You must answer truthfully the questions asked by your probation officer.

5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. You must follow the instructions of the probation officer related to the conditions of supervision

**A243**

Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision and impose a term of imprisonment, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed
)_____    _____
      Defendant                                                                    Date

_____    _____
      U.S. Probation Officer Designated Witness              Date

**CERTIFIED AS A TRUE COPY ON THIS DATE:** _____

By: _____
      Deputy Clerk

**RETURN**

I have executed this judgment as follows:

Defendant delivered on _____ to _____ a _____,
with a certified copy of this judgment.

_____
                    Brian Taylor
           Acting United States Marshal

By     _____
                    Deputy Marshal

**A244**

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

### United States District Court

District of Connecticut

Caption:

United States of America v.

Jesse C. Litvak

Docket No.: 3:13cr19

Janet C. Hall
(District Court Judge)

Notice is hereby given that Jesse C. Litvak appeals to the United States Court of Appeals for the Second Circuit from the judgment ✓ , other _____
(specify)

entered in this action on May 2, 2017 .
(date)

This appeal concerns: Conviction only |___| Sentence only |___| Conviction & Sentence |✓| Other |___|

Defendant found guilty by plea | | trial |✓| N/A [ .

Offense occurred after November 1, 1987? Yes |✓| No [___ N/A [___

Date of sentence: April 26, 2017 N/A |__|

Bail/Jail Disposition: Committed |✓| Not committed | N/A |

Surrender date set not sooner than September 11, 2017 and not later than September 22, 2017.

Appellant is represented by counsel? Yes ✓ | No | If yes, provide the following information:

Defendant's Counsel: Adam D. Harber

Counsel's Address: Williams & Connolly LLP, 725 12th St. NW

Washington, DC 20005

Counsel's Phone: 202 434 5820

Assistant U.S. Attorney: Jonathan N. Francis

AUSA's Address: Connecticut Financial Center, 157 Church Street

New Haven, CT 06510

AUSA's Phone: 202 821 3811

Signature

**A245**

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2017, a copy of this memorandum was uploaded to and filed with the CM/ECF System for the United States District Court for the District of Connecticut, which served a courtesy copy on all counsel in the case.

/s/ C.J. Mahoney



**U.S. Department of Justice**

United States Marshals Service

*District of Connecticut*
*US Marshals Services*

*LETTER SHEET*

*New Haven, CT 06510-2030*

05/19/17

Attorney: Dane Butswinkas/C.J. Mahoney

Self-Surrender of: Jesse Litvak

Dear Atty. Butswinkas/Mahoney

This letter will confirm procedures necessary to effect the Self-Surrender of the above named subject who is your client.

It is the understanding of all parties that the above named subject will surrender under his/her own power and his/her own expense to the facility determined by the **Bureau of Prison,** on or before the time indicated below:

DESIGNATED TO: Pensacola          110 RABY AVE PENSACOLA, FL  32509

SELF-SURRENDER ON:     9/12/17      NLT. 12:00 PM

All pertinent documentation related to the above mentioned Self-Surrender has been forwarded to the designated facility. To acknowledge notification, please sign, and fax or email this cover sheet to the U.S. Marshal Criminal Desk's New Haven office.

If you have any questions concerning your client's self-surrender location, please contact the **Bureau of Prison**. The Bureau of Prisons has information regarding facility locations, policies and procedures at www.bop.gov.

Sincerely,

J. Hilaire
Criminal Program Specialist
United States Marshals Service
District of Connecticut
James.hilaire@usdoj.gov
Fax (203) 773-2419

**A247**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:13CR19(JCH) |
| | : | |
| v. | : | |
| | : | |
| JESSE C. LITVAK | : | May 19, 2017 |

## MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL

The United States submits this opposition to the defendant Jesse C. Litvak's motion for

release pending appeal [Doc. #551]. Because Litvak has not raised a substantial question of law

or fact, and none of his arguments is likely to result in reversal or an order for a new trial, he has

not met the statutory requirements for bail pending appeal. His motion should be denied.

## LEGAL STANDARD

Under 18 U.S.C. § 3143(b), a district court must order a convicted defendant detained

pending appeal unless it determines that (1) there is clear and convincing evidence "that the

defendant is not likely to flee or pose a danger to the safety of any other person or the

community if released"; (2) "the appeal is not for purpose of delay"; (3) "the appeal raises a

substantial question of law or fact"; and (4) if the appeal is decided in the defendant's favor, it is

"likely to result in reversal or an order for a new trial." *See United States v. Randell*, 761 F.2d

122, 124-25 (2d Cir. 1985). A "substantial question" is one that is "close" or "very well could be

decided the other way." *Id.* at 125 (quotation marks omitted). If the Court finds that a question

to be "substantial," it must then determine "whether that question is so integral to the merits of

the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely

to require reversal of the conviction or a new trial." *Id.* (quotation marks omitted). The

defendant bears the burden of establishing all of the criteria for release pending appeal. *Id.*; *see*

*also United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004) (recognizing statutory "presumption in favor of detention" following conviction).

## ARGUMENT

In his short memorandum, Litvak merely lists (without arguing) nine purported errors by the Court. Under the applicable standards of review, none is a "close" or "fairly debatable" question of law or fact, and none is likely to result in the Second Circuit reversing or ordering a third trial.

### A. The Government's Evidence Was Sufficient

First, Litvak states that there was insufficient the evidence for his conviction on Count Four. Litvak is wrong, and clearly so.

A defendant bears a "heavy burden" given the "exceedingly deferential standard of review" applied by the Court of Appeals to sufficiency claims. *United States v. Anderson*, 747 F.3d 51, 59 (2d Cir. 2014) (citations and quotation marks omitted). After viewing "the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government," a court "must uphold a conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Anderson*, 747 F.3d at 59-60 (emphasis in original, quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), *inter alia*). "[T]he only question under *Jackson* is whether that finding [of guilt] was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam).

The Government's evidence to convict on Count Four plainly met this standard. The Court evaluated Litvak's motion for judgment of acquittal—which focused exclusively on materiality—in its April 17, 2017 Ruling Re: Motion For Judgment Of Acquittal Or, In The Alternative, A New Trial [Dkt. 533]. The Court's decision summarized the relevant evidence,

applied the appropriate law, and reached a reasoned result.  Given the Second Circuit's prior decision in this case concerning the sort of victim testimony that is sufficient to establish materiality, *United States v. Litvak*, 808 F.3d 160, 175-76 (2d Cir. 2015), Litvak could never overcome his heavy burden of demonstrating that there was insufficient evidence of materiality on this record.

Accordingly, an appeal based on the sufficiency of the evidence will not raise a substantial question of fact or law.

### B.     The Court's Evidentiary Rulings Were Correct

Next, Litvak states that the Court abused its discretion in four evidentiary rulings: 1) allowing testimony that victims perceived Litvak to be acting as their agent; 2) admitting evidence regarding victims' investors; 3) precluding evidence regarding conduct at other broker-dealers without either the victims' or Litvak's knowledge; and 4) excluding evidence regarding the Government's investigative techniques.  The Court's ruling on each of these was proper, but even if not, any error was harmless.

A district court's evidentiary rulings are afforded great deference in recognition of its "superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice."  *United States v. Abu-Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010). The Court of Appeals "will reverse an evidentiary ruling only for abuse of discretion, which [it] will identify only if the ruling was arbitrary and irrational."  *Id.* (quotations and citations omitted).  "Errors are not grounds for reversal if they are harmless, i.e., if there is 'fair assurance' that the 'judgment was not substantially swayed by the error.'"  *United States v. Gonzalez*, 764 F.3d 159, 168 (2d Cir. 2014) (citation omitted).

Litvak's four evidentiary issues were the subject of motions in limine that were analyzed by the Court at length in its June 26, 2016 Ruling Re: Motions In Limine [Dkt. #432].  In each

instance, the Court applied well-established evidentiary law to a set of facts that it was uniquely well-suited to evaluate, given its understanding of the evidence from Litvak's first trial. In some respects, the Court even agreed with Litvak's arguments on these motions, granting each motion in part and denied it in part. None of the Court's rulings was "arbitrary and irrational," but even if any were, none imposed such a grievous handicap on Litvak as to give rise to a "fair assurance" that the jury's verdict was "substantially swayed by the error."

Accordingly, an appeal based on Litvak's evidentiary complaints will not raise a close question, and is unlikely to result in reversal or a new trial.

### C. The Jury Charge Was An Accurate Statement Of The Law

Next, Litvak states that the Court erred in instructing the jury on the elements of securities fraud. At trial, Litvak raised only four objections to the Court's jury charge. *See* Trial Tr. at 1516:4-23. Read as a whole, the Court's jury instructions properly stated the law.

The Court of Appeals reviews jury instructions to which a defendant objected *de novo*. *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). If there is error, the Court of Appeals will vacate a criminal conviction only if the error prejudiced the defendant by misstating the law. *United States v. Ferguson*, 676 F.3d 260, 275 (2d Cir. 2011). Instructions are reviewed in their entirety to determine "whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." *United States v. Weintraub*, 273 F.3d 139, 151 (2d Cir. 2001). Even if a particular instruction or portion thereof is deficient, the Court of Appeals reviews "the entire charge to see if the instructions as a whole correctly comported with the law." *United States v. Jones*, 30 F.3d 276, 283 (2d Cir. 1994).

Here, the Court meticulously crafted its charge to the jury. It was based on a charge which the Second Circuit had examined and found (at least in relevant part) to be proper; it incorporated nearly verbatim the statement of the law of materiality from binding cases; it was

the result of an iterative process that accommodated the parties' views. Indeed, the Court even went so far as to create a fourth element of securities fraud to oblige the defense's focus on materiality. Litvak has previously admitted that three of his four arguments are at odds with Second Circuit law. Trial Tr. 686:19 - 692:10. Given the scrutiny applied by the Court and the parties (and the Second Circuit) to these jury instructions, the Court can be confident that the Court of Appeals will read the whole charge as an accurate statement of the law of securities fraud.

Accordingly, an appeal of the Court's jury instruction will not raise a close question, and is not likely to result in reversal or a third trial.

### D. The Court's Sentencing Process and Decision Were Not Erroneous

Finally, Litvak states that the Court erred in three respects in his sentencing: 1) in its guidelines calculations; 2) in failing to take into account the nine counts of acquittal; and 3) in imposing a more severe sentence than it did in 2014. The Court's decisions on these sentencing matters was within its discretion and consistent with the law, and thus did not raise a close question.

On appeal, a district court's sentencing decisions are reviewed for reasonableness under a "deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007); *see also United States v. Watkins*, 667 F.3d 254, 260 (2d Cir. 2012). "This form of appellate scrutiny encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). "A district court commits procedural error where it . . . makes a mistake in its Guidelines calculation . . . or rests its sentence on a clearly erroneous finding of fact." *Id.* at 190. "[W]hen conducting substantive review, [the Second Circuit] take[s] into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional

- 5 -

A252

advantages of the district court." *Id.* Appellate "review of a sentence for substantive reasonableness is particularly deferential" in part because of "a district court's unique factfinding position, which allows it to hear evidence, make credibility determinations, and interact directly with the defendant (and, often, with his victims), thereby gaining insights not always conveyed by a cold record." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012).

Before imposing sentence on Litvak, the Court conducted a nearly five-hour hearing, during which the parties elaborated on the factual and legal arguments raised in their thorough sentencing memoranda. The Court was uniquely suited to find the "facts relevant to sentencing by a preponderance of the evidence," *United States v. Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005), given its knowledge of the evidence adduced at Litvak's two trials and of the facts that had changed since his first sentencing. The Court applied those facts to determine the applicable sentencing range after deciding the contested guidelines issues, namely whether Litvak's nine acquitted and 65 uncharged fraudulent trades were "relevant conduct," whether he had caused "loss" amounting to more than $6.3 million, and whether he had 35 victims. Based on its consideration of all the facts regarding Litvak's background, character, and conduct, 18 U.S.C. § 3661, and the statutory sentencing factors, 18 U.S.C. § 3553(a), the Court chose to depart dramatically from the guidelines to impose a somewhat more severe sentence than Litvak originally received, based on the new facts which the Court identified. *Wasman v. United States*, 468 U.S. 559, 572 (1984) ("[A] sentencing authority may justify an increased sentence by affirmatively identifying relevant conduct or events that occurred subsequent to the original sentencing proceeding."); *United States v. Weingarten*, 713 F.3d 704, 714 (2d Cir. 2013) ("[w]e have previously found no reasonable likelihood of vindictiveness where the sentencing court 'predicated its increased sentence on events which occurred subsequent to the original sentencing

proceeding'"); *United States v. Coke*, 404 F.2d 836, 845 (2d Cir. 1968) ("[A]fter a retrial at the defendant's instance, the court may permissibly increase a sentence, just as it may reduce one, in light of his conduct since sentence was initially passed.").  The Court's sentencing was thus procedurally and substantively appropriate.

Accordingly, an appeal of the Court's sentencing will not raise a close question.

## CONCLUSION

None of the nine potential appellate issues identified by Litvak amounts to a substantial question of law or fact, and none is likely to result in a reversal of his conviction or remand for a new trial.  Because he has failed to satisfy the required statutory criteria for bail pending appeal, the Government respectfully requests that the Court deny Litvak's motion.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY
Federal Bar. No. ct16012
william.nardini@usdoj.gov
HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv07037
heather.cherry@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2017, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's CM/ECF System.


_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 3:13–cr–19 (JCH) |
| | : | |
| JESSE C. LITVAK, | : | JUNE 6, 2017 |
| Defendant. | : | |

## RULING RE: MOTION FOR RELEASE PENDING APPEAL (DOC. NO. 551)

## I.   INTRODUCTION

A federal jury found defendant Jesse Litvak ("Litvak") guilty of one count of securities fraud, while finding him not guilty of nine counts of securities fraud, on January 27, 2017.  See Jury Verdict (Doc. No. 510) at 1–2.  The court denied Litvak's Motion for Judgment of Acquittal or, in the Alternative, a New Trial, see generally Ruling Re: Mot. for J. of Acquittal or, in the Alternative, a New Trial ("Mot. for Acquittal Ruling") (Doc. No. 533), and sentenced Litvak to twenty-four months in prison, see Judgment (Doc. No. 542).  The court has ordered Litvak to surrender himself at a place and time designated by the Bureau of Prisons between September 11, 2017 and September 22, 2017.  See Tr. of Sentencing Hr'g (Doc. No. 539) at 176:10–176:16.  Litvak filed a Notice of Appeal from the Judgment of this court on May 3, 2017.  See generally Notice of Appeal (Doc. No. 546).

Litvak's Motion for Release Pending Appeal is currently pending.  See generally Mot. for Release Pending Appeal ("Motion") (Doc. No. 551).  The government has opposed Litvak's Motion, see generally Mem. in Opp'n to Def.'s Mot. for Release Pending Appeal ("Opp'n" or "Opposition") (Doc. No. 556), and Litvak filed a brief Reply, see Reply in Supp. of Mot. for Release Pending Appeal ("Reply") (Doc. No. 557) at 1.

For the reasons set forth below, Litvak's Motion is **DENIED**.

## II.    LEGAL STANDARD

The parties agree that section 3143(b) of title 18 of the United States Code

("section 3143(b)") sets forth the standard the court is to apply in ruling on the Motion.

See Mem. in Supp. of Mot. for Release Pending Appeal ("Mem. in Supp." or

"Memorandum") (Doc. No. 551-1) at 1; Opp'n at 1.  Section 3143(b) requires that the

court order the release of a defendant pending appeal if it finds:

> (A) by clear and convincing evidence that the person is not likely to flee or pose a
> danger to the safety of any other person or the community if released . . .; and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial
> question of law or fact likely to result in—
> > (i) reversal,
> > (ii) an order for a new trial,
> > (iii) a sentence that does not include a term of imprisonment, or
> > (iv) a reduced sentence to a term of imprisonment less than the total of the
> > time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1).

The Second Circuit has defined a "substantial question" as "one of more

substance than would be necessary to a finding that it was not frivolous," "a close

question or one that very well could be decided the other way."  United States v.

Randell, 761 F.2d 122, 125 (2d Cir. 1985) (quoting United States v. Giancola, 754 F.2d

898, 901 (11th Cir. 1985)); see also United States v. Perotti, No. 3:14–cr–215 (JAM),

2016 WL 6987069, at *1 (D. Conn. Oct. 25, 2016) (citing Randell, 761 F.2d at 125).  If

the court determines that a question is "substantial," within the meaning of

section 3143(b), it must then decide "whether that question is so integral to the merits of

the conviction on which [the] defendant is to be imprisoned that a contrary appellate

holding is likely to require reversal of the conviction or a new trial." Randell, 761 F.2d at 125 (quotation marks and citation omitted).

The burden of persuasion as to each element of section 3143(b) rests on the defendant. See id.; cf. United States v. Abuhamra, 389 F.3d 309, 317 n.5, 319 (2d Cir. 2004) (describing section 3143(b) as imposing a heavier burden than 18 U.S.C. § 3143(a), which "establishes a presumption in favor of detention" following conviction but before sentencing).

## III.  DISCUSSION

The government does not suggest that Litvak is likely to flee or that he poses any threat to the community if released.  The court agrees: Litvak has been free on bail for the last four years, and there has been no indication that Litvak was likely or intended to flee, or that he posed any risk to others in his community.[1]  Therefore, the issue before the court is whether the issues Litvak intends to raise in his pending appeal are "substantial" ones that justify release pending appeal.

Litvak lists nine "key issues that will be raised on appeal," each coupled with a cross-reference to arguments set forth in earlier briefing and court proceedings that he incorporates by reference.  See Mem. in Supp. at 1–2.  Notably, Litvak offers no new argument in his Memorandum as to the significance of the court's alleged errors: he simply claims error and points the court to arguments already considered and rejected by the court.

---

[1] There was an incident concerning a victim that occurred while Litvak's first appeal was pending. However, the court does not view that as raising at this point a question of whether Litvak is a "risk" to others' safety.

A258

None of the questions Litvak raises are "substantial" ones justifying release pending appeal.

A.    Sufficiency of the Evidence

First, Litvak suggests that the question of whether the evidence was sufficient for the jury to return a guilty verdict on Count Four is a substantial one. See Mem. in Supp. at 1.  Not so.

In Litvak's first appeal, the Second Circuit noted that courts "must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." United States v. Litvak, 808 F.3d 160, 170 (2d Cir. 2015) (quoting United States v. Brock, 789 F.3d 60, 63 (2d Cir. 2015)).  "[T]he standard of review is exceedingly deferential."  Id. at 169 (quoting Brock, 789 F.3d at 63).

Applying the appropriate measure of deference to the jury's findings, the court has previously concluded that the evidence was more than sufficient for the jury to convict Litvak on Count Four.  See generally Mot. for Acquittal Ruling (Doc. No. 533) at 6–26.  The court will not repeat the multifarious reasons it has already rejected Litvak's arguments, particularly because Litvak has not offered any new ones. However, the court notes that it was not—and is not—of the view that the sufficiency question is a close one.  Though the evidence from the second trial alone must bear the weight of the conviction, the Second Circuit has made clear that, as a general matter, testimony from counterparties that they considered Litvak's statements "important" "precludes a finding that no reasonable mind could find Litvak's statements material."

See Litvak, 808 F.3d at 175–76 (citations omitted).  Such testimony was given at the second trial.

Therefore, the question of the sufficiency of the evidence is not a substantial one.

B.    Evidentiary Rulings

Litvak also suggests that several of this court's evidentiary rulings will be "key issues" on appeal, reflecting a belief that these alleged errors might support release pending appeal.  See Mem. in Supp. at 1–2.  Litvak believes the court: (1) should not have permitted testimony that victims perceived him as acting as their agent; (2) should not have admitted evidence regarding the identity of investors in Litvak's counterparties' funds; (3) should not have "exclude[ed] evidence of industry practice"; and (4) should not have "restrict[ed] the defense's cross-examination of Agent O'Connor."  See id.

The district court's evidentiary rulings are reviewed "under a deferential abuse of discretion standard," and will be disturbed "only where the decision to admit or exclude evidence was manifestly erroneous."  Litvak, 808 F.3d at 179 (quoting United States v. McGinn, 787 F.3d 116, 127 (2d Cir. 2015)).  "Moreover, even if a ruling was manifestly erroneous, [the circuit court] will still affirm if the error was harmless."  Id. (quoting McGinn, 787 F.3d at 127).  "[U]nder harmless error review, [the circuit court] ask[s] whether [it] can conclude with fair assurance that the errors did not substantially influence the jury."  Id. at 184 (quoting United States v. Gupta, 747 F.3d 111, 133 (2d Cir. 2014)).

The court has already conducted a thorough review of each of Litvak's evidentiary arguments.  See generally Ruling Re: Mots. in Limine (Doc. No. 432).  In each case, the court applied the relevant statutes, Federal Rules of Evidence, and case

law to the facts of this case, with which it was already quite familiar.  As the government

points out, "[i]n some respects, the [c]ourt [ ] agreed with Litvak's arguments on these

motions, granting each motion in part and den[ying] it in part."  <u>See</u> Opp'n at 4.

Moreover, in the event any of the court's rulings could be considered "manifestly

erroneous," none of them could have "substantially influenced the jury," such that the

error would not be harmless.  <u>See</u> <u>Litvak</u>, 808 F.3d at 179, 184.

Therefore, the evidentiary issues Litvak plans to raise on appeal are not

"substantial" questions that justify release pending that appeal.

C.     <u>Jury Charge</u>

Next, Litvak states that he will renew his objections to the court's instructions to

the jury on the elements of securities fraud.  <u>See</u> Mem. in Supp. at 2.

The Court of Appeals will review "a claim of error in jury instructions de novo,

reversing only where, viewing the charge as a whole, there was prejudicial error."

<u>United States v. Sheehan</u>, 838 F.3d 109, 121 (2d Cir. 2016) (quoting <u>United States v.</u>

<u>Aina-Marshall</u>, 336 F.3d 167, 170 (2d Cir. 2003)).  The Second Circuit has further

explained this standard of review:

> In conducting that review [of claimed error in jury instructions], we examine the
> charge as a whole to see if the entire charge delivered a correct interpretation of
> the law.  An erroneous instruction, unless harmless, requires a new trial.  An
> error is harmless only if it is clear beyond a reasonable doubt that a rational jury
> would have found the defendant guilty absent the error.

<u>United States v. Sheehan</u>, 838 F.3d 109, 121 (2d Cir. 2016) (quotation marks and

citations omitted).

The court has repeatedly considered and rejected Litvak's claims of error in the

jury instructions, many of which posit arguments that are directly contrary to Second

Circuit precedent.  See, e.g., Mot. for Acquittal Ruling at 25–26.  As such, Litvak has not carried his burden in persuading the court that error(s) in the jury instructions give rise to a substantial question likely to result in reversal of his conviction.

        D.     <u>Sentencing</u>

Finally, Litvak alludes to three alleged errors in the sentence imposed on him as justification for release pending appeal: (1) that the court erred in its determination of "relevant conduct" and "loss" in calculating the Sentencing Guidelines, and by considering acquitted conduct; (2) that the court did not adequately consider the jury's acquittal on nine of the ten securities fraud counts in determining a proper sentence; and (3) that the court erred by imposing a more severe sentence than it did after the first trial.  <u>See</u> Mem. in Supp. at 2.

So long as a district court complies with the procedural requirements in sentencing proceedings, the court will "set aside a district court's <u>substantive</u> determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions."  <u>United States v. Cavera</u>, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quotation marks and citation omitted).  "A district court commits procedural error where it fails to calculate the Guidelines range . . . , makes a mistake in its Guidelines calculation, or treats the Guidelines as mandatory."  <u>Id.</u> at 190 (citations omitted).  "It also errs procedurally if it does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact" or if it "fails adequately to explain its chosen sentence . . . ."  <u>Id.</u> (citations omitted).  The Circuit Court will identify as substantively unreasonable "only those sentences that are so 'shockingly high, shockingly low, or otherwise unsupportable as a matter of law' that

allowing them to stand would 'damage the administration of justice.'" United States v. Broxmeyer, 699 F.3d 265, 289 (2d Cir. 2012) (quoting United States v. Rigas, 583 F.3d 108, 123 (2d Cir. 2009)).

The court conducted a lengthy hearing before imposing sentence on Litvak, at which it heard argument (in addition to receiving written briefing) and ultimately rejected many of Litvak's legal arguments. The court also made many factual findings that were not favorable to him. However, based on controlling law, there is not a substantial question that the court erred in determining the "relevant conduct" and "loss" for the purposes of the Sentencing Guidelines or by considering acquitted conduct.[2]

Regarding the court's alleged failure to consider the fact that the jury acquitted Litvak, that argument is entirely belied by the court's explicit discussion of that fact throughout the lengthy Sentencing Hearing and specifically in imposing sentence. See, e.g. Tr. of Sentencing Hr'g (Doc. No. 539) at 166:19–167:10.

Finally, Litvak suggests he should be released pending appeal because the court "erred in imposing a sentence more severe than the one it imposed in 2014." See Mem. in Supp. at 2. There is no substantial question that where, as here, there are different facts before the court when sentencing a defendant for a second time, the court may impose a greater sentence. See Wasman v. United States, 468 U.S. 559, 572 (1984) ("[A] sentencing authority may justify an increased sentence by affirmatively identifying

---

[2] Relatedly, the court sentenced Litvak to a term of incarceration well below that suggested by the Guidelines, the calculation of which was driven in large part by the loss table. Cf. Tr. of Sentencing Hr'g (Doc. No. 539) at 89:12–89:15 (expressing view of court that "the guideline [range is] not as helpful as it might otherwise be in some other cases").

relevant conduct or events that occurred subsequent to the original sentencing proceedings." (citation omitted)).  Even the case Litvak cites is consistent with this proposition.  See United States v. Bryce, 287 F.3d 249, 256 (2d Cir. 2002) ("When a court increases a defendant's sentence after appeal without new evidence or information, a presumption of vindictiveness applies that can be overcome by objective information in the record justifying the increased sentence." (emphasis added) (citation omitted)).  The court extensively discussed circumstances that had changed between the sentencing after the first trial and the one after the second, and on the ways those changed circumstances informed the sentence ultimately imposed.  See Tr. of Sentencing Hr'g at 165:17–168:22, 169:16–170:20, 171:5–171:23.

In any event, the court imposed the same term of incarceration after the second trial as it did after the first: twenty-four months.  Compare Judgment (Doc. No. 275) at 1, with Judgment (Doc. No. 542) at 1.  The only portion of the sentence that was "more severe" was the fine amount.  It is somewhat unclear why, even if the court erred in imposing a greater fine, Litvak believes the Court of Appeals would order "(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."  See 18 U.S.C. § 3143(b)(1)(B).  Regardless, the court carefully considered the factors relevant to imposition of a fine as well as the changed circumstances that justified the higher fine. See Tr. of Sentencing Hr'g at 165:11–165:16, 171:5–171:23.

## IV.    CONCLUSION

Litvak suggests that the issues he intends to raise in his pending appeal "are at least as 'substantial' as those he raised in the first, when the Second Circuit granted his request for release pending appeal." Mem. in Supp. at 1. He also claims that release pending appeal "is particularly compelling in this case, given its history . . . ." Id. at 2. As evidenced by the Circuit's holding in Litvak's first appeal, that appeal was meritorious. Nevertheless, there has not been any indication that the court did not comply with the Circuit's instructions on remand. Thus, the fact that the Circuit granted him release during the pendency of his first appeal is not relevant now: the issues he intends to raise on appeal are different from those in the first appeal.

However much Litvak believes he will succeed on this appeal, release during the appeal's pendency is not appropriate, unless he can satisfy the criteria set out in section 3143(b). For the reasons set forth above, this court does not conclude that he has done so. Therefore, Litvak's Motion for Release Pending Appeal (Doc. No. 551) is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 6th day of June, 2017.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for defendant-appellant Jesse C. Litvak and a member of the Bar of this Court, certify that, on June 30, 2017, a copy of the attached Motion for Release Pending Appeal was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

/s/Kannon K. Shanmugam
KANNON K. SHANMUGAM

JUNE 30, 2017